## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

RIVERKEEPER, INC.,

                Plaintiff,

    v.

ANTHONY TRISTANI,

                Defendant.

---------------------------------------------------------------

Case No. 1:20-cv-5071

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)

---

Plaintiff Riverkeeper, Inc., by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.    This action is brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act," "CWA," or "the Act"), to address and abate Defendant's ongoing and continuous violations of the Act.

2.    Defendant, and companies that Defendant controls, discharge polluted industrial stormwater from a waste trucking facility located at 860 Humboldt Street, Brooklyn, NY 11222 (the "Facility") into Newtown Creek in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit").

3.      Defendant's violations of the General Permit and the Clean Water Act include discharges of polluted stormwater and other pollution that are not authorized by the General Permit, and inadequate pollution control measures and pollution prevention plans.

4.      Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into Newtown Creek, the New York Harbor, Long Island Sound and other receiving waters in this District.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.      Defendant's stormwater discharges contribute to this endemic stormwater pollution problem.  Defendant and Defendant's companies engage in industrial activities such as the collection of commercial waste, scrap metal, paper, and other recyclables and wastes, and outdoor storage of waste containers, trucks, and vehicle maintenance.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby waters.  Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow these water bodies a

fighting chance to regain their health.

## II.

### JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

7.     On January 31, 2020, Riverkeeper provided notice of Defendant's violations of the Act and of its intention to file suit against Defendant to Defendant; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Riverkeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

8.     More than sixty days have passed since the notice letter was served on Defendant and the State and federal agencies.  Riverkeeper has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

9.     Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

10.     This action is not barred by any prior administrative penalty action under CWA

Section 309(g), 33 U.S.C. § 1319(g).

11.    Venue is proper in the United States District Court for the Eastern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

**III.**

**PARTIES**

12.    Plaintiff Riverkeeper, Inc. ("Riverkeeper") is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York.  Riverkeeper's mission includes safeguarding the ecological and biological integrity of the Hudson River and its tributaries.  Riverkeeper was originally founded by the Hudson River Fisherman's Association, a group of fishermen concerned about the ecological state of the Hudson River, and the effect of its polluted and degraded condition on fish. Riverkeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums.  Riverkeeper has more than 3,400 members, many of whom reside near to, use and enjoy the Hudson River and the waters and tributaries of New York Harbor, including more than one hundred members that live in close proximity to Newtown Creek and the East River, which are polluted by industrial stormwater runoff from the Defendant's Facility.

13.    Riverkeeper's members reside near to, use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting.  Many of Riverkeeper's members live near Newtown Creek, participate in community activities focused around Newtown Creek, and recreate upon and alongside the waters of New York Harbor, including Newtown Creek.  Water quality in Newtown Creek (and by extension, in New York Harbor) directly affects the health,

recreational, aesthetic, commercial, and environmental interests of Riverkeeper's members. Thus, the interests of Riverkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the General Permit. The relief sought herein will redress the harms to Riverkeeper caused by Defendant's activities.

14.     The relief sought herein will redress the harms to Riverkeeper and its members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Riverkeeper and its members, for which harm they have no plain, speedy, or adequate remedy at law.

15.     Riverkeeper brings this action on behalf of itself and its members. Riverkeeper's interest in reducing Defendant's discharges of pollutants into Newtown Creek and requiring Defendant to comply with the requirements of the General Permit are germane to Riverkeeper's purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Riverkeeper.

16.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Anthony Tristani controls and is the chief executive officer and/or owner of Cogent Waste Solutions LLC, an entity incorporated under the laws of the State of New York on March 21, 2019.

17.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Anthony Tristani controls and is the chief executive officer and/or owner of 854 Humboldt Realty LLC, an entity incorporated under the laws of the State of New York on May 22, 2009.

18.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Anthony Tristani is or was the chief executive officer and/or owner of Five Star Carting LLC, an entity incorporated under the laws of the State of New Jersey and authorized to do business in

the State of New York under the name Five Star Carting NY, LLC.

19.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Anthony Tristani is or was the chief executive officer and/or owner of Five Star Carting Inc., an entity incorporated under the laws of the State of New York.

20.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Anthony Tristani is or was the chief executive officer and/or owner of Rapid Processing LLC, an entity incorporated under the laws of the State of New York.

21.     Riverkeeper is informed and believes, and thereupon alleges, that the entities Five Star Carting LLC and/or Five Star Carting Inc. and/or Rapid Processing LLC owned and operated the Facility from at least January 1, 2015 through at least May 4, 2017.

22.     Riverkeeper is informed and believes, and thereupon alleges, that from mid-2017 through late 2019, the Facility was owned by Armada Waste NY LLC f/k/a GPB Waste NY LLC d/b/a Five Star Carting, an entity incorporated under the laws of the State of New York. Through that period, Defendant Anthony Tristani continued to operate or manage the Facility.

23.     Riverkeeper is informed and believes, and thereupon alleges, that 854 Humboldt Realty, LLC is and has been the owner of the real property located at 860 Humboldt Street, Brooklyn NY 11222 (Block 2582, Lot 105) since at least January 31, 2020.

24.     Riverkeeper is informed and believes, and thereupon alleges, that Cogent Waste Solutions LLC is and has been the operator of the waste transportation facility located at 860 Humboldt Street, Brooklyn NY 11222 (the "Facility") since at least January 31, 2020.

25.     Riverkeeper is informed and believes, and thereupon alleges, that Defendant Anthony Tristani is and has been the person responsible for Clean Water Act compliance at the Facility for all time periods relevant to the allegations in this complaint.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

26.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

27.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  An NPDES permit requires dischargers of pollution to comply with various limitations.

28.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

29.     In New York, DEC has been delegated the authority to issue NPDES permits.  Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

### Stormwater Permits

30.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress

enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

31.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

32.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

33.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

## New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

34.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, N.Y. DEP'T ENVTL. CONSERVATION (Mar. 1, 2018) ("General Permit").  DEC also has the authority to issue SPDES permits for individual applicants.

35.     Under the General Permit, permittees must comply with federal technology-based standards.  The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).   In turn, the Act's technology-based standards

dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  Id. § 1311(b)(2)(E).[1]  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

36.     Accordingly, as a state-issued, delegated NPDES permit, the General Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT") standards for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") standards for conventional pollutants.  *See* General Permit Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice.").

37.     The General Permit also ensures compliance with state water quality standards. The Clean Water Act requires that any NPDES permit issued by a state contain any further limits necessary to ensure compliance with a state's water quality standards.  *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards") and 1342(b)(1)(A) (requiring compliance with "any

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

applicable requirements" of 33 U.S.C. § 1311).  *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

38.    Accordingly, as a state-issued, delegated NPDES permit, the General Permit prohibits permittees from causing or contributing to violations of water quality standards.  *See* General Permit Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700-705."); II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

### The General Permit Framework

39.    The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision.  *See* 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title[.]").

40.    At the outset, the General Permit establishes eligibility conditions that Permittees must meet in order to obtain coverage.  General Permit, Part I. Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent.  General Permit, Part I.D.

41.    Among other things, when submitting a Notice of Intent the applicant must identify the specific outfalls through which it will discharge industrial stormwater.  A permittee

may only lawfully discharge stormwater associated with industrial activity from these outfalls. General Permit, Parts I.D.3 and I.F.

42.     Next, the General Permit also contains a variety of substantive limits that all permittees must meet (*see* General Permit Part II).  These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and narrative effluent limitations that impose compulsory pollution control and minimization practices.  *See* General Permit, Part II.

43.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  *See* General Permit, Part VII.  Although permittees may have a primary industrial activity occurring at their site, they are required to comply with all conditions of the General Permit pertaining to any other industrial activities occurring at their facility too, referred to as "co-located" activities.  *Id.*  ("Stormwater discharges from co-located industrial activities are authorized by this permit, provided that the owner or operator complies with any and all of the requirements applicable to each industrial activity at the facility.").

44.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  *See* General Permit Part II.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).  The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good

engineering practices, to meet the effluent limits contained in the General Permit.  General Permit, Part II, Part III.A.7.

45.     A permittee must record the BMPs and controls measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  General Permit, Part III.  The owner or operator must develop, implement, and continually update the plan. General Permit, Part III.  The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit.  *Id*. Further the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit – a fully implemented SWPPP is a precondition of coverage.  General Permit, Part I.D.1.a.

46.     Permittees must also track, improve upon and report upon their performance under the General Permit.  The General Permit requires regular inspections, monitoring and sampling of stormwater discharges, periodic reporting, and corrective action to reduce pollution when necessary.  *See* General Permit Parts IV-VI.

47.     The General Permit also relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (benchmarks) for each pollutant, in order to ensure that permittees are complying with the limits set forth in the General Permit.  *See* General Permit, Part VII (adopting sector-specific benchmarks for each category of permittees).

48.     A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." General Permit, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention

plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

49.     Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), vacated on other grounds, 485 U.S. 931 (1988).

### Key Conditions of the General Permit

50.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case.

51.     In order to minimize pollution, the General Permit requires Defendant to keep clean all exposed areas that are potential sources of pollutants.  General Permit, Part II.A.2.

52.     The General Permit requires Defendant to sweep or vacuum exposed areas at regular intervals; store materials in containers; keep dumpsters lidded at all times; and prevent the introduction of floatable debris in surface waters of the state by keeping exposed areas clear of waste and intercepting waste.  General Permit, Part II.A.10.

53.     The General Permit requires Defendant to minimize off-site tracking of materials to prevent pollution.  General Permit, Part II.A.11.

54.      The General Permit prohibits any discharge that may cause or contribute to a violation of New York's water quality standards.  General Permit, Part II.C.1.c.

55.     Defendant's SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  General Permit, Part III.A.

56.     Part VII of the General Permit also imposes other requirements on Defendant based on its specific industrial activities, including but not limited to the following: annual training (at a minimum) that covers good housekeeping practices, confining vehicles awaiting maintenance with actual or potential leaks to designated areas, and cleaning pavement surface to remove oil and grease.  General Permit, Part VII.P.

57.     Part IV of the General Permit obliges industrial dischargers to conduct an annual comprehensive site inspection of a facility that includes evaluation of areas where industrial materials or activities are exposed to precipitation or where spills and leaks have occurred within the past three years.  General Permit, Part IV.A.1.  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected. Records of this inspection must be kept for five years.  General Permit, Part IV.A.2.

58.     In addition, qualified facility personnel must carry out routine inspections at least quarterly.  General Permit, Part IV.B.  During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.  Such deficiencies must then be addressed through corrective actions.  General Permit, Part V.

59.     The General Permit requires industrial dischargers to monitor a facility, sample stormwater discharges, and submit complete and accurate reports to DEC.  General Permit, Parts IV, VI, Appendices H.8.g, H.9.  The required reporting includes an annual report and periodic discharge monitoring reports.  General Permit, Part VI.A.1 and A.2.  Additionally, when there is an exceedance of a numeric effluent limit or of a benchmark that applies to the impairing pollutant discharged to an impaired waterbody, a discharger must report on the exceedance event and corrective actions taken in response.  General Permit, Part VI.A.2(b).

## Beneficial Uses of New York Surface Waters

60.     The DEC has classified the portion of Newtown Creek where the Facility discharges as a Class SD water.  6 N.Y.C.R.R. § 890.6.

61.     Under New York's water quality standards, a waterbody that is designated SD is meant to be suitable for fishing and for fish, shellfish, and wildlife survival, as well as for potential use for primary and secondary contact recreation.  6 N.Y.C.R.R. § 701.14.

62.     New York's water quality standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and hundreds of others.  *See generally* 6 N.Y.C.R.R. §§ 702, 703 (outlining quantitative and qualitative standards, respectively).   A waterbody must meet these numeric and narrative criteria in order to support its designated uses.  *See id.* §§ 702.2, 702.9.

63.     DEC has designated Newtown Creek and its tributaries as impaired pursuant to CWA Section 303(d) for failure to meet minimum water quality standards for a number of pollutants, including chemical oxygen demand and pathogens.  *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, N.Y. DEP'T ENVTL. CONSERVATION, 33 (Nov. 2016).

### CWA Citizen Enforcement Suits

64.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

65.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

66.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

67.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

68.     Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring before November 2, 2015 and up to $55,800 per day per violation for violations occurring after that date.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

### V.

### STATEMENT OF FACTS

### Defendant is Responsible for Clean Water Act Compliance at the Facility

69.     The Defendant Anthony Tristani is and has been the person who controls industrial operations at the Facility at all times relevant to the allegations in the complaint.

70.     Accordingly, Defendant is and has been responsible for Clean Water Act compliance at the Facility at all times relevant to the allegations in the complaint.

**Industrial Activities at the Facility Expose Pollutants to Stormwater**

71.     The activities and practices of the various entities controlled by Defendant that have or are operating the Facility expose materials and pollutants to stormwater.

72.     Activities at the Facility include but are not limited to the collection of commercial waste, scrap metal, paper, and other recyclables and wastes, and outdoor storage of waste containers, trucks, and vehicle maintenance.  In carrying out these activities at the Facility, the entities engage in storing and handling materials in a manner that exposes pollutants to precipitation and snowmelt.  At the Facility, the stormwater discharged into Newtown Creek can bring solids that suspend or dissolve in stormwater, metals, hydraulic fluids, fuel, and other pollutants into Newtown Creek.

73.     At the Facility, trucks, dumpsters, roll-off containers, and other waste hauling equipment are stored uncovered and exposed to precipitation.

74.     Vehicles and industrial equipment at the Facility may expose many other pollutants to the elements, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids.

75.     Vehicles driving on and off the Facility or parked on the public street are point sources of pollution.

76.     Riverkeeper is informed and believes and alleges that the operation of the Facility generates particulate matter and liquids (i.e. "garbage juice") that are dispersed in and around the Facility.

**The Facility Discharges Polluted Stormwater Into Waters of the United States**

77.     With every rain storm or snow melt, polluted stormwater discharges from the Facility.  Stormwater containing the pollutants described above is conveyed off-site into waters of the United States through nearby drains that connect to the separate sewer system.

78.     The parts of the municipal separate storm sewer system ("MS4") into which the Facility discharges polluted stormwater run directly into Newtown Creek.

79.     Pollutants entering Newtown Creek also flow into the East River and New York Harbor.

80.     Newtown Creek, the East River, and New York Harbor are all "waters of the United States."

81.     Industrial activity at the Facility has caused and continues to cause a "discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12), and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Facility on at least each and every day that there has been a precipitation event greater than 0.1 inches.  (EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event)).

82.     Newtown Creek, the East River, and New York Harbor consistently fail to meet state water quality standards.

### Enforcement History at the Facility

83.     On information and belief, this Facility has been operated as a local waste hauling facility since at least 2010 by various entities controlled by Anthony Tristani.  Local transportation facilities operate under a primary Standard Industrial Classification ("SIC") Code of 4212, and therefore require coverage under the General Permit in New York State.

84.     In 2016, Riverkeeper learned that the Facility was operating without coverage under the General Permit.  At that time, the Facility was owned and operated under the business

name "Five Star Carting" by Rapid Processing LLC, Five Star Carting LLC d/b/a Five Star

Carting NY LLC, and/or Five Star Carting Inc.  Anthony Tristani was a corporate officer and/or

owner of each of these entities, and was the officer principally responsible for Clean Water Act

compliance at the Facility.

85.     Accordingly, on June 28, 2016, Riverkeeper sent a notice of intent to sue Five

Star Carting Inc., Five Star Carting NY LLC, Five Star Carting LLC, and Rapid Processing LLC

(collectively, "Five Star") and Anthony Tristani as the responsible corporate officer.  A true and

correct copy of that notice letter is attached as Exhibit B, and is incorporated by reference.

86.     After the 60-day notice period expired, on September 8, 2016, Riverkeeper filed

suit against Five Star and Anthony Tristani, alleging that they were discharging polluted

industrial stormwater from the Facility into Newtown Creek without a valid NPDES permit, in

violation of Sections 402(p) of the CWA, 33 U.S.C. §§ 1342(p), and 40 C.F.R. §§ 122.26(c)(1)

and (e)(1).  *See Riverkeeper, Inc. v. Five Star Carting, Inc.*, No. 16-cv-5008, ECF 1 (E.D.N.Y.

Sept. 8, 2016).

87.     On May 4, 2017, the Court entered a Consent Decree between Riverkeeper and

Five Star in settlement of Riverkeeper's claims.  A true and correct copy of that Consent Decree

is attached as Exhibit C, and is incorporated by reference.

88.     The Consent Decree imposed several substantive and procedural requirements

upon Five Star to ensure the Facility was operated in compliance with the General Permit and the

Clean Water Act.  These requirements included obtaining coverage under the General Permit,

implementing and operating in accordance with a mutually-approved Stormwater Pollution

Prevention Plan ("SWPPP"), providing Riverkeeper with copies of all documents related to

water quality or Clean Water Act compliance, conducting sampling of the Facility's outfalls

within 60 days, and notifying Riverkeeper of any structural changes made to the Facility.

89.     The Consent Decree also required Five Star to notify Riverkeeper of any transfer of ownership or control of the Facility to a non-party.

90.     In consideration for compliance with the Consent Decree, Riverkeeper agreed to voluntarily dismiss Defendant Anthony Tristani from that litigation.

91.     In approximately July 2017, without notifying Riverkeeper, Five Star transferred ownership of the Facility and all of its assets to GPB Waste NY LLC.  GPB Waste NY LLC subsequently changed its name to Armada Waste NY LLC.

92.     Although the Facility was owned by Armada Waste NY LLC f/k/a GPB Waste NY LLC, Defendant Anthony Tristani continued to serve as the Facility's principle manager, and the Facility continued to operate under the business name "Five Star Carting."

93.     During this period, as Riverkeeper later learned, Defendant Anthony Tristani discontinued the Facility's coverage under the General Permit, in violation of the Consent Decree, by submitting a Notice of Termination to DEC on September 5, 2018, in which Mr. Tristani affirmed, under penalty of law, that the Facility ceased operations as of October 1, 2017.

94.     Defendant Anthony Tristani's certification was false.

95.     In fact, the Facility continued to operate as a waste hauling facility without coverage under the General Permit, in violation of the Clean Water Act and the Consent Decree. The Facility also failed to operate in accordance with the SWPPP, and Defendant failed to conduct sampling, provide documents to Riverkeeper, and failed to notify Riverkeeper of necessary structural changes at the Facility.

96.     Upon learning of the transfer of ownership and other breaches of the Consent Decree, on January 31, 2020, Riverkeeper sent a "Notice of Violation of Consent Decree and

Intent to File Suit" to Anthony Tristani, GPB Waste NY LLC, and Armada Waste NY LLC. Exhibit A.  Therein, Riverkeeper alleged violations of the Consent Decree, alleging that the named entities were successors in interest to the Consent Decree.  Riverkeeper also provided notice of its intent to sue any operator that was not bound to the terms of the Consent Decree.

97.     In late 2019, Armada Waste NY LLC f/k/a GPB Waste NY LLC transferred ownership of the Facility to 854 Humboldt Realty LLC and operation of the Facility to Cogent Waste Solutions LLC.

98.     Defendant Anthony Tristani is currently the chief executive officer and/or owner of 854 Humboldt Realty LLC and Cogent Waste Solutions LLC.  Defendant Anthony Tristani remains the person responsible for Clean Water Act compliance at the Facility and has remained so throughout the various transfers of ownership of the Facility.

**Defendant's Coverage Under the General Permit at the Facility**

99.     On November 19, 2019, 854 Humboldt Realty LLC submitted a notice of intent for coverage under the General Permit.  Defendant did not provide Riverkeeper with notice of this application.

100.    On December 26, 2019, DEC sent a letter of acknowledgment confirming coverage under the General Permit at the Facility under Permit No. NYR00G336, effective December 21, 2019.

101.    On information and belief, Cogent Waste Solutions LLC has submitted a Notice of Intent for coverage under the General Permit, but DEC has not yet acknowledged receipt of this Notice of Intent.  Therefore, Cogent Waste Solutions LLC does not have coverage for its operation of the Facility under the General Permit.

102.    The General Permit requires a SWPPP to be fully implemented prior to applying

for coverage under the General Permit.

103.    On information and belief, the Facility is not operating in compliance with a fully implemented SWPPP, and is therefore ineligible for coverage under the General Permit.

104.    On information and belief, as of the date of filing of this complaint, the Facility still lacks valid permit coverage under the General Permit.

**Defendant's Inadequate Pollution Prevention Practices**

105.    On information and belief, Riverkeeper alleges that there are insufficient storm water control measures and best management practices ("BMPs") installed at the Facility.

106.    Riverkeeper has received reports and observations of visibly contaminated stormwater discharging from the Facility and into storm drains on adjacent streets.

107.    Riverkeeper is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated, or adequate storm water pollution treatment technologies to treat storm water once contaminated.

108.    On information and belief, Riverkeeper alleges that Defendant has not implemented an adequate SWPPP for the Facility.  The SWPPP does not set forth adequate site-specific BMPs, such as housekeeping measures, or adequate structural control measures, to be consistent with the Best Available Technology Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control Technology ("BCT") for the Facility, and to meet the General Permit's requirement to minimize pollutant discharges.  To the extent the SWPPP

contains adequate practices, it has not been fully implemented at the Facility.

109.    In addition, to the extent the Facility has valid coverage under Permit No. NYR00G336, Defendant is failing to comply with its terms.  On information and belief, Defendant failed to submit an Annual Certification Report for 2019, nor Discharge Monitoring Reports for the first three quarters of 2020, as required by the General Permit.  Riverkeeper therefore believes and alleges that Defendant failed to conduct the quarterly, periodic, and annual inspections and sampling required since obtaining coverage in December 2019.

110.    Defendant's violations of the CWA at the Facility are ongoing and continuous, are capable of repetition, and result from the same underlying and inadequately resolved causes.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### Unlawful Discharge of Pollutants
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

111.    Riverkeeper incorporates by reference all preceding paragraphs as if set forth herein.

112.    CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

113.    CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

114.    CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

115.     CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

116.     CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

117.     40 C.F.R. § 122.2 defines "waters of the United States" to include, *inter alia*: (i) "All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide"; (ii) "All interstate waters, including interstate 'wetlands'"; (iii) Tributaries to such waters; (iv) Wetlands adjacent to such waters or their tributaries; and (v) "All other waters . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."

118.     CWA Section 402(p), 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i), require facilities discharging stormwater associated with industrial activity to obtain a NPDES permit.

119.     Although Defendant purportedly has coverage under the General Permit through the entity 854 Humboldt Realty LLC, the Facility is not eligible for coverage unless an adequate SWPPP has been fully implemented.  General Permit Part I.D.1.

120.     On information and belief, an adequate SWPPP has not been fully implemented at the Facility, therefore the Facility is not eligible for coverage under the General Permit.

121.     Although Defendant has filed a notice of intent for coverage through the entity Cogent Waste Solutions LLC, that coverage is not yet effective as DEC has not provided a letter of acknowledgement.

122.     Defendant has discharged stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

123.     Defendant continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

124.     Each and every day on which Defendant discharges stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

125.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

126.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

127.     Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

128.     The General Permit, Parts II.D and VII, requires Defendant to implement mandatory general and sector-specific control measures and BMPs in order to minimize the discharge of pollutants from the Facility.

129.     Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including Best Management Practices (BMPs) selected and designed in accordance with Part II.D) that are technologically available and economically practicable and achievable in light of best industry practice."

130.    To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

131.    Riverkeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendant has not implemented adequate control measures or BMPs required by the General Permit.

132.    Because the industrial activities carried out at the Facility are categorized in SIC Code 4212, Defendant must implement the sector-specific control measures specified in Part VII of the General Permit for Sector P.

133.    Defendant has failed to implement control measures that meet the BAT and BCT standards at the Facility for its discharges of stormwater associated with industrial activity containing oil and grease, chemical oxygen demand, benzene, ethylbenzene, toluene, and xylene in violation of Parts II and VII of the General Permit.

134.    Each day that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the BAT and BCT requirements each day Defendant fails to develop and fully implement such technologies and practices at the Facility.

135.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

136.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop, Implement, and Maintain an
Adequate Storm Water Pollution Prevention Plan
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

137.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

138.    Part III of the General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan.

139.    As described in Part III.A.3 of the General Permit, the SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

140.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

141.    The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies.  Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

142.    The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

27

143.    Defendant has failed to develop, implement, and keep up to date an adequate SWPPP for the Facility.  The inadequacy of the SWPPP is evidenced by the inadequate stormwater control measures and BMPs at the Facility, as well as Defendant's failure to comply with the General Permit's reporting requirements.

144.    Each day that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and CWA § 301(a), 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the SWPPP requirements each day Defendant fails to develop and fully implement an adequate SWPPP for the Facility.

145.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

146.    Wherefore, Riverkeeper prays for relief as hereinafter set forth.

### FOURTH CAUSE OF ACTION
**Failure to Conduct Routine Site Inspections and Comply with
General Monitoring, Recordkeeping, and Reporting Requirements
(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

147.    Riverkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

148.    To the extent Defendant has had valid General Permit coverage under Permit No. NYR00G336 since December 21, 2019, Defendant is failing to abide by its terms.

149.    The General Permit requires facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

150.     Defendant failed to document and report discharges from the Facility in the first three quarters of 2020.

151.     Since December 21, 2019, Defendant has failed to conduct adequate annual comprehensive quarterly routine site inspections of the Facility.  The inadequacy of these inspections is evidenced by the failure to submit annual and semi-annual reports to DEC and the other indicators of inadequate stormwater control measures and BMPs identified above.

152.     Each and every day on which Defendant fails to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These failures are ongoing and continuous violations of the Act

153.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Riverkeeper, and its members, for which harm Riverkeeper has no plain, speedy, or adequate remedy at law.

154.     Wherefore, Riverkeeper prays for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

155.     Wherefore, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

    a.   Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

    b.   Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

c.   Order Defendant to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual SPDES permit that is at least as stringent);

d.   Order Defendant to take appropriate actions to remediate the harm caused by his violations of the General Permit and the Clean Water Act, to the extent possible;

e.   Order Defendant to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

f.   Order Defendant to pay the costs of litigation, including Riverkeeper's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

g.   Award any such other and further relief as this Court may deem appropriate.

156.   Alternatively, if Defendant has obtained valid General Permit coverage for its activities at the Facility, Riverkeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.   Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with the General Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to comply with the General Permit's inspection, monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant to provide Riverkeeper with reports documenting the quality and quantity of his discharges to waters of the United States and his efforts to comply with the Act and the Court's orders;

h.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for all violations occurring on or before November 2, 2015, and $55,800 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by his activities;

j.   Order Defendant to pay the costs of litigation, including Riverkeeper's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

k.   Award any such other and further relief as this Court may deem appropriate.

Exhibit A:  Notice of Intent to Sue Anthony Tristani (January 31, 2020)

Exhibit B:  Notice of Intent to Sue Five Star Carting Inc., Five Star Carting NY LLC, Five Star Carting LLC, Rapid Processing LLC, and Anthony Tristani (June 28, 2016)

Exhibit C:  Consent Decree, *Riverkeeper, Inc. v. Five Star Carting, Inc.*, No. 1:16-cv-05008-NG-

ST, ECF 17 (E.D.N.Y. May 4, 2017)

Dated this 22nd day of October, 2020          Respectfully submitted,

New York, New York

By:  /s/  *Julia Muench*

Edan Rotenberg

Julia Muench

SUPER LAW GROUP, LLC

180 Maiden Lane, Suite 603

New York, NY 10038

*Attorneys for Riverkeeper*

# EXHIBIT A

# SUPER LAW GROUP, LLC

January 31, 2020

**Via Certified Mail, Return Receipt Requested**

Lawrence R. Schillinger, Esq.      GPB Waste NY, LLC
PO Box 11182                       535 W. 24th Street
Albany, NY 12211                   New York, NY 10011

Anthony Tristani                   Armada Waste NY, LLC
58-35 47th Street                  1581 Franklin Avenue
Maspeth, NY 11378                  Mineola, New York, 11501

Re:   *Riverkeeper, Inc. v. Five Star Carting, Inc., Five Star Carting NY, LLC, Five Star
      Carting, LLC, Rapid Processing, LLC, and Anthony Tristani*,
      Case No. 16-cv-5008 – Notice of Violation of Consent Decree and Intent to File Suit.

Greetings,

       I am an attorney writing on behalf of Riverkeeper, Inc.  Pursuant to paragraph 42 of the
Consent Decree (Attachment 1) in the above-captioned case (Doc. No. 17), this letter provides
notice to Five Star Carting, Inc., Five Star Carting NY, LLC, Five Star Carting, LLC, Rapid
Processing, LLC, and Anthony Tristani, (collectively "Five Star"), and Armada Waste NY, LLC,
f/k/a GPB Waste NY, LLC ("Armada"), that you are in violation and breach of the Consent
Decree.

       On June 28, 2016, Riverkeeper notified Five Star of its intent to file suit (Attachment 2)
because Five Star was discharging polluted stormwater without a permit from two of Five Star's
local waste trucking facilities: the "Brooklyn Facility" (located at 860 Humboldt Street in
Brooklyn, NY) and the "Queens Facility" (located at 58-35 47th Street in Queens, NY).  Both
facilities were discharging into Newtown Creek.  Riverkeeper subsequently filed suit to enforce
the stormwater requirements of the Clean Water Act on September 8, 2016.

       In response, Five Star filed a Notice of Intent to seek coverage under New York's Multi-
Sector General Permit for the Brooklyn Facility, provided Riverkeeper with a Stormwater
Pollution Prevention Plan ("SWPPP") for the Brooklyn Facility, and contracted for truck
washing services at the Queens Facility.  The parties then negotiated a Consent Decree providing
for continued compliance with the Clean Water Act.  Five Star signed the Consent Decree on
December 9, 2016, and the Court entered the Consent Decree on May 4, 2017.

       As a preliminary matter, the Consent Decree provides that:

              This Decree shall be binding upon and inure to the benefit of the
              Parties  and  their . . .  successors . . .  and  permitted  assigns. . . .

Notice of Breach of Consent Decree and Intend to File Suit
January 31, 2020
Page 2

> Defendants shall notify Riverkeeper prior to any transfer of ownership or control of the Facility to a non-Party. Defendants agree that as a condition of transfer of ownership or control of the Facility, the new owner or operator shall be informed in writing of this Decree and of its requirements to comply with the Clean Water Act.

Consent Decree ("CD") ¶ 48–49. Five Star failed to notify Riverkeeper of its transfer of ownership and/or control of the Brooklyn Facility to Armada.[1] Accordingly, Five Star (and its successor Armada) is in breach of the Consent Decree.

The Consent Decree also outlined several requirements to ensure the Brooklyn Facility stayed in compliance with the Clean Water Act. As noted above, Armada, as successor to Five Star, any other successor or assign to Five Star, and/or any other entity currently operating the Brooklyn Facility (hereinafter, the "Operator") is bound to the Consent Decree. CD ¶ 48. These requirements include:

- Sample a qualifying storm event within 60 days of the entry of the Consent Decree by the Court, i.e., no later than July 3, 2017. CD ¶ 15. The Operator was then to make adjustments to its best management practices ("BMPs") according to the results of said sampling. CD ¶ 15. Sampling was then to continue at 90-day intervals until compliance with benchmarks was achieved. CD ¶ 16. The Operator was further required to provide Riverkeeper with the sample results within 10 days of such sampling, CD ¶ 22, a written Memorandum summarizing its response within 45 days, CD ¶ 17, and then additional summaries as necessary to keep Riverkeeper on notice of subsequent adjustments to the Brooklyn Facility's BMPs and SWPPP, CD ¶ 18. The Operator has failed to comply with these requirements, and is therefore in breach of the Consent Decree.

- Implement and comply with a SWPPP, Consent Decree ¶ 9, which is available as an attachment to the Consent Decree on the Eastern District of New York's e-filing system in Case Number 1:16-cv-05008 at Document 17 at https://www.nyed.uscourts.gov/. The SWPPP, in turn, requires:
  - the Operator to implement a stormwater discharge monitoring program, SWPPP §§ 10.2, 10.4, 10.6, 10.7; and

---

[1] In July 2017, PR Newswire reported that Five Star had been acquired by GPB Capital. *GPB Capital Grows Waste Management Market Share with Two NYC Acquisitions*, PR NEWSWIRE (July 27, 2017), https://prn.to/2u69Jhc. Furthermore, according to Five Star's website, Five Star's carting operation is registered with New York City's Business Integrity Commission ("BIC") as BIC # 491402. *About Us*, Five Star Carting, www.fivestarcarting.com/about/ (last visited January 30, 2020). According to BIC, that number is registered to GPB Waste NY, LLC, d/b/a Five Star Carting, as of April 3, 2017. *Trade Waste Hauler Licensees*, OPEN DATA – CITY OF NEW YORK (2020), https://data.cityofnewyork.us/City-Government/Trade-Waste-Hauler-Licensees/867j-5pgi/data. According to New York's Department of State, GPB Waste NY, LLC is the former entity name of the entity currently known as Armada Waste NY, LLC, with an initial filing date of September 23, 2016 and the name change registered on March 20, 2019. *Selected Entity Name: GPB Waste NY, LLC*, NY DEP'T OF STATE – DIV. OF CORPS. (Jan. 29, 2020), https://on.ny.gov/36FwtC6.

Notice of Breach of Consent Decree and Intend to File Suit
January 31, 2020
Page 3

      o   the Operator to file Annual Certification Reports and Discharge Monitoring Reports by their required deadlines, SWPPP § 10.8.

The Operator has failed to comply with these requirements of the SWPPP, and is therefore in breach of the Consent Decree.

- Provide to Riverkeeper copies of all documents related to water quality or Clean Water Act compliance regarding the Brooklyn Facility submitted to the U.S. Environmental Protection Agency ("EPA"), N.Y. Department of Environmental Conservation ("DEC"), and N.Y.C. Department of Environmental Protection ("DEP"). This requirement includes, but is not limited to, annual reports, monitoring or sampling data, all SWPPP revisions, data related to discharges to the sanitary sewer system, and any subsequent application for coverage under an individual stormwater discharge permit (a "NPDES" permit) or under a subsequently issued Multi-Sector General Permit. CD ¶ 26. The Operator has failed to comply with this requirement, and is therefore in breach of the Consent Decree.

- Provide to Riverkeeper evidence of all structural changes made to the Brooklyn Facility to achieve compliance with the Clean Water Act, as well as copies of all inspections and/or sampling, within 3 days of receipt of such evidence (or within 10 days of sampling, whichever was sooner). CD ¶ 22. The Operator was also to provide photographs of sampling and inspections required by the Multi-Sector General Permit to Riverkeeper. CD ¶ 23. The Operator has failed to comply with these requirements, and is therefore in breach of the Consent Decree.

Due to these breaches of the Consent Decree, Riverkeeper is unable to confirm the status of the Brooklyn Facility's compliance with the Clean Water Act. Accordingly, pursuant to paragraph 43 of the Consent Decree, Riverkeeper demands to initiate the Meet and Confer efforts required by the Dispute Resolution procedure in Section XI of the Consent Decree with Five Star, Armada, and any Operator of the Brooklyn Facility. This letter also provides notice pursuant to paragraph 42 that Riverkeeper intends to initiate court proceedings to address the aforementioned breaches of the Consent Decree. Should Five Star, Armada, and any Operator fail to Meet and Confer, Riverkeeper will move for contempt or other appropriate relief in the Eastern District of New York, seeking an order compelling Five Star, Armada, and any Operator to comply with the Consent Decree immediately and requiring Five Star, Armada, and any Operator to pay Riverkeeper's reasonable attorneys' fees incurred in obtaining such an order.

Furthermore, since Riverkeeper is unable to confirm the status of the Brooklyn Facility's compliance with the Clean Water Act, Riverkeeper believes and alleges that the current Operator of the Brooklyn Facility remains in violation of the Clean Water Act. In particular, Five Star filed a Notice of Termination with the DEC, ending its coverage under the Multi-Sector General Permit as of September 6, 2018.

Any unpermitted discharge of industrial stormwater by Five Star or one of its successors or assigns is a breach of the consent decree and of Section 301 of the Clean Water Act.

Notice of Breach of Consent Decree and Intend to File Suit
January 31, 2020
Page 4

Accordingly, to the extent that any Operator of the Brooklyn Facility is not bound by the Consent Decree, this letter constitutes notice of Riverkeeper's intent to file suit against the Operator pursuant to Clean Water Act Section 505(a), 33 U.S.C. § 1365(a), in order to enforce the Consent Decree and ensure that the Brooklyn Facility is operated in compliance with the Clean Water Act.  Riverkeeper hereby re-notices any and all Operators of the Brooklyn Facility of its intent to sue for the ongoing Clean Water Act violations occurring at the facility under the corresponding provisions of the Clean Water Act as outlined in the June 28, 2016 notice of intent to sue, attached hereto as Attachment 2.  All of the allegations contained in that letter are herein incorporated by reference, and Riverkeeper additionally alleges that the violations outlined therein persist to this day.

Please contact me at your earliest convenience. I hope we are able to resolve the above issues without engaging the District Court.

Sincerely,

/s/  Edan Rotenberg

Edan Rotenberg
*Attorney for Riverkeeper, Inc.*

Attachments:

1.  Entered Consent Decree, Doc. No. 17, *Riverkeeper, Inc. v. Five Star Carting, Inc., Five Star Carting NY, LLC, Five Star Carting, LLC, Rapid Processing, LLC, and Anthony Tristani*, No. 16-cv-5008 (E.D.N.Y. May 4, 2017).
2.  *Notice of Intent to Sue*, from Super Law Group o/b/o Riverkeeper Inc., to Five Star Carting, Inc., Five Star Carting NY, LLC, Five Star Carting, LLC, Rapid Processing, LLC, and Anthony Tristani (June 28, 2016).

CC:

Andrew Wheeler
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Peter D. Lopez
EPA Region 2 Administrator
U.S. Environmental Protection Agency
290 Broadway
New York, NY 10007-1866

Basil Seggos
Commissioner
N.Y. Dep't of Environmental Conservation
625 Broadway
Albany, NY 12233-1011

# EXHIBIT B

# SUPER LAW GROUP, LLC

June 28, 2016

 **Via Certified Mail, Return Receipt Requested**

Five Star Carting, Inc.
Five Star Carting NY, LLC
Five Star Carting, LLC
58-35 47th Street
Maspeth, New York 11378

Rapid Processing, LLC
860 Humboldt St
Brooklyn, New York 11222

Anthony Tristani
58-35 47th Street
Maspeth, New York 11378

Re:     Notice of Violation and Intent to File Suit under the Clean Water Act

Dear All:

We are writing on behalf of Riverkeeper, Inc.[1] ("Riverkeeper") to notify you of Riverkeeper's intent to file suit against Five Star Carting, Inc., Five Star Carting NY, LLC, Five Star Carting, LLC, Rapid Processing, LLC, and Anthony Tristani (together, "Five Star") pursuant to Section 505(a) of the federal Clean Water Act ("CWA")[2] for violations of the CWA.

Riverkeeper intends to file suit, as an organization and on behalf of its adversely affected members, in the United States District Court for the Eastern District of New York seeking appropriate equitable relief, civil penalties, and other relief no earlier than 60 days from the postmark date of this letter.[3]

Riverkeeper intends to take legal action because Five Star is discharging polluted stormwater from two of Five Star's facilities located near Newtown Creek in Brooklyn and Queens ("the Facilities") to the waters of the United States without a permit, in violation of Sections 301(a)

---

[1] Riverkeeper, Inc. is a not-for-profit environmental organization existing under the laws of the state of New York, headquartered in Ossining, New York.  Riverkeeper's mission includes safeguarding the environmental, recreational and commercial integrity of the Hudson River and its ecosystem, as well as the watersheds that provide New York City with its drinking water.  Riverkeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums.  Riverkeeper has more than 4,500 members, many of whom reside near to, use and enjoy the Hudson River and the waters and tributaries of New York Harbor, including Newtown Creek, Coney Island Creek, Jamaica Bay, and the Gowanus Canal; waters that are polluted by industrial stormwater runoff.

[2] 33 U.S.C. § 1365(a). We refer to statutory provisions by their section in the Clean Water Act and provide the parallel citation to the United States Code only on first reference.

[3] *See* 40 C.F.R. § 135.2(a)(3)(c) (notice of intent to file suit is deemed to have been served on the postmark date).

Notice of Violation and Intent to File Suit
June 28, 2016
Page 2 of 16

and 402(p)(2)(B) of the Clean Water Act.[4]   Further, Five Star has not at either Facility applied for coverage under, nor complied with the conditions of, an individual National Pollutant Discharge Elimination System ("NPDES") permit or the General Permit for the Discharge of Stormwater Associated with Industrial Activity ("General Permit")[5] issued by the New York State Department of Environmental Conservation ("DEC"), in violation of Sections 402(p), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

The street addresses of the Facilities are provided in government records as 58-35 47th Street, Queens, NY ("47th Street Site"), and 860 Humboldt Street, Brooklyn, NY ("Humboldt Street Site").   For clarity, the Facilities' location can be uniquely identified by tax block and lot numbers.   The Humboldt Street Site is at block 2582, lot 105.   The 47th Street Site is at block 2602, lot 35.   The waters of the United States that are polluted by the Facilities are for each, both Newtown Creek and the East River.

# I.

## BACKGROUND

With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into New York Harbor, Long Island Sound, and other receiving waters.   The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the marine environment each year.[6]

DEC has designated more than 7,000 river miles, 319,000 acres of larger waterbodies, 940 square miles of bays and estuaries, and 592 miles of Great Lakes shoreline in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation.[7]   For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.   Contaminated stormwater discharges can and must be controlled in order to improve the quality and health of these waterbodies.

Stormwater discharges flow from both Facilities through a separate sewer system into Newtown Creek and ultimately into the East River and New York Harbor.   DEC has classified Newtown

---

[4] 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B).

[5] New York State Department of Environmental Conservation, *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-12-001, (hereinafter "General Permit"), *available at* http://www.dec.ny.gov/chemical/9009.html.   This General Permit replaces earlier general permits for the discharge of stormwater associated with industrial activity.   It became effective on October 1, 2012, and will expire on September 30, 2017.

[6] Stormwater is water from precipitation events that flows across the ground and pavement after it rains or after snow and ice melt.   *See* 40 C.F.R. § 122.26(b)(13).

[7] *See* EPA, Watershed Assessment, Tracking and Environmental Results, New York Assessment Data for 2012, http://ofmpub.epa.gov/waters10/attains_state.report_control?p_state=NY&p_cycle=2012&p_report_type=A (last visited Aug. 4, 2015).

Creek as an SD water.[8]  Under New York's Water Quality Standards, a waterbody that is designated as SD is meant to be suitable for fishing and for fish, shellfish and wildlife survival.[9] The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others.  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.[10]

Newtown Creek, which is also a federally-listed Superfund site, consistently fails to meet state water quality standards; illegal stormwater discharges from these Facilities contribute to this failure.[11]  In the past, DEC has designated Newtown Creek as impaired pursuant to Section 303(d) of the CWA[12] for failure to meet minimum water quality standards due to high oxygen demand (low levels of dissolved oxygen) and the presence of floatables (oil, grease, and other debris) attributable in part to urban stormwater runoff.[13]  While the Creek has been removed from the list of waterbodies for which a Total Maximum Daily Load ("TMDL") must be developed, the degraded water quality conditions that led to the impaired listing have not been addressed;[14] polluted discharges to Newtown Creek continue to reduce the dissolved oxygen level in the Creek.[15]  Illegal stormwater discharges from these Facilities carry oxygen demanding chemicals into Newtown Creek and therefore contribute directly to this problem.

For years, Newtown Creek was treated as an industrial dumping ground; businesses along its banks polluted with abandon.  In recent decades, New York City has worked to reclaim the quality of New York Harbor and of Newtown Creek.  The City and local residents have invested heavily in efforts to rejuvenate the Creek and surrounding neighbourhoods.  Recently, the U.S. EPA joined the effort by designating Newtown Creek as a Superfund site, setting aside funds for a cleanup, and mobilizing public and private efforts to restore the Creek to a healthier state.[16] Riverkeeper has been working for 50 years on abating pollution in the Hudson River and its tributaries, and has been woring on the Creek with the City, the EPA, and many stakeholders for almost fifteen years.  It is time for Five Star to join fully in this broader effort to restore the biological integrity of Newtown Creek.  At a minimum, Five Star must stop illegally discharging polluted stormwater and other effluents.

---

[8] *See* 6 N.Y.C.R.R. § 890.6.
[9] *See* 6 N.Y.C.R.R. § 701.14.
[10] See 6 N.Y.C.R.R. §§ 702, 703.
[11]*See* NY DEC, *Impaired/DeListed Waters NOT Included on the 2014 Section 303(d) List Sept. 2014*, *available at* http://www.dec.ny.gov/docs/water_pdf/303dlistfinal2014.pdf (hereinafter "303(d) List").
[12] 33 U.S.C. § 1313(d).
[13] *See* 303(d) List.
[14] Newtown Creek is not included on the section 303(d) list, but is included on a list of other impaired waters for which no Total Maximum Daily Load ("TMDL") will be prepared. A TMDL is not necessary because other required control measures are expected to result in restoration in a reasonable period of time. Specifically, Newtown Creek pollution is being addressed through the CSO Consent Order to meet pathogen standards. *See* NYS Dep't of Envtl. Conservation, Impaired/Delisted Waters NOT Included on the 2014 Section 303(d) List, *http://www.dec.ny.gov/docs/water_pdf/303dnotlisted2014.pdf*
[15] *See Id.*
[16] *See* 40 C.F.R. Part 300, App. B.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 4 of 16

## II.

## STANDARDS AND LIMITATIONS ALLEGED TO HAVE BEEN VIOLATED AND ACTIVITIES ALLEGED TO BE VIOLATIONS

**A.** **Five Star is Discharging Stormwater Associated with Industrial Activity to Waters of the United States without a Permit.**

The CWA prohibits the discharge of pollutants to the waters of the United States except in accordance with a valid NPDES permit.[17]  Five Star's industrial activity at the Facilities cause and continue to cause a "discharge of pollutants" within the meaning of Section 502(12) of the CWA[18] and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14), from the Facilities on at least each and every day that there has been a rain event of more than 0.1 inches.[19]

Five Star's activities at the Facilities include but are not limited to the collection of commercial waste, scrap metal, paper, and other recyclables and wastes, and outdoor storage of waste containers, trucks, and vehicle maintenance.  In carrying out these activities at the Facilities, Five Star engages in storing and handling materials in a manner that exposes pollutants to precipitation and snowmelt. At both Facilities, the stormwater discharged into Newtown Creek can bring solids that suspend or dissolve in stormwater, metals, hydraulic fluids, fuel, and other pollutants into Newtown Creek.[20]

The Humboldt Street Site has exposed and continues to expose industrial pollutants to stormwater by, at a minimum, (a) storing dumpsters and roll-off containers outside or otherwise exposing them to the elements, and (b) from vehicles entering and leaving the Facility that track pollutants off site. During precipitation events (including runoff from rainfall and snow or ice melt events), pollutants are carried away from the Facility in stormwater discharges into Newtown Creek, via nearby storm drains on Russell and Humboldt Streets, and on Greenpoint Avenue. For example, Riverkeeper has observed oil sheens in the stormwater running from the Humboldt Street Site, onto the public street.

The 47th Street Site has exposed and continues to expose industrial pollutants to stormwater through, at a minimum: (a) the loading and unloading of waste from trucks or otherwise exposing them to the elements, (b) from vehicles entering and leaving the site that track pollutants off site, and (c) allowing the outdoor storage, maintenance, and repair of vehicles on

---

[17] *See* CWA §§ 301(a) and 402.

[18] 33 U.S.C. § 1362(12).

[19] EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event).

[20] *See* EPA, "Industrial Stormwater Fact Sheet Series, Sector P: Motor Freight Transportation Facilities, Passenger Transportation Facilities, Petroleum Bulk Oil Stations and Terminals, Rail Transportation Facilities, and United States Postal Service Transportation Facilities." *available at* http://water.epa.gov/polwaste/npdes/stormwater/upload/sector_p_transportationfacilities.pdf.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 5 of 16

47th Street. During precipitation events (including runoff from rainfall and snow or ice melt events), pollutants are carried away from the site in stormwater discharges into Newtown Creek, via nearby storm drains located at the intersection of 47th Street and Grand Avenue

Trucks and other heavy vehicles stored on and driving on and off both properties, or parked in the adjacent streets, are also point sources of pollution. Besides the wastes they carry, vehicles and industrial equipment at the Facilities may expose many other pollutants to the elements, including gasoline, diesel fuel, anti-freeze, and hydraulic fluids. Therefore, Five Star's garbage trucks, including but not limited to those parked on 47th Street, constitute point sources of water pollution in and of themselves.  Riverkeeper has observed polluted stormwater on the street next to and below these trucks.

In addition to waste residues, these pollution sources also may release fuel, oil, lubricants, PCBs, PAHs, an array of metals, pH-affecting substances and chemical residues.  These toxic pollutants are often generated in the form of small particulate matter, which settles on the ground and other surfaces that are exposed to stormwater and non-stormwater flows.

Because Five Star fails to adequately shelter and otherwise contain these materials to prevent their release to the environment, precipitation falls on and flows over exposed materials, fluids, and particulates.  Polluted stormwater discharges flow from each of the Facilities into nearby storm drains, and from there into Newtown Creek.

The storm drains adjacent to both Facilities are part of a separate sewer system and discharge directly into Newtown Creek.  Further, vehicles at the Facilities track dust, particulate matter, and other contaminants to areas on and off the premises from which these pollutants can enter stormwater and, ultimately, Newtown Creek and the New York Harbor.

Newtown Creek is a "water of the United States," as defined in 40 C.F.R. § 122.2 and, therefore, "navigable water" as defined in Section 502(7) of the CWA.  Five Star does not have a NPDES permit for these discharges of pollutants.  Thus, Five Star is discharging polluted industrial stormwater into navigable waters of the United States without the permit required under Sections 301 and 402 of the CWA.

**B.      Five Star is Violating the Clean Water Act by Failing to Apply for NPDES Permit Coverage.**

Five Star provides roll off container services and commercial waste and recyclables collection and transportation.  Accordingly, Five Star is an industrial discharger engaged in collecting and transporting refuse under Standard Industrial Classification ("SIC") Code 4212, which is an industrial activity included in Sector P of the General Permit.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 6 of 16

To be eligible to discharge under the General Permit, Five Star must submit to DEC a registration form called a "Notice of Intent."[21]  Notice of Intent forms are available online from DEC.[22]  To register, Five Star is required, among other things, to list all stormwater discharges, including descriptions of the industrial activities taking place in the drainage area of each discharge and the acreage of industrial activity exposed to stormwater, the separate storm sewer system or immediate surface water body or wetland to which site runoff discharges, and the name of the watershed and nearest waterbody to which the site ultimately discharges and information about whether the receiving waters are impaired.[23]  Five Star has failed to prepare and file a Notice of Intent or an application for an individual permit.[24]

**C.**     **Five Star is Violating the Clean Water Act at both Facilities by Failing to Comply with the General Permit.**

As a discharger of stormwater associated with industrial activity, Five Star must comply at all times with the requirements of the General Permit (or an individual permit).[25]  By discharging stormwater associated with industrial activity without complying with the General Permit, Five Star is violating CWA Sections 301(a) and 402(a) and (p).[26]  The main General Permit requirements that Five Star has failed and continues to fail to meet are explained further below.

   **1.  Five Star has not developed and implemented a Stormwater Pollution Prevention Plan.**

Before submitting a registration form, Five Star must prepare, make available, and implement a Stormwater Pollution Prevention Plan ("SWPPP") in accordance with schedules established in the General Permit.[27]  The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP

---

[21] *See* General Permit, Part I.E.3.  In notifying Five Star that the Clean Water Act requires coverage under and compliance with a valid NPDES permit in order to lawfully discharge, and that submission of a Notice of Intent to DEC is required in order to obtain coverage under the General Permit, Riverkeeper does not concede that all of the activities conducted at the Facility are necessarily eligible for coverage under that permit.  For example, if the Facility is discharging process wastewater, such as wash water, or has any other polluted non-stormwater discharge that is not authorized by the General Permit, then an individual NPDES permit is required and the failure to obtain and comply with an individual NPDES permit for such discharges also violates CWA §§ 301(a) and 402(p).  The conditions for eligibility to discharge under the General Permit are provided in Part I.C of the permit.

[22] *See* http://www.dec.ny.gov/docs/water_pdf/gpnoi.pdf.

[23] *See* Division of Water, NY DEC, *Notice of Intent For Stormwater Discharges Associated with Industrial Activity under the State Pollutant Discharge Elimination System (SPDES) Multi-Sector General Permit GP-0-12-001 (MSGP)* (2012), *available at* http://www.dec.ny.gov/docs/water_pdf/gpnoi.pdf.

[24] A thorough search of EPA's Enforcement & Compliance History Online ("ECHO") database and DEC's records reveals that no Notice of Intent has been submitted for either Facility.

[25] This section discusses the compliance requirements of the General Permit.  If Five Star elects to seek coverage under an individual NPDES permit instead, the conditions of that individual permit will be at least as strict as those of the General Permit, thus Five Star will still be required to comply with all of the following.

[26] Sections 301(a) and 402(a) and (p) make it unlawful for Five Star to discharge stormwater associated with industrial activity without first complying with all of the conditions established in a NPDES permit.

[27] *See* General Permit Part III.B.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 7 of 16

must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.[28]

Among other things, the SWPPP must include: a general site description, a general location map identifying the location of the facility and all receiving waters to which stormwater discharges, information related to a company stormwater pollution prevention team, a summary of potential pollutant sources, a description of control measures and best management practices, and schedules and procedures for implementation of control measures, monitoring and inspections.[29]

Five Star has not developed and implemented a legally compliant SWPPP, as required by Part III of the General Permit.[30]

2. **Five Star has not implemented control measures and Best Management Practices that are selected to meet best available technology standards.**

Five Star cannot legally discharge stormwater under the General Permit until Five Star implements mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facilities.[31] The selected measures must reduce the discharge of pollution from the Facilities to the extent practicable through use of the best available technology for the industry.

The General Permit requires that "[t]he owner or operator must select, design, install, and implement control measures (including best management practices)," in accordance with good engineering practices, to meet the effluent limits contained in the permit.[32] The General Permit's effluent limits include both numeric limits specific to certain sectors[33] and non-numeric technology-based effluent limits that apply to all facilities.[34] These non-numeric technology-based restrictions include minimizing the exposure of pollutants to stormwater[35] and minimizing the discharge of pollutants in stormwater[36] "to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice."[37]

---

[28] *See* General Permit Part III.A.

[29] *See* General Permit Part III.C.

[30] Riverkeeper believes no SWPPP exists.  If a SWPPP exists, then it is either facially inadequate or has not been fully and adequately implemented.

[31] *See* General Permit Part I.B.1, *see also* Part VII (setting forth sector-specific control measures and practices).

[32] General Permit Part I.B.1.a. *See also* Part III.C.7 ("The SWPPP must document the location and type of BMPs installed and implemented at the facility to achieve the non-numeric effluent limits in Part I.B.1.a.(2) and where applicable in Part VIII, and the sector specific numeric effluent limitations in Part VIII.").

[33] *See* General Permit, Part VIII.

[34] *See* General Permit, Part I.B.1.a.2.

[35] *See* General Permit, Part 1.B.1.a.2.a.

[36] *See* General Permit, Part 1.B.1.a.2.f.

[37] See General Permit, Part 1.B.1 ("In the technology-based limits included below and in Part VIII, the term 'minimize' means reduce and/or eliminate to the extent achievable using control measures (including best

Notice of Violation and Intent to File Suit
June 28, 2016
Page 8 of 16

Five Star has not minimized the discharge of pollution to the extent achievable by implementing control measures or BMPs that are technologically achievable and economically practicable and achievable in light of best industry practice, as required by Parts I.B.1 and VIII of the General Permit.

   **3.  Five Star has not conducted routine site inspections or complied with monitoring, recordkeeping, and reporting requirements.**

Five Star must conduct an annual comprehensive site inspection and evaluation of areas where industrial materials or activities are exposed to precipitation or where spills and leaks have occurred within the past three years.[38]  The inspection must ensure that all stormwater discharges are adequately controlled and that all BMPs are functioning as expected.[39]  Records of this inspection must be kept for five years.[40]

In addition, qualified facility personnel must carry out routine inspections at least quarterly.[41]  During these inspections, personnel must evaluate conditions and maintenance needs of stormwater management devices, detect leaks and ensure the good condition of containers, evaluate the performance of the existing stormwater BMPs described in the SWPPP, and document any deficiencies in the implementation and/or adequacy of the SWPPP.[42]  Such deficiencies must then be addressed through corrective actions.

The General Permit requires that all covered facilities conduct multiple types of analytical monitoring, and DEC may require additional individualized monitoring as well.[43]  In particular, all facilities authorized under the General Permit must:

- collect and analyze stormwater samples for each outfall at least annually;[44]
- conduct visual monitoring of stormwater discharges at least quarterly;[45]
- perform an annual dry weather inspection to detect non-stormwater discharges;[46]
- inspect, sample and monitor discharges from coal pile runoff;[47]

---

management practices) that are technologically available and economically practicable and achievable in light of best industry practice.").
[38] *See* General Permit, Part IV.A.1.
[39] *See* General Permit, Part IV.A.1.
[40] *See* General Permit, Part IV.A.2.
[41] *See* General Permit, Part III.C.7.b.2.
[42] *See* General Permit, Part III.C.7.b.1 and b.3.
[43] *See* General Permit, Part IV.B.3.
[44] *See* General Permit, Part IV.B.1.c (requiring at least annual collection and analysis of stormwater samples).  *See* General Permit, Part IV.B.1.d, .e, .f, and .g for obligations to sample more frequently.
[45] *See* General Permit, Part IV.B.1.a.
[46] *See* General Permit, Part IV.B.1.b.
[47] *See* General Permit, Part IV.B.1.d.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 9 of 16

- inspect, sample and monitor discharges from secondary containment structures and transfer areas;[48]
- document storm events during which any samples are taken;[49]
- document all of these monitoring activities;[50]
- keep records of the monitoring with the Facility's SWPPP;[51] and
- submit an annual report to DEC accompanied by a Discharge Monitoring Report detailing the results of all required stormwater samples, as well as reports that documents any instance of non-compliance with benchmarks or numeric effluent limitations.[52]

Because Five Star engages in industrial activities associated under Sector P, sampling is required for:

- Oil & Grease;
- Chemical Oxygen Demand;
- Benzene;
- Ethylbenzene;
- Toluene; and
- Xylene.[53]

Riverkeeper is not necessarily aware of all industrial activities taking place at the Facilities. To the extent that industrial activities other than the above are carried out at the Facilities, other sampling may be required as well.[54] This notice provides Five Star with sufficient information to identify the standards and limitations that apply to all categories of industrial activity.

Five Star has failed to conduct the required annual and other routine inspections, monitoring, and testing, as required by, at least, Parts III, IV, and VIII of the General Permit. Five Star also has failed to retain records and submit monitoring reports to DEC, as required by, at least, Parts IV and VIII of the General Permit.

**4. Five Star has failed to comply with additional requirements located in Part VIII of the General Permit.**

As noted above, the General Permit contains various requirements specific to Sector P. These requirements, some of which are referenced above, are collected in Part VIII of the General Permit. They include:

---

[48] *See* General Permit, Part IV.B.1.f.
[49] *See* General Permit, Part IV.B.2.c.
[50] *See, e.g.*, General Permit, Parts IV.B.1.a.8, IV.B.1.b.4, IV.B.1.c.9, *see generally* Part IV.E.
[51] *See* General Permit, Part IV.E.
[52] *See* General Permit, Part IV.B.1 and 2 and Part IV.C.
[53] *See* General Permit, Pat VIII, Sector P.
[54] *See* General Permit, Part VIII.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 10 of 16

- A requirement that the site map identify the locations of any of the following activities or sources:

  • Fueling stations;
  • Vehicle/equipment maintenance or cleaning areas;
  • Storage areas for vehicle/equipment with actual or potential fluid leaks;
  • Loading/unloading areas;
  • Areas where treatment, storage or disposal of wastes occur; liquid storage tanks;
  • Processing areas;
  • Storage areas; and
  • All monitoring areas

- A requirement to describe and assess in Five Star's SWPPP the potential for the following to contribute pollutants to stormwater discharges:

  • On-site waste storage or disposal;
  • Dirt/gravel parking areas for vehicles awaiting maintenance; and,
  • Fueling areas.

- A requirement that the following areas/activities be included in all inspections:

  • Storage area for vehicles /equipment awaiting maintenance;
  • Fueling areas;
  • Indoor and outdoor vehicle/equipment maintenance areas;
  • Material storage areas;
  • Vehicle/equipment cleaning areas; and
  • Loading/unloading areas.

- A requirement that employee training take place, at a minimum, annually (once per calendar year) and address the following, as applicable:

  • Used oil and spent solvent management;
  • Fueling procedures;
  • General good housekeeping practices;
  • Proper painting procedures; and
  • Used battery management.

- A requirement that storage of vehicles and equipment awaiting maintenance with actual or potential fluid leaks be confined to designated areas (delineated on the site map). The SWPPP shall document considerations of the following BMPs (or their equivalents):

  • The use of drip pans under vehicles and equipment;
  • Indoor storage of vehicles and equipment;
  • Installation of berms or dikes;

Notice of Violation and Intent to File Suit
June 28, 2016
Page 11 of 16

> • Use of absorbents;
> • Roofing or covering storage areas; and
> • Cleaning pavement surface to remove oil and grease.

- A requirement that storage vessels of all materials (e.g., for used oil/oil filters, spent solvents, paint wastes, hydraulic fluids) are maintained in good condition, so as to prevent contamination of stormwater, and plainly labelled (e.g., "used oil," "spent solvents," etc.). The SWPPP shall document considerations of the following storage-related BMPs (or their equivalents):

> • Indoor storage of the materials;
> • Installation of berms/dikes around the areas, minimizing runoff of stormwater to the areas;
> • Using dry cleanup methods; and
> • Treating and/or recycling the collected stormwater runoff.

- A requirement that the SWPPP describe and provide for implementation of measures that prevent or minimize contamination of stormwater runoff from all areas used for vehicle/equipment cleaning. The SWPPP shall document considerations of the following BMPs (or their equivalents):

> • Performing all cleaning operations indoors;
> • Covering the cleaning operation;
> • Ensuring that all wash waters drain to a proper collection system (i.e., not the stormwater drainage system unless SPDES permitted); and,
> • Treating and/or recycling the collected stormwater runoff.

- A requirement that the SWPPP describe and provide for implementation of measures that prevent or minimize contamination of the stormwater runoff from all areas used for vehicle/equipment maintenance.  The SWPPP shall document consideration of the following BMPs (or their equivalents):

> • Performing maintenance activities indoors; using drip pans;
> • Keeping an organized inventory of materials used in the shop;
> • Draining all parts of fluids prior to disposal;
> • Prohibiting wet clean up practices where the practices would result in the discharge of pollutants to stormwater drainage systems;
> • Using dry cleanup methods;
> • Treating and/or recycling collected stormwater runoff; and
> • Minimizing runon/runoff of stormwater to maintenance areas.[55]

---

[55] *See* General Permit, Part VIII, Sector P.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 12 of 16

Five Star's activities are included in the definition of industrial activity to which the CWA applies.  Therefore, Five Star must obtain coverage under and comply with the requirements of the General Permit, including those specific to Five Star's industrial activities, as described in Part VIII and outlined above.  Five Star has failed to obtain coverage at either of the Facilities under the General Permit and comply with these additional requirements.

**6. Five Star is Clearly Violating the Clean Water Act.**

In sum, Five Star's discharge of stormwater associated with industrial activities without a permit, Five Star's failure to apply for permit coverage, and Five Star's failure to comply with the above-listed conditions of the General Permit (or an individual NPDES permit) constitute violations of the General Permit and of Sections 301(a) and 402(p) of the Clean Water Act.

## III.

## PERSONS RESPONSIBLE FOR ALLEGED VIOLATIONS

Five Star Carting, Inc., Five Star Carting NY, LLC, Five Star Carting, LLC, Rapid Processing, LLC, and Anthony Tristani are the responsible parties for the violations alleged in this Notice (as defined by Section 502(5) of the CWA).  Riverkeeper believes that Five Star has operated both Facilities since at least 2010.  Five Star has operational control over the day-to-day industrial activities at these Facilities.  Therefore, Five Star is responsible for managing stormwater at the Facilities in compliance with the CWA.  Riverkeeper hereby puts Five Star on notice that if Riverkeeper subsequently identifies additional persons as also being responsible for the violations set forth above, Riverkeeper intends to include those persons in this action.

## IV.

## LOCATION OF THE ALLEGED VIOLATION

The violations alleged in this Notice have occurred and continue to occur at the Facilities located at 58-35 47th Street, Queens, NY and 860 Humboldt Street, Brooklyn, NY ("Humboldt Street Site").  For clarity, the Facilities' locations can be uniquely identified by tax block and lot numbers.  The Humboldt Street Site is at block 2582, lot 105.  The 47th Street Site is at block 2602, lot 35.  Stormwater flows from the Facilities into a separate storm sewer system that discharges directly into Newtown Creek.  The failure to develop and implement pollution prevention plans and take the other required measures are violations occurring at the Facility in general and in the inadequate documents themselves.[56]

---

[56] The federal courts have held that a reasonably specific indication of the area where violations occurred, such as the name of the facility, is sufficient and that more precise locations need not be included in the notice.  *See, e.g.*, *Natural Resources Defense Council v. Southwest Marine, Inc.*, 945 F. Supp. 1330, 1333 (S.D. Cal. 1996), aff'd 236 F.3d 985, 996 (9th Cir. 2000); *City of New York v. Anglebrook Ltd. Partnership*, 891 F. Supp. 900, 908 (S.D.N.Y.

Notice of Violation and Intent to File Suit
June 28, 2016
Page 13 of 16

# V.

## <u>DATES OF VIOLATION</u>

Every day upon which Five Star has failed to apply for permit coverage since Five Star first commenced operations at the Facilities and discharged polluted stormwater is a separate violation of Sections 301(a) of the CWA and EPA's regulations implementing the CWA.[57] These days of violation have continued consecutively since at least 2010.

Additionally, Five Star has discharged without a permit in violation of Section 301(a) of the CWA on every day since Five Star commenced operations at the Facility on which there has been a measurable precipitation event or discharge of previously accumulated precipitation (i.e., snowmelt) over 0.1 inches.

Finally, if Five Star seeks permit coverage after receiving this letter but fails to fully comply with the requirements of the General Permit (or an individual permit), each day upon which Five Star claims coverage under a NPDES permit but fails to comply with that permit will constitute a separate day of violation with respect to each unmet condition of that permit.

Five Star is liable for the above-described violations occurring prior to the date of this letter and for every day after the date of this letter that these violations continue.  In addition to the violations set forth above, this Notice covers all violations of the CWA evidenced by information that becomes available after the date of this Notice of Intent to File Suit.[58]  These violations are ongoing, and barring full compliance with the permitting requirements of the Clean Water Act, these violations will continue.

---

1995); *Assateague Coastkeeper v. Alan & Kristin Hudson Farm,* 727 F. Supp. 2d 433, 439 (D. Md. 2010); *United Anglers v. Kaiser Sand & Gravel Co.*, No. C 95-2066 CW, 1995 U.S. Dist. LEXIS 22449 at *4 (N.D. Cal. Sept. 27, 1995).

[57] *See* 33 U.S.C. §§ 402(p)(3)(A) and (p)(4)(A) (requiring the establishment of industrial stormwater NPDES permits and of a permit application process).

[58] *See, e.g. Public Interest Research Grp. v. Hercules, Inc.*, 50 F.3d 1239, 1248-49 (3d Cir.1995) (a notice that adequately identifies specific violations to a potential defendant also covers repeated and related violations that the plaintiff learns of later. "For example, if a permit holder has discharged pollutant 'x' in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered.").

Notice of Violation and Intent to File Suit
June 28, 2016
Page 14 of 16

## VI.

## **RELIEF REQUESTED**

Riverkeeper will ask the court to order Five Star to comply with the Clean Water Act, to pay penalties, and to pay Riverkeeper's costs and legal fees.

First, Riverkeeper will seek declaratory relief and injunctive relief to prevent further violations of the Clean Water Act pursuant to Sections 505(a) and (d), and such other relief as permitted by law.  Riverkeeper will seek an order from the Court requiring Five Star to obtain NPDES permit coverage and to correct all other identified violations through direct implementation of control measures and demonstration of full regulatory compliance.

Second, pursuant to Section 309(d) of the CWA,[59] each separate violation of the CWA subjects Five Star to a penalty not to exceed $37,500 per day for each violation that occurred. Riverkeeper will seek the full penalties allowed by law.

Third and lastly, pursuant to Section 505(d) of the CWA, Riverkeeper will seek recovery of litigation fees and costs (including reasonable attorney and expert witness fees) associated with this matter.

## VII.

## **PERSONS GIVING NOTICE**

The full name, address, and telephone number of the persons giving notice are as follows:

Riverkeeper, Inc.
20 Secor Road
Ossining, NY 10562
(914) 478-4501
Attn.: Sean Dixon

## VIII.

## **IDENTIFICATION OF COUNSEL**

Riverkeeper is represented by legal counsel in this matter.  The name, address, and telephone number of Riverkeeper's attorneys are:

---

[59] 33 U.S.C. § 1319(d); *see also* 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

Notice of Violation and Intent to File Suit
June 28, 2016
Page 15 of 16


Edan Rotenberg
Reed W. Super
Nicholas W. Tapert
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, New York 10038
(212) 242-2355

## IX.

## CONCLUSION

The foregoing provides more than sufficient information to permit Five Star to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.[60]

If Five Star has developed a SWPPP for either site, Riverkeeper requests that Five Star send a copy to the undersigned attorney.[61]  Otherwise, Riverkeeper encourages Five Star to begin developing a SWPPP immediately after receiving this letter and asks that Five Star please inform the undersigned attorney of Five Star's efforts so Riverkeeper can work with Five Star to avoid disputes over the contents of the SWPPP.[62]

---

[60] 40 C.F.R. § 135.3(a).

[61] Note that under Part III.D.2 of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within 14 days of receipt of a written request."

[62] Riverkeeper will not send a new notice letter in response to any effort Five Star makes to come into compliance with the Clean Water Act after receiving this letter, for example, by developing a SWPPP.  The federal courts have held that citizens sending a notice letter are not required to identify inadequacies in compliance documents that do not yet exist and are "not required to send a second notice letter in order to pursue specific claims regarding the inadequacies of [a defendant's] post-notice compliance efforts." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 920 (9th Cir. 2004). *See also Natural Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985, 997 (9th Cir. 2000) ("subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant.  The defendant's later changes . . . do not retroactively divest a district court of jurisdiction under 33 U.S.C. § 1365(b)."); *City of New York v. Anglebrook L.P.*, 891 F. Supp. 900, 908 (S.D.N.Y. 1995) (plaintiff's notice letter based on inadequacies of defendant's original SWPPP held sufficient to establish court's jurisdiction, even though defendant later prepared a revised SWPPP).

Notice of Violation and Intent to File Suit
June 28, 2016
Page 16 of 16

During the sixty-day notice period, Riverkeeper is willing to discuss effective remedies for the violations noted in this letter that may avoid the necessity of protracted litigation. If Five Star wishes to pursue such discussions, please contact the undersigned attorney immediately so that negotiations may be completed before the end of the sixty-day notice period. We do not intend to delay the filing of a complaint in federal court, regardless of whether discussions are continuing at the conclusion of the sixty days.

Very truly yours,

Edan Rotenberg
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, New York 10038
(212) 242-2355

cc:

Gina McCarthy, Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Judith A. Enck, EPA Region 2 Administrator
Environmental Protection Agency
290 Broadway
New York, NY 10007-1866

Basil Seggos, Commissioner
New York State Department of Environmental Conservation
625 Broadway
Albany, NY 12233-1011

Sheldon H. Kronen
2621 Palisade Ave.
Riverdale, New York, 10463

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------

RIVERKEEPER, INC.,

                Plaintiff,

     v.

FIVE STAR CARTING, INC.; FIVE STAR
CARTING NY, LLC; FIVE STAR CARTING, LLC;
and RAPID PROCESSING, LLC; and ANTHONY
TRISTANI,

                Defendants.

------------------------------------------------------------

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAY 0 4 2017 ★
BROOKLYN OFFICE

Case No. 1:16-cv-05008

[PROPOSED] CONSENT DECREE

(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251 to 1387)

 

WHEREAS, Plaintiff Riverkeeper, Inc. is a not-for-profit environmental organization organized under the laws of the state of New York, with its principal place of business in Ossining, New York.

WHEREAS, Defendant Five Star Carting, Inc. is a corporation incorporated under the laws of the State of New York that has an office at 58-35 47th Street, Maspeth, New York and participates in ownership and operation of the Facilities

WHEREAS, Defendant Rapid Processing, LLC is a corporation incorporated under the laws of the State of New York that has an office at 860 Humboldt Street, Brooklyn, New York and participates in ownership and operation of the Facilities.

WHEREAS, Riverkeeper alleges that one or more of the Defendants discharge polluted stormwater runoff/process water from their waste hauling facilities located at 58-35 47th Street in Queens, NY (the "Queens Facility"), and 860 Humboldt Street in Brooklyn, NY (the "Brooklyn Facility") (collectively the "Facilities), into the waters of the United States, including Newtown Creek, a navigable water of the United States which in turn discharges to New York Harbor.

WHEREAS, the waste hauling businesses located at the Facilities operate under a primary Standard Industrial Classification ("SIC") Code of 4212, and therefore, any alleged discharge of stormwater associated with activities at the Facilities is subject to the General Permit for the Discharge of Stormwater Associated with Industrial Activity ("General Permit") issued by the New York State Department of Environmental Conservation ("DEC"), Permit No. GP-0-12-001.

WHEREAS, Riverkeeper sent a notice of intent to sue Defendants (the "Notice Letter") on June 28, 2016, and filed this action on September 8, 2016, alleging violations of 33 U.S.C. §§ 1311(a) and 1342 of the Clean Water Act (CWA) seeking declaratory and injunctive relief, civil penalties, and reasonable attorneys' fees and costs.

WHEREAS, Riverkeeper alleged in its complaint (the "Complaint") and in its earlier Notice Letter that Defendants have violated and continue to violate CWA Section 33 U.S.C. §§ 1311(a) and 1342 by, inter alia, discharging polluted stormwater associated with industrial activity without coverage under the General Permit and by failing to comply with the conditions of the General Permit.

WHEREAS, on September 1, 2016, Defendants submitted to DEC a notice of intent to seek coverage under the General permit at the Brooklyn Facility.

WHEREAS, Defendants provided Plaintiff with their Stormwater Pollution Prevention Plan (SWPPP) for the Brooklyn Facility.

WHEREAS, Defendants have contracted with Ameriwash Group, LLC, to provide its truck washing services at the Queens Facility.

WHEREAS, without any concession or admission by Defendants that they have violated the Clean Water Act, or any concession or admission by Riverkeeper that Defendants' implementation of the measures listed above will prevent all discharge of polluted stormwater or will assure compliance with the terms and conditions of the General Permit, Riverkeeper and Defendants (collectively, "the Parties" or individually "Party") agree that it is in their mutual interest to resolve this matter without the taking of evidence or findings of fact or law, and the Parties would like to avoid prolonged and costly litigation; and

WHEREAS, this Decree shall be submitted to the United States Department of Justice and the United States Environmental Protection Agency for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and

WHEREAS, Riverkeeper agrees to seek a voluntary dismissal of any and all claims alleged against Five Star Carting, LLC, Five Star NY, LLC and Anthony Tristani.

NOW, THEREFORE, without the trial of any issue of fact or law, without the admission by Defendants of any of the facts or violations alleged in the Complaint, upon consent of the Parties, and upon consideration of the mutual promises contained herein,

**IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED, ADJUDGED AND DECREED BY THE COURT AS FOLLOWS:**

## I.   DEFINED TERMS

The defined terms set forth in the foregoing recitals are hereby incorporated into the body of this Decree and are made a part hereof.  In addition, the following terms used in this Decree have the meaning set forth below:

1. Effective Date:  the day the Court enters this Decree after the expiration of the forty-five (45) day review period required by 33 U.S.C. § 1365(c)(3).

2. Term of this Decree: the period beginning on the Effective Date and ending three (3) years from the date of the Effective Date.

3. The Facilities: the facilities located at 58-35 47th Street in Queens, NY (the "Queens Facility"), and 860 Humboldt Street in Brooklyn, NY (the "Brooklyn Facility").

4. "The Agencies" shall mean the United States Environmental Protection Agency and the United States Department of Justice.

5.  "Defendants" shall mean Five Star Carting, Inc. and Rapid Processing, LLC.

## II.   JURISDICTION AND VENUE

6. **Jurisdiction.**  Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), 33 U.S.C. § 1365(a) (Clean Water Act jurisdiction).  Riverkeeper has standing and has complied with the statutory notice requirements under the CWA, 33 U.S.C. § 1365(a)(1), and the corresponding regulations at 40 C.F.R. § 135.2.  An actual, justiciable controversy exists between Riverkeeper and Defendants.  The requested relief is proper under 28 U.S.C. §§ 2201, 2202, and 33 U.S.C. § 1365(a).

7. **Venue.**  Venue is properly vested in this Court pursuant to 33 U.S.C. § 1365(c)(1), because the events giving rise to this action occurred at the Sixth Street Facility, and in the Gowanus Canal and New York Harbor watersheds, navigable waters of the United States are located within this judicial district.

8. **Consent.**  For purposes of this Decree, or any action to enforce this Decree, Defendants consent to the Court's jurisdiction over this Decree and any such action and over Defendants.  For purposes of this Decree, Defendants consent to venue in this judicial district.

## III.   OBTAINING COVERAGE UNDER THE GENERAL PERMIT AT THE BROOKLYN FACILITY

9. **SWPPP Implementation**. Defendants will implement the attached SWPPP at the Brooklyn Facility in compliance with the terms of the General Permit, which is hereby incorporated into this Decree, and the Clean Water Act.  A failure to adhere to the SWPPP is a violation of this Decree.

10. **SWPPP Amendments.** If Defendants amend the SWPPP, or are required to amend the SWPPP for any reason including but not limited to the reasons enumerated in the General Permit, Defendants shall provide written notice to Riverkeeper within fifteen (15) days of the amendment or of learning of the need to amend its SWPPP, whichever is sooner, and shall provide Riverkeeper with all documents related to such amendment.

11. **Compliance with General Permit.** Defendants agree to operate the Brooklyn Facility in compliance with the applicable requirements of the General Permit and Clean Water Act.

12. **Implemented Storm Water Controls.** Defendants shall maintain in good working order all storm water collection and treatment systems currently installed or to be installed pursuant to this Consent Decree, including but not limited to existing housekeeping measures.

## IV.  MONITORING PROGRAM AT THE BROOKLYN FACILITY

13. **Additional Monitoring.** In addition to the inspections, monitoring and reporting required under the General Permit and set forth in the attached SWPPP, Defendants agree to perform the following additional monitoring described herein during the Term of this Decree.

14. **Sampling Points.** The sampling points (*i.e.*, designated outfalls) shall be those described in the SWPPP.

15. **Sampling Frequency.** Within 60 days of the Effective Date of this Decree Defendants will sample and analyze stormwater discharges from one qualifying storm event, subject to the occurrence of a qualifying storm event during normal operating hours.   Should the sampling data reveal any exceedances of benchmark effluent limits, then within 90 days following receipt of said sampling data Defendants will identify and implement adjustments to the Best Management Practices (BMP's) set forth in the SWPPP to address any such benchmark exceedances.   Defendants shall undertake a second round of sampling within 90 days of implementing any BMP adjustments.   Sampling will continue at 90 day intervals until such time as two consecutive sampling intervals yield sampling data without any exceedances of benchmark effluent limits, but if at any time sampling data yields such an exceedance Defendants will have an additional 90 days between samples to implement adjustments to BMPs.

16. **Corrective and Follow Up Action.** Where an effluent limitation or benchmark monitoring cutoff concentration is exceeded, or when Riverkeeper provides Defendant notice of non-compliance, Defendants shall take responsive actions to improve storm water management practices, including re-evaluating structural and non-structural BMPs and considering additional BMPs aimed at reducing pollutant levels observed in samples.  Defendants shall follow the requirements of the General Permit, including the Corrective and Follow Up Actions required by Part IV.B.1.e.(5).

17. In furtherance of these obligations, the owner and operator of the Facility shall prepare a written statement ("Memorandum") discussing:

    a. Any constituent which experienced an exceedance;

    b. An explanation of the possible cause(s) and/or source(s) of the excess levels; and;

    c. Responsive actions, including modified or additional feasible best management practices ("BMPs"), to reduce storm water pollutants and further reduce the possibility of future exceedances.

Such Memorandum shall be e-mailed and sent via first class mail to Riverkeeper no later than forty-five (45) days following receipt of the analytical results.

18. Any additional measures set forth in the Memorandum shall be implemented and the Brooklyn Facility's SWPPP shall be amended as necessary to include any additional BMP measures designated in the Memorandum no later than one hundred and twenty (120) days after the Memorandum is sent to Riverkeeper, or one hundred and twenty (120) days after the last event in the process described below.

19. Upon receipt of the Memorandum, Riverkeeper may review and comment on any additional measures. If requested by Riverkeeper within thirty (30) days of receipt of such Memorandum, the Parties shall meet and confer, which may include a site inspection, within thirty (30) days of Riverkeeper's request to discuss the contents of the Memorandum and the adequacy of proposed measures to improve the quality of the Facility's storm water. If within thirty (30) days of the Parties meeting and conferring, the Parties do not agree on the adequacy of the additional measures set forth in the Memorandum, the Parties may agree to seek a settlement conference with the Court. If the Parties fail to reach agreement on additional measures, Riverkeeper may bring a motion before the Court. If Riverkeeper does not request a meet and confer regarding the Memorandum within thirty (30) days of receipt, Riverkeeper shall waive any right to object to such Memorandum pursuant to this Decree.

20. Any concurrence or failure to object by Riverkeeper, as appropriate, with regard to the reasonableness of any additional measures required by this Decree or implemented by Defendants shall not be deemed to be an admission of the adequacy of such measures should they fail to bring the Facility's storm water into compliance with applicable water quality criteria or the Clean Water Act's technology based standards requiring industrial stormwater discharges to be controlled to the level achievable by the best available technology economically achievable ("BAT").

21. **Sampling Methodology.** Defendants will take samples at each sampling point in a manner that is consistent with the requirements and protocols set forth in the General Permit. Defendants may report this sampling as part of the stormwater monitoring required by the General Permit.

22. **Results sent to Riverkeeper.** Defendants will send a copy of each inspection, evidence of completion of structural changes, and/or sampling result to Riverkeeper no later than three (3) days after receipt or ten days after sampling, whichever is sooner.

23. **Photographs.** Defendants shall photograph the sampling location (1) at each time a sample is taken and (2) during the wet weather storm inspections required by the General Permit. All photographs required by this Consent Decree shall be in color and electronically formatted. Electronic copies of the photographs shall be retained and named in reference to the date it was taken, the initials of the person taking the photograph and the location of the photographed area. Any photograph required by this Consent Decree shall be provided to Riverkeeper via a mutually agreeable electronic format.

24. **Inspections.** Defendants agree to grant site access to representatives of Riverkeeper, including consultants acting on its behalf, to inspect the Brooklyn Facility for compliance with the General Permit and the terms of this Decree. Such access will be provided upon seven (7) days notice and up to once per quarter (four times per year) during the Term of this Decree. Site visits shall be conducted only during the Facility's normal business hours. Riverkeeper representatives may collect samples of stormwater discharges and take photographs of the Brooklyn Facility. Should any noncompliance with the General Permit or the terms of this Decree be identified by a representative of Riverkeeper, Defendants will provide the opportunity for one (1) additional site visit per month until the Brooklyn Facility is fully compliant with the General Permit and this Decree, and the Parties will follow the procedures outlined for corrective action in Paragraphs 16-20. Riverkeeper will provide Defendants with copies of any such determinations of noncompliance within three (3) business days of receipt of such information by Riverkeeper after the site visit. Defendant does not through this process admit that the noncompliance alleged by Riverkeeper has occurred and Defendant retains the right to contest any alleged violations.

25. **Other Monitoring.** Defendants will also comply with all other inspection and monitoring requirements of the General Permit.

26. **Recordkeeping.** Defendants will comply with the reporting and recordkeeping requirements of the General Permit. Defendants shall maintain written documentation at the Brooklyn Facility describing all inspections and assessments required under applicable provisions of the General Permit or of this Decree. Defendants shall forward copies of such documentation to Riverkeeper on an annual basis during the Term of this Decree. Further, during the Term of this Decree, Defendants shall copy Riverkeeper on any documents related to water quality or Clean Water Act compliance regarding the Facility submitted to any government agency including, but not limited to, the EPA, DEC, and New York City DEP. This includes, but is not limited to:

   a. Annual Reports;
   b. Monitoring or sampling data;
   c. All revisions to the SWPPP;

6

> d. Data related to discharges to the sanitary sewer system, if any; and
>
> e. Submission of an application for coverage under and individual NPDES permit or Registration for coverage under a subsequently issued General Permit.

## V.   EXCEEDANCES AND VIOLATIONS AT THE BROOKLYN FACILITY

27. **Reporting Numeric Effluent Limitation Violations.** If at any point during the Term of this Decree, the analytical results of any sample for any parameter exceeds any applicable *numeric effluent limitation* established in the General Permit, Defendants shall, within seven (7) days of receiving the analytical results, report the event to DEC and to Riverkeeper in the manner required by Part IV.C.4 of the General Permit.

28. **Benchmark Exceedances.** If the monitoring results for any parameter in any sample during the Term of this Decree exceeds any of the applicable benchmark monitoring cut-off concentrations listed in the General Permit, Defendants shall, within seven (7) days of receiving the analytical results, report the exceedance to Riverkeeper by e-mail, attaching a Report of Non-Compliance Event Form, available from NY DEC, as specified in Part IV.C.4 of the General Permit.

## VI.   CLEAN WATER ACT COMPLIANCE AT THE QUEENS FACILITY

29. Defendants shall operate the Queens Facility in compliance with the Clean Water Act.

30. Specifically, Defendants shall not conduct vehicle maintenance, including but not limited to mechanical work or washing, on the public street or in a manner that otherwise allows pollutants to migrate on to the public street.

## VII.  PAYMENTS

31. **Environmental Benefit Payment.**  Defendants shall pay the sum of ten thousand dollars ($10,000) in the form of a certified bank check to the Newtown Creek Alliance, 45-18 Skillman Avenue, Sunnyside, NY 11104, for use on projects relating to the reduction, mitigation, and/or remediation of the effects of stormwater pollution or environmental restoration of, or other benefit to, Newtown Creek or New York Harbor watersheds.  Defendants shall notify Riverkeeper in writing concurrently when the payment is made and provide a copy of the check. The payment shall be placed in escrow with Defendants' attorney at the time the parties sign this Decree, and will be transferred to the Newtown Creek Alliance no later than seven (7) days after the Effective Date of this Decree. None of this payment shall be disbursed to Riverkeeper.

32. **Fees, Costs, and Expenses.**  Defendants shall pay a sum of ten thousand dollars ($10,000) as full and complete satisfaction of Riverkeeper's claims for attorneys' fees and costs incurred to date, including investigative and expert costs.  The payment shall

be placed in escrow with Defendants' attorney at the time the parties sign this Decree, and will be transferred to Riverkeeper's attorney on or before the 7th day after the effective date of this decree. The check shall be payable to "Super Law Group, LLC." Payments will be deposited in Super Law Group's IOLA Trust Account for the benefit of Riverkeeper.

## VIII. EFFECT OF DECREE

33. **Riverkeeper's Release of Liability.** Upon Court approval and entry of this Consent Decree, Riverkeeper covenants not to sue and releases Defendants (including their representatives, assigns, agents, employees, officers, attorneys and consultants) from any and all claims, causes of action, or liability related to stormwater under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, for damages, penalties, fines, injunctive relief, or any other claim or relief (i) relating to or resulting from noncompliance with the Clean Water Act occurring prior to the Effective Date, and (ii) for any past violations of the Clean Water Act at the Facility alleged, or that could have been alleged in the Complaint. This Paragraph does not constitute a waiver or release of any claims relating to the enforcement of this Decree.

34. **Reservation.** Riverkeeper does not waive its right to bring a future action for injunctive or declaratory relief, penalties, and attorneys' fees and costs based on stormwater discharges that occur after the Term of this Decree.

35. **Defendants' Releases of Liability.** Defendants release and discharge Riverkeeper and its representatives, assigns, agents, employees, officers, attorneys and consultants, including those who have held positions in the past, from any and all claims, liability, demands, penalties, costs, and causes of action of every nature which concern or are connected with this action.

36. **Compliance with Law.** Riverkeeper does not by consent to the Decree warrant or aver in any manner that Defendants' compliance with this Decree shall constitute or result in compliance with federal or state law or regulation. Nothing in this Decree shall be construed to affect or limit in any way the obligations of Defendants to comply with all federal, state, and local laws and regulations governing any activity required by this Decree.

37. **Impossibility of Performance.** Where implementation of the actions set forth in this Decree within the agreed deadlines becomes impossible, despite the timely good faith efforts of the Parties, the Party who is unable to comply shall notify the others in writing within seven (7) days of the date that the failure becomes apparent, and shall describe the reason for the non-performance. The Parties agree to meet and confer in good faith concerning the non-performance and, where the Parties concur that performance was or is impossible, despite the timely good faith efforts of one of the Parties, new performance deadlines shall be established. In the event that the Parties cannot timely agree upon the terms of such a stipulation, either of the Parties shall have the right to seek intervention of the Court.

## IX. FEDERAL REVIEW OF DECREE

38. **Review by Agencies.** The Parties recognize that, pursuant to 33 U.S.C. § 1365(c)(3), this Decree cannot be entered until forty-five (45) days after the receipt of a copy of the proposed Decree by the Agencies. Therefore, upon signing of this decree by the Parties, Riverkeeper shall serve copies of this Decree upon the EPA Administrator, the Regional EPA Administrator, and the Attorney General for review, as required by 40 C.F.R. § 135.5. If for any reason the United States should decline to approve this Decree in the form presented, the Parties agree to continue negotiations in good faith to cure any objection to entry of this Decree raised by the United States.

39. **Entry of Order.** Upon the expiration of the forty-five-day review period provided by 33 U.S.C. § 1365(c)(3), the Parties shall move the Court for entry of this Decree. This Decree shall take effect on the date it is entered by this Court and shall terminate three (3) years from when it is entered by the Court. If for any reason the Court should decline to approve this Decree in the form presented, the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Decree.

## X. MODIFICATION AND ENFORCEMENT OF DECREE

40. **Modification in Writing.** This Decree may be modified only upon written consent of the Parties and the approval of the Court.

41. **Continuing Jurisdiction of the Court.** The United States District Court for the Eastern District of New York shall retain and shall have jurisdiction over the Parties to this Decree for the resolution of any disputes that may arise under this Decree. This Court shall also allow this action to be reopened for the purpose of enabling the Parties to this Decree to apply to the Court for any further order that may be necessary to construe, carry out, enforce compliance and/or resolve any dispute regarding the terms or conditions of this Decree.

42. **Notice.** Riverkeeper shall provide Defendants with seventy-two (72) hours written notice prior to initiating court proceedings to enforce this Decree at the address shown below in the signature line.

## XI. DISPUTE RESOLUTION PROCEDURE

43. **Meet and Confer.** Except as specifically noted herein, any disputes with respect to any of the provisions of this Decree shall be resolved through the following procedure. The Parties agree to first meet and confer to resolve any dispute arising under this Decree. In the event that such disputes cannot be resolved through this meet and confer process, the Parties agree to request a settlement meeting before the Court. In the event that the Parties cannot resolve the dispute by the conclusion of the settlement meeting with the Court, the Parties agree to submit the dispute via motion to the Court.

9

44. **Fee Awards.** In resolving any dispute arising from this Agreement, the Court shall have discretion to award attorneys' fees and costs. The relevant provisions of the then applicable Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure shall govern the allocation of fees and costs in connection with the resolution of any disputes before the Court.

## XII.   MISCELLANEOUS PROVISIONS

45. **Entire Agreement.** This Decree constitutes the entire agreement among the Parties concerning the subject matter hereof and supersedes all previous correspondence, communications, agreements and understandings, whether oral or written, among the Parties.

46. **Notices.** Any notice, demand, copies of documents and other communications required to be made under the provisions of this Decree (collectively, "Notices") by any Party hereto shall be effective only if in writing and (a) personally served, (b) mailed by United States registered or certified mail, return receipt requested, postage prepaid, or (c) sent by a nationally recognized courier service (i.e., Federal Express), to be confirmed in writing by such courier.  Notices shall be directed to the Parties at their respective addresses set forth below. Notices given in the foregoing manner shall be deemed given (a) when actually received or refused by the party to whom sent if delivered by courier, or (b) if mailed, on the day of actual delivery as shown by the addressee's registered or certified mail receipt or at the expiration of three (3) business days after the date of mailing, whichever first occurs.

Notices for Riverkeeper shall be sent to:

Edan Rotenberg
Super Law Group, LLC
180 Maiden Lane, Suite 603
New York, NY 10038
*Attorney for Riverkeeper*

Notices sent to the individual listed above at the address listed above shall be deemed as notice to Riverkeeper.

Notice for all Defendants shall be sent to:

Lawrence R. Schillinger, Esq.
PO Box 11182
Albany NY 12211

And

Anthony Tristani

58-35 47th St.
Maspeth NY

Notices sent to the individual listed above at the address listed above shall be deemed as notice to all Defendants.

Each Party shall promptly notify the other Party of any change in the above-listed contact information by using the procedures set forth in this paragraph.

47. **Authorization.** Each person signing this Decree represents and warrants that s/he has been duly authorized to enter into this Decree by the Party on whose behalf it is indicated that the person is signing.

48. **Successors and Assigns.** This Decree shall be binding upon and inure to the benefit of the Parties and their respective representatives, heirs, executors, administrators, successors, officers, directors, agents, attorneys, employees and permitted assigns.

49. **Transfer of Ownership.** Defendants shall notify Riverkeeper prior to any transfer of ownership or control of the Facility to a non-Party. Defendants agree that as a condition of transfer of ownership or control of the Facility, the new owner or operator shall be informed in writing of this Decree and of its requirements to comply with the Clean Water Act.

50. **Interpretation.** The provisions contained herein shall not be construed in favor of or against any Party because that party or its counsel drafted this Decree, but shall be construed as if all Parties prepared this Decree, and any rules of construction to the contrary are hereby specifically waived. The terms of this Decree were negotiated at arm's length by the Parties hereto. The language in all parts of this Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined by law, in the General Permit, Clean Water Act or specifically herein.

51. **Headings.** The section and paragraph headings contained in this Decree are for reference purposes only and shall not affect in any way the meaning or interpretation of this Decree.

52. **Counterparts.** This Decree may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. The Parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original. Any one of such completely executed counterparts shall be sufficient proof of this Decree. Telecopied, scanned (.pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed counterparts of this Decree. Copies of the original Decree, whether transmitted by facsimile or other means, shall be effective.

11

53. **Severability.** In the event that any of the provisions of this Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

54. **Joint and Several Liability.** Defendants are jointly and severally liable for all payments required under this Decree.

55. **Changes to the General Permit.** Defendants will comply fully with the General Permit and any permit modification, individual permit, or General Permit reissuance applicable to the Facility during the Term of this Decree. If new or revised benchmark monitoring cutoff concentrations or effluent limitations (numeric or non-numeric) become applicable, compliance with them is required and any exceedance of a new or modified benchmark monitoring cutoff concentration or effluent limitation will have the same effect as any exceedance of an existing benchmark monitoring cutoff concentration or effluent limitation.

## XIII.   EXHIBITS

56. The following exhibits are attached to this Decree and made a part hereof:

   a.   Exhibit A: Stormwater Pollution Prevention Plan

Dated: 3-23-17                     Five Star Carting, Inc.

By: Nico Tricta

Dated: 3-23-17                     Rapid Processing, LLC

By: Nico Tristra

12

Dated:  March 21, 2017                          Riverkeeper, Inc.


                                                By:     Sean Dixon
                                                Title:  Staff Attorney


ENTERED and DATED this 1st day of May , 2017

                                        /s/ Nina Gershon
                                        Honorable Nina Gershon
                                        United States District Judge

13

# Exhibit A

Case 1:20-cv-05071-ENV-MS Document 1 Filed 10/22/20 Page 70 of 203 PageID #: 70
Case 1:16-cv-05008-NG-ST Document 17 Filed 05/04/17 Page 15 of 148 PageID #: 446
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 15 of 148 PageID #: 148



# FIVE STAR CARTING, INC.
## 860 HUMBOLDT STREET
## BROOKLYN, NEW YORK 11222

# STORMWATER POLLUTION PREVENTION PLAN

Developed in Compliance with the
Multi-Sector General Permit (MSGP) for
Stormwater Discharges Associated with Industrial Activity

(GP-0-12-001)

## AUGUST 2016

Prepared by:



Water Action Compliance Assistance and Planning
www.wacaap.com

Copyright © 2016 by Water Action Compliance Assistance and Planning LLC

Case 1:20-cv-05071-ENV-SMS   Document 1   Filed 10/22/20   Page 71 of 203 PageID #:71
Case 1:16-cv-05008-NG-SMS   Document 17   Filed 05/04/20   Page 16 of 148 PageID #:441
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 16 of 148 PageID #: 149

Copyright © 2016 by Water Action Compliance Assistance and Planning LLC

All rights reserved. No part of this publication may be reproduced, distributed, or transmitted in any form or by any means, including photocopying, recording, or other electronic or mechanical methods, without the prior written permission.

Copyright © 2016 by Water Action Compliance Assistance and Planning LLC

# CONTENTS

INTRODUCTION ...................................................................................................... 1

   A. PURPOSE OF THE STORMWATER POLLUTION PREVENTION PLAN .............. 1

   B. LOCATION AND INDUSTRIAL ACTIVITIES ............................................... 1

   C. PLAN AVAILABILITY ........................................................................... 2

   D. KEEPING SWPPP CURRENT ................................................................ 2

   E. CORRECTIVE ACTIONS ....................................................................... 3

   F. NOTICE(S) OF INTENT AND MODIFICATION .......................................... 3

   G. PLAN CERTIFICATION – FIVE STAR CARTING, INC. HUMBOLDT ST .............. 4

1.0 STORMWATER POLLUTION PREVENTION TEAM ........................................ 5

2.0 GENERAL SITE DESCRIPTION ................................................................ 7

   2.1 DRAINAGE AREA 1 (DA-1) DESCRIPTION .......................................... 8

      2.1. A Industrial Activities ............................................................ 8

      2.1. B General Description of Stormwater Path .................................. 9

      2.1. C Runoff From Adjacent Property .............................................. 9

      2.1. D General Path of Stormwater to Surface Water and MS4 ............... 9

      2.1. E Receiving Waters ................................................................ 9

      2.1. F Municipal Separate Storm Sewer System (MS4) ........................ 9

      2.1. G Other SPDES Permitted Discharges ........................................ 9

      2.1. H Impervious Surface Estimate ................................................. 9

      2.1. I Location of Sensitive Areas .................................................... 9

   2.2 DRAINAGE AREA 2 (DA-2) DESCRIPTION .......................................... 10

      2.2. A Industrial Activities ............................................................ 10

      2.2. B General Description of Stormwater Path .................................. 11

      2.2. C Runoff From Adjacent Property .............................................. 11

i

2.2. D General Path of Stormwater to Surface Water and MS4 ............................... 11

2.2. E Receiving Waters ............................................................................................ 11

2.2. F Municipal Separate Storm Sewer System (MS4) ........................................... 11

2.2. G Other SPDES Permitted Discharges ............................................................... 11

2.2. H Impervious Surface Estimate ........................................................................... 11

2.2. I Location of Sensitive Areas .............................................................................. 11

Figure 2.1 Municipal Separate Storm Sewer System (MS4) Survey ....................... 12

3.0 SUMMARY OF POTENTIAL POLLUTANT SOURCES ........................................... 13

3.1 FLEET PARKING, MAINTENANCE ........................................................................ 13

3.1. A Industrial Activities ........................................................................................... 13

3.1. B Potential Pollutants ......................................................................................... 13

3.1. C Potential for Presence of Pollutants in Stormwater ....................................... 14

4.0 SPILLS AND RELEASES OF LIQUIDS IN EXPOSED AREAS AND AREAS THAT
DRAIN TO A STORMWATER CONVEYANCE ............................................................... 15

4.1 SPILL AND RELEASE RECORD ........................................................................... 15

Table 4.1 Record of spills and releases in exposed areas ....................................... 15

4.2 SPILL KITS ............................................................................................................. 16

5.0 GENERAL LOCATION MAPS .................................................................................. 17

Figure 5.1 General Site Map – 10 Foot Contours ..................................................... 17

Figure 5.2 – Municipal Storm Drains in Vicinity of Five Star Carting Humboldt St.
Facility ......................................................................................................................... 18

6.0 SITE MAPS .............................................................................................................. 19

Figure 6.1 Pollutant Sources .................................................................................... 19

Figure 6.2 Site Stormwater Drainage ....................................................................... 20

7.0 STORMWATER CONTROLS ......................................................................... 21

7. A GOOD HOUSEKEEPING PRACTICES ....................................................... 21

7. B INSPECTIONS ........................................................................................... 24

    7. B.1 Types of Inspections ........................................................................... 24

    7. B.2 Response to deficiencies observed during inspections ...................... 28

7. C MAINTENANCE AND REPAIR OF VEHICLES AND EQUIPMENT ............ 28

7. D PRACTICES TO MINIMIZE SPILLS, AND SPILL RESPONSE ................. 28

7. E TRAINING TOPICS ................................................................................... 30

7. F ELIMINATION OF NON-STORMWATER DISHARGES ............................ 31

7. G PREVENTING DISCHARGE OF WASTE, GARBAGE AND FLOATABLES ...... 32

7. H MINIMIZING DUST AND OFF-SITE TRACKING OF WASTE MATERIALS ....... 32

7. I MINIMIZING EROSION AND SEDIMENTATION ....................................... 32

    7. I.1 Minimizing Soil Erosion ....................................................................... 32

7. J TRADITIONAL STRUCTURAL BMPS TO MINIMIZE EXPOSURE .......... 33

7. K SALT PILES ............................................................................................. 33

7.L LEAD- AND MERCURY-CONTAINING MATERIALS ................................ 33

7.M RESERVED .............................................................................................. 33

7.N RESERVED .............................................................................................. 33

7.0 RESERVED .............................................................................................. 33

7. P SECTOR P- SPECIFIC REQUIREMENTS ............................................... 34

    7. P.1 Summary of Potential Pollutant Sources ........................................... 34

    7 P.2 Inspections .......................................................................................... 34

    7. P.3 Good Housekeeping ........................................................................... 34

    7. P.4 Management of Used Oil and Spent Solvents. ................................... 34

    7 P.5 Battery Management ............................................................................ 34

7. P.6 Vehicle and Equipment Storage Areas ...........................................................35

7. P.7 Material Storage Areas ...................................................................................35

7. P.8 Vehicle and Equipment Cleaning Areas.........................................................35

7. P.9 Vehicle and Equipment Maintenance Areas ..................................................35

8.0 DOCUMENTATION RELATED TO ENDANGERED SPECIES................................36

9.0 DOCUMENTATION RELATED TO HISTORIC PLACES...........................................37

10.0 MONITORING, SAMPLING AND REPORTING......................................................38

   10.1 TYPES OF MONITORING REQUIREMENTS .....................................................38

   10.2 INSTRUCTIONS- MONITORING AND ANALYSIS .............................................39

      10.2.1 Containers, Sample Storage and Shipping ..................................................39

      10.2.2 Find an approved laboratory .........................................................................40

      10.2.3 Sample Collection Frequency and Analysis ..................................................41

      Table 10.1 Required Benchmark and Compliance Monitoring Analysis.................. 42

      10.2.4 Qualifying storm event...................................................................................42

      10.2.5 Sample Collection "Window" .........................................................................43

      10.2.6 Sample Collection Procedure.........................................................................43

   HOW TO DO STORMWATER SAMPLING: A GUIDE FOR INDUSTRIAL FACILITIES
   - WASHINGTON STATE DEPARTMENT OF ECOLOGY Found After page .............44

   10.3 REPRESENTATIVE OUTFALL WAIVER............................................................45

   10.4 QUARTERLY VISUAL EXAMINATIONS RESULT EVALUATION .....................46

      10.4.1 QUARTERLY VISUAL EXAMINATIONS MONITORING...............................46

      10.4.2 QUARTERLY VISUAL EXAMINATIONS RESULT EVALUATION...............46

   10.5 BENCHMARK SAMPLE RESULT EVALUATION................................................47

      10.5.1 Requirements If Benchmark Cut-off Concentrations Are Exceeded ............47

   10.6 ANNUAL DRY WEATHER FLOW I CERTIFICATION.........................................48

iv

10.7 ANNUAL COMPREHENSIVE SITE COMPLIANCE EVALUATION.................... 49

10.8 REPORTING REQUIREMENTS.......................................................................... 50

    10. 8.1 Annual Certification Report .......................................................................... 50

    10. 8.2 Discharge Monitoring Reports .................................................................... 51

    10.8.3   Corrective Action Forms and Non-Compliance Event Forms ....................53

    Discharge Monitoring Report Instructions ............................................................. 53

APPENDIX A – QUARTERLY SITE INSPECTION RECORDS ........................................A

APPENDIX B – QUARTERLY VISUAL MONITORING EXAMINATION RECORDS .......B

APPENDIX C –................................................................................................................. C

BENCHMARK MONITORING RECORDS ....................................................................... C

APPENDIX D ................................................................................................................... D

STORMWATER MONITORING REPORTS...................................................................... D

APPENDIX E – TRAINING RECORDS............................................................................E

APPENDIX F ....................................................................................................................F

ANNUAL DRY WEATHER FLOW INSPECTION AND CERTIFICATION FORM ............F

ANNUAL COMPREHENSIVE COMPLIANCE EVALUATION REPORTS.......................F

APPENDIX G – RECORDS OF CORRECTIVE ACTIONS ............................................. G

APPENDIX H ................................................................................................................... H

STORMWATER POLLUTION PREVENTION PLAN (SWPPP) REVISION LOG ........... H

APPENDIX I – BLANK FORMS........................................................................................ I

APPENDIX J – NOTICES OF INTENT and MODIFICATION, ........................................ J

ACKNOWLEDGMENT LETTER, CORRESPONDENCE ................................................. J

APPENDIX K -THE MULTI-SECTOR GENERAL PERMIT (MSGP) FOR
STORMWATER DISCHARGES ASSOCIATED WITH INDUSTRIAL ACTIVITY (GP-0-
12-001)...........................................................................................................................K

APPENDIX L - SPILL REPORTING ................................................................................L

THIS PAGE INTENTIONALLY LEFT BLANK

# INTRODUCTION

## A. PURPOSE OF THE STORMWATER POLLUTION PREVENTION PLAN

This plan has been developed under the supervision of management as a resource and reference, in compliance with the Multi-Sector General Permit (MSGP) for Stormwater Discharges Associated with Industrial Activity (GP-0-12-001). The contents of this plan provide information required by Parts III.C and VIII and describe practices selected, implemented and maintained to achieve controls and limits required by Part I.B.

## B. LOCATION AND INDUSTRIAL ACTIVITIES

The Five Star Carting, Inc. truck maintenance facility is located on approximately 1.09 acres at 860 Humboldt Street, Brooklyn, New York (Latitude 40. 7311178°, Longitude – 73.945894°). The facility services and maintains vehicles used in over-the-road transportation of solid waste material. The primary industrial activity, local trucking without storage, is described by Standard Industrial Classification (SIC) code 4212. Discharge of stormwater that has come in contact with materials and activities associated with this sector requires authorization under Sector P of the Multi-Sector General Permit (MSGP).

The National Resources Conservation Service (NRCS), United States Department of Agriculture (USDA) classifies the soils in the vicinity of the facility as urban land with tidal marsh substratum. The typical profile of this locality is 1-20" impervious cemented material, underlain by very gravelly sand, with moderate to rapid permeability, to 79". Local topography generally slopes toward Greenpoint Avenue from the north and south, and 0 - 2 % west to east.

The facility is located within the United States Geologic Survey (USGS) Hydrologic-12 Unit 020301010405. Stormwater associated with industrial activities from Five Star Carting operations at the Humboldt Street facility discharges to the Newtown Creek (Water Index Number Mw2.1 ER-LI-4 per 6 NYCRR 890.6) via the New York City Municipal Separate Storm Sewer System (MS4).

1

Newtown Creek is a Class SD tributary to the East River and part of the Hudson River Estuary. This waterbody is not included on the current 303(d) list; therefore, under the definition of impaired waterbodies set forth in GP-0-12-001, enhanced monitoring requirements and Special Conditions per Part II.C are not applicable to the Humboldt Street facility.

## C. PLAN AVAILABILITY

A copy of the SWPPP is available for review at the time of an on-site inspection by the New York State Department of Environmental Conservation (DEC), United States Environmental Protection Agency (EPA), and New York City Department of Environmental Protection, the operator of the Municipal Separate Storm Sewer System (MS4). Also, in the interest of the public's right to know, a copy of the SWPPP must be made available to the public within 14 days of receipt of a written request. Interested parties may contact Lawrence R. Schillinger Esq., P.O. Box 11182, Albany, New York 12211 to make arrangements to review this plan.

## D. KEEPING SWPPP CURRENT

The SWPPP will be amended whenever there is a change in design, construction, operation, or maintenance at the facility which may have an effect on the potential for the discharge of pollutants from the facility which has not otherwise been addressed in the SWPPP; or it is found to be ineffective in eliminating or significantly minimizing pollutants from sources identified under Part III.C, or is otherwise not achieving the goals or requirements of this permit. The SWPPP will be modified if it has been found to be inaccurate or incomplete or if inspections or monitoring reveal violations of the permit.

Modifications to stormwater controls will identify the corrective actions needed and include a schedule that meets the time frames in Section E below. Failure to complete the required follow up action(s) is a violation of the permit.

A SWPPP Revision Log is available in Appendix H of this plan.

2

## E. CORRECTIVE ACTIONS

If existing *BMP*s need to be modified or if additional *BMP*s are necessary, implementation will be completed before the next anticipated storm event, if practicable, but not more than 12 weeks after completion of the comprehensive site evaluation or other inspection, unless permission for a later date is granted in writing by the DEC.

**For structural *BMP*s that will take longer than 12 weeks to implement, Five Star Carting, Inc. will request approval from the DEC in writing as required and will include a schedule for completing the proposed project.**

The DEC or EPA may notify the owner or operator at any time that the plan does not meet one or more of the minimum requirements of this permit. Such a notification will identify those provisions of the permit that are not being met, as well as the required modifications. Within fourteen (14) calendar days of such notification, or as otherwise indicated by the DEC, Five Star Carting, Inc. will make the required changes to the SWPPP and submit written notification to the DEC that the changes have been made.

A log of major corrective actions is found in Appendix G of this plan.

## F. NOTICE(S) OF INTENT AND MODIFICATION

A Notice of Intent (NOI) form will be submitted to the DEC and signed in accordance with Part V.H. to gain coverage under GP-0-12-001. Thereafter, the DEC will be notified of changes or corrections to previously submitted information using a Notice of Modification (NOM) form. NOIs and NOMs submitted to gain or modify information, as well as forms submitted under previous versions of the permit are retained in the SWPPP. The Notices of Intent (NOIs) submitted to gain coverage under GP-0-12-001 and modify coverage under the MGSP are found in Appendix J of this plan.

Case 1:20-cv-05071-ENV-SMS   Document 1   Filed 10/22/20   Page 81 of 203 PageID #: 181
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 26 of 148 PageID #: 451
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 26 of 148 PageID #: 159

THIS PAGE INTENTIONALLY LEFT BLANK

## G. PLAN CERTIFICATION – FIVE STAR CARTING, INC. HUMBOLDT ST.

This plan is signed in accordance with Part V.H. of the MSGP.

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that *qualified personnel* properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

_____     _____/_____/_____

                Signature                                    Date

Title: _____

THIS PAGE INTENTIONALLY LEFT BLANK

# 1.0 STORMWATER POLLUTION PREVENTION TEAM

The Pollution Prevention Team has specific assignments for implementation of the SWPPP as outlined in the following table. The Pollution Prevention Team will also inspect areas of the facility on a regular basis. In addition to the actions of the Pollution Prevention Team, each employee is tasked with continuously observing, reporting, and initiating corrective action when conditions warrant.

5

THIS PAGE INTENTIONALLY LEFT BLANK

*Table 1.* Stormwater Pollution Prevention Team

| Date: 8/30/2016 | | |
|---|---|---|
| **Task Description** | **Individual or Title Responsible for Task** | **Contact Information** |
| **Signature authority** | Nino Tristani Anthony Tristani | 718-349-7555 |
| **Supervision of plan implementation** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |
| **Spill Response** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |
| **Spill Kit Inventory** | Patrick Yubi | 718-349-7555 ext 307 |
| **Supervision of record keeping** | Patrick Yubi | 718-349-7555 ext 307 |
| **Equipment inspection, maintenance and repair** | Patrick Yubi | 718-349-7555 ext 307 |
| **Good Housekeeping/ Routine yard, shop and storage inspection and maintenance** | Patrick Yubi | 718-349-7555 ext 307 |
| **Annual Comprehensive Site Compliance Evaluation and Report** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |
| **Evaluation of sample and inspection results and corrective actions** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |
| **Stormwater monitoring** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |
| **Stormwater reporting** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |
| **Staff Training** | Ruben Chico and Anthony Valenti | 718-349-7555 ext 305 |

6

THIS PAGE INTENTIONALLY LEFT BLANK

## 2.0 GENERAL SITE DESCRIPTION

The Five Star Carting, Inc. truck maintenance facility is located on a lot bounded on the north by Greenpoint Avenue, and on the west and east by Humboldt and Russell Streets, respectively. Humboldt and Russell Streets are sloped south to north toward Greenpoint Avenue, which descends in elevation from west to east. The rear walls of unassociated buildings on Calyer Street border the Five Star Carting facility on the south.

There are two entrances to the facility property. One entrance is from Humboldt Street on the west side of the facility and one from Russell Street on the east. Stormwater discharges from the irregularly sloped yard via two outfalls located at these entrances.

A 47-foot wide, 100-foot long steel-span structure located along the southwest side of the property serves as the primary work area for activities associated with truck maintenance. Gases are stored in a security cage on the northwest side of the yard. Tires are changed under a canopy-covered work area defined by concrete blocks on the north side of the yard. A 20 x 8-foot container, located outside the southeast corner of the steel-span structure, houses the majority of fluids. A welding/metal-working area, on the northeast side of the site, is located between 20 X 8 foot containers, stacked two-high. Part of the metal working area is covered. Equipment, such as forklifts operate in all areas of the yard. Two trailers, serving as lockers and offices are located along the southern boundary of the property. An employee parking area occupies approximately 850 square feet adjacent to the Russell Street entrance. The remainder of the yard is used for truck parking and storage of empty dumpsters.

Two poorly defined and overlapping subdrainage areas are identified for the purposes of this plan as Drainage Areas 1 and 2. A minor rise, situated approximately in the center of the open area of the yard subtly divides these areas. Stormwater collects in a slight depression, located to the east of the rise and midway along the Russell Street boundary, collects stormwater. This area may flow both north and south to either subdrainage area in intense storms, but tends to evaporate in lesser events. See approximate drainage areas in Figure 6.2.

7

## 2.1 DRAINAGE AREA 1 (DA-1) DESCRIPTION

Drainage Area 1 is approximately L-shaped and occupies roughly 24,400 square feet (.56 acres) of the parcel. The area is defined by the fences on the north and west, and receives runoff from a minor rise in the middle of the yard. A minor depression, approximately 5,660 square feet in area and situated midway on the east boundary. Stormwater ponded there may flow toward the northeast of this area as well as toward Drainage Area 2. Outfall 001 is located in Drainage Area 1 near the northwest corner of the property at the main entrance of the facility on Humboldt Street. The area is one hundred percent impervious.

### 2.1. A Industrial Activities

Materials and industrial activities related to maintenance of trucks utilized in local trucking without storage occur in exposed areas in Drainage Area 1.

Trucks entering via the Humboldt Street entrance, drive across the yard, over a minor drainage divide, to be parked in Drainage Area 2.

Maintenance is performed under cover in the steel-span structure, and in exposed areas.

New and scrap lead-acid batteries, and equipment is stored between the steel-span structure and the fence on the west.

Waste oil is stored in a non-stationary caged tote under shelves near the front of the steel-span structure at the edge of an irregular drainage divide between drainage areas.

Equipment is stored in a container on the south side of the Humboldt Street entrance.

Tires are changed in a covered area bounded by concrete block along the north fence. New and used tires are stored in a container in the northeast corner of the yard.

Gases are stored in a security cage adjacent to the north of the Humboldt Street entrance.

Dumpsters are primarily stored along the east fence, but may also be temporarily located in other areas.

Welding, cutting, dumpster and truck repair, and other metal-working tasks are performed in the northeast corner of the site.

Trucks are fueled off-site at gas stations.

### 2.1. B General Description of Stormwater Path

Stormwater flows west toward Outfall 001 from a high point located approximately mid-yard. Runoff from the metal working area in the northeast of the yard discharges in a westerly direction along the northern boundary to Outfall 001 at the Humboldt Street entrance. In intense storms, this runoff may include overflow from a minor depression on the east side of the yard. The western boundary of the site drains toward Outfall 001 from both directions. The ground surface under the north side of steel-span structure is also sloped toward the entrance where Outfall 001is located.  See Figure 6.2.

### 2.1. C Runoff From Adjacent Property

There is no significant run-on to this subdrainage area.

### 2.1. D General Path of Stormwater to Surface Water and MS4

Stormwater discharging from Outfall 001 flows downgradient toward the intersection of Humboldt Street and Greenpoint Avenue to storm drains located within the Municipal Separate Storm Sewer System (MS4) owned and operated by the New York City Department of Environmental Protection. This segment of the storm sewer system discharges to Newtown Creek. See Introduction Section B, Figures 2.1, 5.1, 5.2 and 6.2.

### 2.1. E Receiving Waters

See Section B of the Introduction, Figures 2.1, 5.1, 5.2 and 6.2.

### 2.1. F Municipal Separate Storm Sewer System (MS4)

See Section B of the Introduction, Figures 2.1, 5.2 and 6.2.

### 2.1. G Other SPDES Permitted Discharges

There are no discharges currently covered under another SPDES permit at the facility.

### 2.1. H Impervious Surface Estimate

Impervious surfaces in this drainage area include the steel-span structure; paved yard and containers. The yard is one hundred percent impervious.

### 2.1. I Location of Sensitive Areas

There are no sensitive areas within this drainage area.

9

## 2.2 DRAINAGE AREA 2 (DA-2) DESCRIPTION

Drainage Area 2 is generally rectangular and occupies roughly 12,900 square feet (.28) acres of the parcel. The area is defined by the rear of unassociated buildings to the south, the area to the east of the steel-span building, a slight depression along the center area of the east fence, and a minor rise in the middle of the yard. This drainage area is irregularly sloped toward the south and the east.

A minor depression, approximately 5,660 square feet in area and situated midway on the east boundary, may flow toward the southeast of this area as well as toward Drainage Area 1.

Trailers used for lockers and offices and an employee parking area at the Russell Street entrance, not associated with industrial activities, occupy approximately 2,165 square feet of Drainage Area 2. Outfall 002 is located near the southeast corner of the property at the entrance to the facility from Russell Street. The area is one hundred percent impervious.

### 2.2. A Industrial Activities

Materials and industrial activities related to maintenance of trucks utilized in local trucking without storage occur in exposed areas in Drainage Area 2.

Trucks are parked throughout the drainage area.

Fluids may be drained from trucks and refilled in exposed areas.

Minor repairs may be completed in this subdrainage area.

The majority of fluids are stored in a container at the southeast corner of the steel-span structure. Some fluids are also stored in the steel-span structure.

A shelving unit on the east side of the steel-span structure is used to store parts and equipment, and may be used to protect fluids for short periods of time.

Waste oil is stored in a non-stationary caged tote under shelves near the front of the steel-span structure at the edge of an irregular drainage divide between drainage areas.

Dumpsters are primarily stored along the east fence, but are also found in other areas.

10

## 2.2. B General Description of Stormwater Path

Stormwater flows south toward the trailers and east toward Outfall 002 from a high point located approximately mid-yard. Runoff flows south along a portion of the fence located near the entrance. Stormwater flowing toward the southeast of this drainage area is unlikely to discharge, except in intense storms. Runoff to Outfall 002 may also include overflow from a minor depression on the east side of the yard in heavy rains or snowmelt. See Figure 6.2.

## 2.2. C Runoff From Adjacent Property

There is no significant run-on to this subdrainage area, but stormwater from Russell Street pools near the entrance where it comingles with stormwater from the facility.

## 2.2. D General Path of Stormwater to Surface Water and MS4

Stormwater discharging from Outfall 002 flows downgradient toward the intersection of Russell Street and Greenpoint Avenue, to storm drains located within the Municipal Separate Storm Sewer System (MS4) owned and operated by the New York City Department of Environmental Protection. This segment of the separate storm sewer discharges to Newtown Creek. See Introduction Section B, Figures 2.1, 5.1, 5.2 and 6.2.

## 2.2. E Receiving Waters

See Section B of the Introduction, Figures 2.1, 5.1, 5.2 and 6.2.

## 2.2. F Municipal Separate Storm Sewer System (MS4)

See Section B of the Introduction, Figures 2.1, 5.2 and 6.2.

## 2.2. G Other SPDES Permitted Discharges

There are no discharges currently covered under another SPDES permit at the facility.

## 2.2. H Impervious Surface Estimate

The yard is one hundred percent impervious. Impervious surfaces in this drainage area include the roofs of the trailers, paved yard and containers.

## 2.2. I Location of Sensitive Areas

There are no sensitive areas within this drainage area.

11

THIS PAGE INTENTIONALLY LEFT BLANK



Figure 2.1 Municipal Separate Storm Sewer System (MS4) Survey

THIS PAGE INTENTIONALLY LEFT BLANK

# 3.0 SUMMARY OF POTENTIAL POLLUTANT SOURCES

## 3.1 FLEET PARKING, MAINTENANCE

### 3.1. A Industrial Activities

Trucks are parked in the yard when not completing their routes.

Dumpsters are stored in the yard.

Welding and other metal-working activities take place in the northeast of the yard.

Vehicles are maintained and repaired under the steel-span structure whenever possible.

Fluids may be drained from trucks and refilled under cover and in exposed areas.

Tire changes and other minor repairs are completed under an awning and in exposed areas. Tires are stored in a container in the northeast corner of the yard.

Materials related to truck and dumpster maintenance are stored throughout the yard. Fluids are stored inside the steel-span structure and in a non-stationary caged tote near the southeast corner of the steel-span structure.

Parts are stored in the steel-span structure and on a shelving unit on the east of the structure.

Equipment, parts and new and used lead-acid batteries are stored between the steel-span building and the fence along Humboldt Street.

Waste oil may be drained from vehicles in exposed areas. Waste oil is stored in a non-stationary caged tote at the northeast corner of the steel-span structure.

Waste from chemical toilets used in the office and lockers is pumped out by a professional service truck parked at or near the Russell Street entrance.

### 3.1. B Potential Pollutants

Vehicle maintenance is considered a source of potential contamination to stormwater. Waste oil, antifreeze, hydraulic fluids, virgin engine oil, brake and transmission fluids, and oil and grease may leak from vehicles and damaged containers in exposed areas, or may be tracked from the covered workshop to exposed areas.

13

Worn gaskets, leaking hydraulic lines and connections in equipment may introduce fuel and hydraulic fluid, oil and grease to paved surfaces.

Damaged or leaking scrap lead-acid batteries may introduce contamination to paved surfaces. Intact lead-acid batteries stored in exposed locations may also introduce lead and other metals to the environment.

Oil may be introduced to exposed areas in the event of a spill from the waste oil and virgin oil tanks located inside the maintenance garage.

Fluids may be conveyed off-site via stormwater if spills occurring during delivery or transfer of containers are not promptly cleaned up.

Loose small debris and waste from trucks and dumpsters may escape to the yard where it may become windborne or conveyed to storm sewers via stormwater. Sediment and residue may be tracked over paved surfaces by incoming and outbound vehicles.

Potential contaminants include floatables, residues from organic waste, fuel (gas/diesel), fuel additives, oil/lubricants, heavy metals, brake fluids, chlorinated solvents and arsenic.

Oil and grease, Chemical Oxygen Demand, Benzene, Toluene, Ethyl Benzene and Xylene are identified by the MSGP as pollutants of particular concern associated with Sector P activities.

Waste from chemical toilets may leak or spill.

## 3.1. C Potential for Presence of Pollutants in Stormwater

The potential for presence of loose materials, waste residue, sediment and various types of small debris in stormwater from all areas is high.

The potential for presence of contamination to stormwater from leaks and spills from the yard is high.

The potential for presence of suspended solids, metals, oil and grease, and various fluid contaminants in stormwater from sediment, leaked fluid and small debris tracked over paved surfaces in the yard and main entrance is high.

The potential for spills of waste from chemical toilets is moderate.

# 4.0 SPILLS AND RELEASES OF LIQUIDS IN EXPOSED AREAS AND AREAS THAT DRAIN TO A STORMWATER CONVEYANCE

There is potential for spills in all areas of the facility; however, no reportable spills have occurred at this facility.

## 4.1 SPILL AND RELEASE RECORD

In the event of a reportable spill or release in areas that are exposed to precipitation or that may otherwise drain to a stormwater conveyance, a record of the occurrence will be kept in this section.

Table 4.1 Record of spills and releases in exposed areas

| Record of Spills and Releases in Exposed Areas of the Facility | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| If Reportable Quantity: | | | | | | | | |
| Release Date | Time Release Observed | Substance Released | Associated Outfall ID | Estimate Quantity Released | Reportable Quantity? | Date Reported | Reported By | Reported To |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

## 4.2 SPILL KITS

Sufficient quantities of dry cleanup materials are available to all areas of the facility.

16

Case 1:20-cv-05071-ENV-SMS Document 1 Filed 10/22/20 Page 100 of 203 PageID #:4160
Case 1:16-cv-05008-NG-ST Document 11 Filed 05/04/17 Page 45 of 148 PageID #:470
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 45 of 148 PageID #: 178

# 5.0 GENERAL LOCATION MAPS



Figure 5.1 General Site Map – 10 Foot Contours

Case 1:20-cv-05031-ENV-VMS   Document 1   Filed 10/22/20   Page 101 of 203 PageID #: 101
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 46 of 148 PageID #: 171
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 46 of 148 PageID #: 179

THIS PAGE INTENTIONALLY LEFT BLANK



Figure 5.2 – Municipal Storm Drains in Vicinity of Five Star Carting Humboldt St. Facility

THIS PAGE INTENTIONALLY LEFT BLANK

## 6.0 SITE MAPS



Figure 6.1 Pollutant Sources

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:20-cv-05071-ENV-SMS Document 1 Filed 10/22/20 Page 106 of 203 PageID #:106
Case 1:16-cv-05008-NG-ST Document 11 Filed 05/04/17 Page 51 of 148 PageID #:432
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 51 of 148 PageID #: 184



Figure 6.2 Site Stormwater Drainage

THIS PAGE INTENTIONALLY LEFT BLANK

# 7.0 STORMWATER CONTROLS

## 7. A GOOD HOUSEKEEPING PRACTICES

### Entrances

Entrances are continuously monitored for evidence of leaks or debris.

Responsible staff respond promptly to spills and leaks using dry cleanup methods.

Entrances and lot are kept free of light debris that may become windblown or conveyed off-site in stormwater flows.

### Steel-Span Structure Workshop and Outdoor Work Areas

Work is performed under cover to the maximum extent possible.

Off-site discharge of wastewater is prohibited.

Greasy rags, oil filters, air filters, batteries, spent coolant and degreasers are disposed of properly.

Waste fluids are picked up by approved recyclers on a timely basis.

There are no mercury-containing switches changed or serviced at the facility.

Lubricants, anti-freeze, hydraulic fluids, oil and other fluids used to maintain equipment are stored under cover or in containers of compatible material. All containers are accurately labeled.

Materials are stored in containers to the maximum extent possible to keep high-traffic areas free. Storage areas in the steel-span structure are kept organized.

Dry cleanup materials are available to address spills that occur indoors. Containers are available to store spent materials until they are disposed.

Solids are removed from ground surfaces as needed to prevent off-site tracking of residue and dirt.

Spent dry cleanup materials are properly disposed.

21

The area around the maintenance shop is kept organized. Ground surfaces are protected by tarpaulins or other covering when work that may cause fluids to leak is being completed to minimize the amount of fluids conveyed off-site in precipitation events.

Waste fluid containers are intact, in good condition and and labeled. Empty and damaged containers are properly disposed.

Parts and filters are properly drained prior to disposal.

Equipment is inspected and maintained to ensure the potential for leaks is minimized. If should occur fluid residue is removed using dry cleanup methods and necessary repairs are completed.

Spills and leaks are immediately addressed using dry clean up materials. An adequate amount of dry clean up materials and waste containers are available at all times.

### Lead-Acid Batteries

Scrap lead-acid batteries are transferred to the battery storage area as soon as possible. Batteries are not left in exposed areas overnight or in precipitation events.

Batteries are stored next to the steel-span structure, off the ground surface, under tarps and stacked no more than 3 batteries high to prevent damage to cases that could result in leaks.

Should acid leaks from damaged lead-acid batteries occur, they are immediately neutralized and cleaned using dry cleanup methods.

### Truck Parking and General Yard Areas

If necessary, drip pans or absorbent pads are placed under trucks and equipment awaiting repair to minimize leaks to ground surfaces until necessary repairs are completed.

When leaks area identified, fluid residue is removed using dry cleanup methods.

The yard is maintained to prevent loose debris, sediment or oil and grease from escaping the facility perimeter.

Empty and damaged containers are properly disposed.

22

Lightweight materials are managed to prevent them from becoming windborne or conveyed to other areas in stormwater.

Sediment is not allowed to build up in the lot.

An adequate amount of dry clean up materials and waste containers are available at all times.

Waste is not allowed to accumulate.

**Dumpster Storage Areas**

Staff ensures that waste and leaking fluids from dumpsters are not allowed to accumulate in the yard. Should waste be found or fluid is found to be leaking from dumpsters, waste is cleaned up and properly disposed.

**Metal Working Areas**

Staff ensures that small scrap and fines from metal working are not allowed to accumulate. Metal scrap, particulates and other materials used in metal working are cleaned up daily or more often, if conditions of wind or precipitation may convey waste off-site.

Traffic is controlled to prevent tracking metal and other waste into other areas of the yard.

## 7. B INSPECTIONS

Facility personnel inspects areas of the yard where industrial activities or materials are exposed to stormwater and indoor areas where material may be tracked into stormwater pathways.

### 7. B.1 Types of Inspections

Several types of site inspections are performed at this facility. Other monitoring requirements that have site inspection components are also listed below, along with references to the section of the plan where instructions for completing the monitoring are found.

- Routine yard inspections
- Daily leak detection inspections focusing on areas under trucks and equipment
- Quarterly site inspections (Note: These are inspections of the conditions at the facility that focus of potential source of contamination of stormwater. Quarterly Visual Examinations of <u>Stormwater</u> are described in Section 10.4)
- Annual Dry Weather Flow Inspection includes a site inspection component (Section 10.6)
- Annual Comprehensive Site Compliance Evaluation includes a site inspection component (See Section 10.7).


### 7. B.1.1 ROUTINE YARD INSPECTIONS

Staff inspects the perimeter of the yard to ensure good housekeeping is being implemented. Trash and other lightweight material is removed to prevent off-site tracking of litter that may be conveyed to storm drains.

Dumpster containing waste are covered by the end of the day and during precipitation events.

Storage areas outside the maintenance shop are checked to ensure that batteries are not left in exposed areas.

## 7. B.1.2 DAILY LEAK DETECTION INSPECTIONS

Assigned staff is trained to perform daily inspections to detect leaks. If leaks are detected, staff uses drip pans to prevent leaking fluids from being deposited on the ground. Dry clean up methods are used to remove residual fluid from ground surfaces. Leaking vehicles are identified to maintenance staff and timely repairs are scheduled. Ongoing problems with timely maintenance are brought to the attention of management.

## 7. B.1.3 QUARTERLY SITE INSPECTIONS

Quarterly Site inspections* ensure that good housekeeping is being implemented, structural controls and best management practices are being implemented. Deficiencies are immediately corrected, or brought to the attention of the individual with responsibility for SWPPP implementation for corrective action and follow up.

Quarterly site inspections are performed once in each of the following periods:

Quarter 1: January 1- March 31

Quarter 2: April 1 – June 30

Quarter 3: July 1-September 30

Quarter 4: October 1- December 31

**Entrances**

Determine whether impervious surface needs to be repaired or stabilized.

Inspect entrances to confirm good housekeeping is being practiced and off-site transport of scrap, waste, debris or particulates is minimized.

**Steel-Span Workshop**

Evaluate organization. Confirm proper labeling procedures.

Inspect floors to confirm good spill prevention, containment and clean up practices are being followed.

Confirm that work is being performed under cover whenever possible.

Confirm availability of spill kit with sufficient quantities of dry cleanup media.

25

**Storage Areas Outside Steel-Span Structure**

Confirm that maintenance and repair of equipment and vehicles is being performed under cover to the maximum extent possible and there is minimal evidence of leaks from work being performed in exposed areas.

Check area around waste and virgin oil tanks to ensure good housekeeping and spill cleanup.

Confirm good spill response and make sure that spent dry cleanup materials are properly disposed.

Confirm good housekeeping including proper disposal of greasy rags.

Confirm good organization of scrap and parts in exposed areas.

Confirm that damaged, leaking containers and unused containers are disposed off-site.

**New and Waste Lead-Acid Battery Storage**

Confirm good storage practices. No batteries should be in exposed areas overnight or during precipitation events.

Ensure that no residual battery acid is present where batteries are stored.

**Fluid Containment**

Inspect the areas around the fluid container and waste oil storage container to ensure good housekeeping and proper spill response.

Confirm proper transfer practices in and around containers and fluid storage unit.

**Fleet Parking and Multi-Use Areas of Yard**

Inspect the yard to ensure good housekeeping practices are being implemented.

Inspect all areas where trucks are parked to ensure adequate leak prevention and dry cleanup practices.

Confirm proper storage of tires to prevent water from collecting.

Inspect the yard to confirm that tires are stored appropriately so water does not accumulate, and confirm they are being transported off-site in a timely way.

Inspect ground surfaces to ensure excess buildup of sediment is not occurring.

### Dumpster Storage Areas

Inspect dumpster storage areas to ensure adequate housekeeping, leak prevention and dry cleanup practices.

Inspect ground surfaces to ensure excess buildup of sediment is not occurring.

### Metal Working Areas

Inspect areas where welding and other metal work is completed to ensure scrap and particulates are not being allowed to accumulate.

Inspect ground surfaces to ensure excess buildup of sediment is not occurring.

### Perimeter

Inspect the areas along the fence to ensure that no erosion has occurred and there is no evidence of off-site discharge of washwater.

Inspect the perimeter of the yard to confirm good housekeeping is being practiced and ensure light-weight materials are not escaping.

Ensure no erosion is occurring.

Completed Quarterly Site Inspection reports are retained in Appendix A.

*Note that the site inspection is different than the Quarterly Visual Monitoring of stormwater required under the MSGP. Instructions for Quarterly Visual Monitoring of stormwater is included in Section 10.2.

A blank Quarterly Site Inspection form is included in Appendix I.

### 7. B.2 Response to deficiencies observed during inspections

Deficiencies in non-structural BMPs are promptly brought to the attention of management and must be corrected before the next precipitation event whenever possible, but not later than 14 days of the inspection. More complicated maintenance or repairs to structural BMPs are completed within 12 weeks after the problem is identified unless permission for a later date is granted in writing by the Department.

Records of corrective actions are retained in Appendix G of this plan.

Corrective Actions are explained further in Section E of the Introduction.

## 7. C MAINTENANCE AND REPAIR OF VEHICLES AND EQUIPMENT

Poorly maintained machinery and vehicles are more likely to leak fluids or fail to adequately perform intended functions. Testing, maintenance and repair of industrial equipment and systems is a required part of a stormwater pollution prevention plan.

The preventative maintenance program is based on continuous care of equipment and vehicles to ensure compliance with Parts I.B.1.a and III.C.7.c of the permit. Operators are responsible for bringing any observed problems to the attention of management. In turn, management responds promptly to results of inspections if problems are identified.

Equipment and vehicle maintenance is scheduled by staff under supervision of management.

## 7. D PRACTICES TO MINIMIZE SPILLS, AND SPILL RESPONSE

The majority of drums and tanks of fluid used for maintenance of equipment are stored in a covered container, away from high traffic areas. Fluids are also stored and used under cover, in the main workshop located in the steel-span structure.

A non-stationary caged tote containing waste oil is located under shelves near the entrance of the steel-span structure, out of high traffic areas. Proper transfer practices are used when adding waste oil to the tote.

Drip pans are used under trucks when leaks are detected.

28

Fluids stored in the covered container are transferred to the steel-span structure via flexible hoses to minimize the potential for spillage that could occur if fluids were transported over the ground surface in containers.

The yard is paved to prevent migration of leaked fluids into underlying soils.

Lead-acid batteries are stored under a tarp to minimize exposure to precipitation and run-on to leaks that may occur.

A spill kit stocked with appropriate materials in sufficient quantities to handle spills that may reasonably be expected to occur are available in the steel-span building.

After clean up from a spill, absorbents are promptly placed in containers for proper disposal.

Staff is trained in spill prevention and response.

As indicated in Part II.B of the MSGP, the discharge of hazardous substances or petroleum in the stormwater discharge(s) from the facility will be prevented or minimized in accordance with this plan.

Any spill of petroleum will be reported in accordance with 6 NYCRR Part 613.8. Any spill of a hazardous substance must be reported in accordance with 6 NYCRR Part 595.3.

Notification will be made to the DEC Spill hotline (1-800- 457-7362) within two hours of identifying a release meeting reporting criteria. Spills or leaks will be cleaned up immediately.

## 7. E TRAINING TOPICS

Employees receive on the job training when they are hired, when deficiencies are identified, and when changes in operations or site conditions change. In addition, all employees attend a formal annual training on the following topics according to their responsibilities:

- Purpose of SWPPP
- Spill prevention and response (including preventative maintenance through proper collection and transfer or reclaimed liquids, maintenance of liquid storage areas, and proper disposal of waste fluids).
- Good housekeeping
- Material management practices
- Used battery management
- How to recognize unauthorized discharges
- How to evaluate the condition and maintenance needs of stormwater controls and equipment that may contribute to contamination of stormwater if not functioning properly (importance of preventative maintenance).
- Proper handling and storage of lead-containing material Management of spent solvents
- Management of used oil
- Proper sampling and reporting procedures
- How to identify when corrective actions are required

Completed training records are available in Appendix E.

A blank training tracking form is available in Appendix I.

## 7. F ELIMINATION OF NON-STORMWATER DISHARGES

The MSGP does not authorize non-stormwater discharges associated with the activities at this facility.

Dry cleanup methods are used to remove leaked fluids from the ground. Spills are not "hosed down". Discharge of wastewater is prohibited.

Discharge of washwater from truck cleaning is controlled to prevent off-site discharge.

Annual Dry Weather Flow Certification

In order to remain eligible for coverage of stormwater discharges under the MSGP, facilities must certify that there are no non-stormwater discharges from the facility (unless they are included in the list of allowable non-stormwater discharges listed in the current MSGP or authorized under a separate individual permit).

Operators are required to evaluate their facility for the presence of non-stormwater discharges on an annual basis. This plan includes a certification signed by an official signatory authority (defined in Part V. of the MSGP) for each calendar year the facility is covered under the permit. If found, unauthorized discharges must be immediately eliminated or authorized under an alternative permit.

At minimum, the certification must include:

- The date of any testing and/or evaluation
- Identification of potential significant sources of non-stormwater discharges at the site
- A description of the results of any test and/or evaluation for the presence of non-stormwater discharges
- A description of the evaluation criteria or testing method used and
- A list of the outfalls or on-site drainage points that were directly observed during the test

This facility uses a form found in Appendix I to document compliance with this requirement. Completed Dry Weather Flow Inspection forms are retained in Appendix F.

31

## 7. G PREVENTING DISCHARGE OF WASTE, GARBAGE AND FLOATABLES

Solid materials, including floating debris, are prevented from being discharged to the New York City Municipal Separate Storm Sewer System by diligent implementation of good housekeeping procedures, including careful maintenance of the yard and frequent inspection/maintenance of the perimeter of the facility to prevent accumulation of materials that may become windborne or conveyed off-site.

Dumpsters are kept covered.

## 7. H MINIMIZING GENERATION OF DUST AND OFF-SITE TRACKING OF RAW, FINAL OR WASTE MATERIALS

The MSGP requires facilities to minimize the tracking of waste materials or sediments; to minimize the generation of dust; and minimize the tracking or blowing of raw, final, or waste materials form areas of no exposure to exposed areas.

This facility minimizes the tracking of materials by managing waste and litter.

Staff maintains the yard, with special attention to metal working areas, dumpster storage areas and entrances to ensure that any loose material is efficiently removed.

Routine inspections include attention to indoor workspaces and storage areas to ensure that materials are not tracked to exposed areas of the facility.

## 7. I MINIMIZING EROSION AND SEDIMENTATION

### 7. I.1 Minimizing Soil Erosion

The yard is impervious. Paved surfaces are repaired as needed.

32

## 7. J TRADITIONAL STRUCTURAL BMPS USED TO MINIMIZE EXPOSURE OF STORMWATER TO POLLUTANTS

One hundred percent of the active yard is paved and considered functionally impervious.

Parts that are likely to leak or convey dissolved metals in stormwater are stored under cover to the maximum extent possible.

Lead acid batteries are covered.

Tires are stored in containers.

Equipment and fluids are stored, to the maximum extent possible, in enclosed containers or under cover.

Vehicles are maintained and repaired under cover in the steel-span structure to the maximum extent possible.

## 7. K SALT PILES

There are no salt storage piles in exposed areas at this facility. Bags of salt are stored under cover.

## 7.L LEAD- AND MERCURY-CONTAINING MATERIALS

Lead –acid batteries are covered.

There are no mercury-containing switches changed or serviced at the facility.

## 7.M RESERVED

## 7.N RESERVED

## 7.0 RESERVED

## 7. P SECTOR P- SPECIFIC REQUIREMENTS

Materials and industrial activities associated with the Five Star Carting truck maintenance yard are described by Standard Industrial Classification (SIC) code 4212 and are covered under Sector P of the MSGP.

Part VIII.P of the MSGP identifies several categories of associated environmental concerns that must be addressed in order to maintain coverage. Stormwater best management practices addressing these concerns are integrated throughout the plan.

### 7. P.1 Summary of Potential Pollutant Sources

A summary of potential pollutant sources is included in Section 3.1.

### 7 P.2 Inspections

A summary of inspection procedures is included in Section 7.B.

### 7. P.3 Good Housekeeping

Good housekeeping procedures in all areas are included in Section 7.A.

### 7. P.4 Management of Used Oil and Spent Solvents.

Practices intended to minimize the potential for discharge of used oil and spent solvents are included in Section 7.A, (Good Housekeeping), 7.D. (Practices to Minimize Spills, and Spill Response), and 7.E. (Training).

After draining used oil from vehicles, it is transferred to a caged tote for storage until being transported off-site by an approved recycler.

Used oil filters are drained before disposal.

Spent solvents are recycled.

### 7 P.5 Battery Management

Practices addressing battery management are included in Section 7.A, (Good Housekeeping), 7.D. (Practices to Minimize Spills, and Spill Response), and 7.E. (Training).

34

7. P.6 Vehicle and Equipment Storage Areas

Use of drip pans is described in Sections 7.A, 7.B and 7.D

Indoor/outdoor maintenance of vehicles and equipment is included in Section 7.A .

Use of dry absorbents to clean up spills and leaks – Sections 7.A and 7.D

Paving and covering storage areas – Sections 7.A and 7.J

7. P.7 Material Storage Areas

Indoor storage of the materials – Sections 7.A, 7.B, 7.D, 7.J

Using dry cleanup methods - Sections 7.A and 7.D

7. P.8 Vehicle and Equipment Cleaning Areas

Cleaning operations – Any vehicles cleaning is done away from outfalls. There is currently no running water at the facility. If water is available in the future, the volume of water used to clean vehicles will be controlled to prevent off-site discharge.

7. P.9 Vehicle and Equipment Maintenance Areas

Performing maintenance activities indoors; using drip pans – Section 7.A, 7.D

Keeping an organized inventory of materials used in the shop – Section 7.A

Draining all parts of fluids prior to disposal – Section 7.A

Prohibiting wet clean up practices where the practices would result in the discharge of *pollutants* to stormwater drainage systems – 7.F

Using dry cleanup methods - Sections 7.A, 7.B, 7.D

Treating and/or recycling collected stormwater runoff – The Five Star Carting facility began current operations in the summer of 2016. Management will review results of laboratory analysis required under the terms of the MSGP to determine whether concentrations of pollutants are adequately controlled, and will implement further controls if necessary to meet benchmarks.

35

THIS PAGE INTENTIONALLY LEFT BLANK

# 8.0 DOCUMENTATION RELATED TO ENDANGERED SPECIES

This facility is not required to provide information related to endangered species because it is not new (to be built) and has no plans to expand the perimeter of operations beyond the existing footprint (per GP-0-12-001, Part III.C.8).

THIS PAGE INTENTIONALLY LEFT BLANK

## 9.0 DOCUMENTATION RELATED TO HISTORIC PLACES

This facility is not required to provide information related to historic and archeologically sensitive areas because it is not new (to be built) and has no plans to expand the perimeter of operations beyond the existing footprint (per GP-0-12-001, Part III.C.9).

THIS PAGE INTENTIONALLY LEFT BLANK

# 10.0 MONITORING, SAMPLING AND REPORTING

Stormwater discharges from the outfalls included in the Notice of Intent (NOI) are authorized under GP-0-12-001, provided the terms and conditions of the permit are met and the industrial activities at the site are accurately described in the NOI submitted to the Department of Environmental Conservation.

If additional outfalls are discovered after an NOI is submitted to the Department of Environmental Conservation, a Notice of Modification (NOM) will be submitted to add the outfalls to the facility's coverage.

Covered facilities are required to keep stormwater monitoring records and results collected previous to and during the term of a facility's coverage under GP-0-12-001 to be retained with the SWPPP. Records must be retained for five (5) years after termination of coverage under the MSGP.

## 10.1 TYPES OF MONITORING REQUIREMENTS

There are four individual and separate categories of monitoring requirements that apply to this facility:

• Quarterly Visual Monitoring

• Annual Benchmark Monitoring

   o  Follow-up Benchmark Monitoring   if exceedance of benchmark occurs

• Annual Dry Weather Flow Monitoring

• Annual Comprehensive Site Inspection

## 10.2 INSTRUCTIONS- MONITORING AND ANALYSIS

How to Collect and Examine or Prepare Stormwater Samples for Quarterly Visual Examination and Laboratory Analysis: Containers, Qualifying Rain Event and Sample Collections Sample Collection Procedure "Window" and Analysis

Quarterly Visual Examinations and Annual Benchmark Monitoring require the collection of grab samples of stormwater in containers. The types of containers needed, and the way the samples are analyzed are different, but they are collected in the same way, during a qualifying storm event, and during the same "window" of time from when the discharge begins.

10.2.1 Containers, Sample Storage and Shipping

### Quarterly Visual Examination

Samples collected for a Quarterly Visual Examination can be collected in any clean, clear container. Collection of at least 2 cups to 1 quart of stormwater makes it easy to examine the sample.

### Benchmark Monitoring Samples

Grab samples for lab analysis are collected in containers provided by an approved laboratory, stored and transported to the laboratory according to the directions provided by the laboratory. (Some containers contain acid, so gloves should be worn and spills must be prevented.)

Review the list of required analyses in Table 10. 1 in Section 10.2.3 and order the correct number and type of containers from an approved laboratory from Section 10.2.2.

Keep a cooler, ice packs, mailing labels (if samples will be shipped rather than driven to the lab), a Chain of Custody form, bubble wrap, labels, a Sharpie marker, enough plastic bags for containers, form and other correspondence are ready before a qualifying storm event occurs. Keep ice packs frozen so they're ready as soon as a benchmark sample is collected. Return the completed Chain of Custody form with the samples. The laboratory completes the portion of the form that states when the laboratory received the sample. Keep a copy of the completed Chain of Custody forms in Appendix D.

39

## 10.2.2 Find an approved laboratory

The laboratory analyzing your samples must perform analysis according to test procedures approved under 40 CFR Part 136, or equivalent, unless other test procedures have been specified in the permit.

There are several laboratories approved by New York State Department of Health for analysis of stormwater in Manhattan, Queens and Nassau Counties at the time of this writing. Any lab included in the following Department of Health webpage that is approved for non-potable water is acceptable: http://www.wadsworth.org/labcert/elap/comm.html.

There are several laboratories approved by New York State Department of Health for analysis of stormwater in Manhattan, Queens and Nassau Counties at the time of this writing. Any lab included in the following Department of Health webpage that is approved for non-potable water is acceptable: http://www.wadsworth.org/labcert/elap/comm.html

**Manhattan**

AMBIENT GROUP, INC.
470 7TH AVENUE 12TH FLOOR
NEW YORK NY 10018
MR. SEAN M. WALLACE (212) 944 -4615

ATLAS ENVIRONMENTAL LABS CORP
255 W 36TH STREET SUITE #1503
NEW YORK NY 10018
MS. JACKIE DARVISH (212) 563 -0400

EMSL ANALYTICAL, INC
307 WEST 38TH STREET
NEW YORK NY 10018
MR. JAMES HALL (212) 290 -0051

GREEN PLANET LABS, LLC
108 W. 39TH STREET SUITE 500
NEW YORK NY 10018
MS. ALYSSA MCDONALD (718) 858 -7020

**Queens**

KAM CONSULTANTS
35-40 36TH ST
LONG ISLAND CITY NY 11106
MR. GEORGE KOUVARAS (718) 729 -1997

**Nassau**

CASCADE WATER SERVICES
113 BLOOMINGDALE ROAD
HICKSVILLE NY 11801
MR. JASON SAMUEL (800) 247 -3973

CERTIFIED LABORATORIES INC
200 EXPRESS STREET
PLAINVIEW NY 11803
MR. MARTIN MITCHELL (516) 576 -1400

NY ENVIRONMENTAL AND ANALYTICAL
LABS INC
88 HARBOR ROAD
PORT WASHINGTON NY 11050
MR. LI TSANG (516) 944 -9500

SHAPIRO ENGINEERING PC
181 SOUTH FRANKLIN AVE-STE 305
VALLEY STREAM NY 11581
MR. ROBERT LOPINTO (516) 791 -230

10.2.3 Sample Collection Frequency and Analysis

**Quarterly Visual Examinations** - See Section 10.4.

**Benchmark Monitoring Samples**

Stormwater samples are collected and analyzed once per calendar year at each outfall identified in Figure 6.2 for the benchmarks associated with Sector P unless a legitimate and appropriate waiver is claimed.

Each annual Benchmark Monitoring sample is analyzed for the parameters found in Part VIII.P of the permit, and included in Table 10.1 of this plan.

The type of sample collection and analysis known as Benchmark Monitoring is so named because the results of analysis of the samples performed at an approved laboratory must be compared with "benchmark" cut-off concentrations for pollutants of concern. This information is used to evaluate whether the stormwater controls and best management practices at the facility are adequate and are being implemented effectively.

Samples are collected and shipped to the approved lab using the instructions in Section 10.2. Results returned by the laboratory are entered into a Discharge Monitoring Report that must be submitted to NYS Department of Environmental Conservation, as directed in Section 10. 8.

**Corrective Action Samples**

If results of analysis of an annual benchmark sample exceed the benchmark cut-off concentration, a follow-up sample, called a Corrective Action sample, must be collected and analyzed to determine whether actions taken to address the source of contamination and/or stormwater treatment practices implemented to minimize pollutants being conveyed off-site were effective.

The permit only requires that a corrective action sample is analyzed for the pollutant(s) that exceeded the cut-off concentration(s), and only at the outfalls where the exceedance(s) occurred. Exception: If an exceedance occurs at a Representative Outfall, a sample must also be collected at the outfalls for which the waiver was claimed, and analyzed for the pollutant(s) of concern that exceeded the cut-off concentration.

41

Table 10.1 Required Benchmark and Compliance Monitoring Analysis

Analysis of samples of stormwater for the following benchmarks are required for facilities covered under Sector P:

| Pollutants of Concern Sector P Outfalls 001 and 002 | Benchmark Cut-offs GP-0-12-001 |
|---|---|
| Oil and Grease | 15 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/l |
| Benzene | 50 ug/l |
| Ethyl benzene | 50 ug/l |
| Toluene | 50 ug/l |
| Xylene | 50 ug/l |

## 10.2.4 Qualifying storm event

Both Quarterly Visual Examinations and Benchmark Monitoring require the collection of stormwater during a qualifying storm event.

A qualifying storm event is a measurable precipitation event of at least 0.1 inch.

- At least 72 hours must have passed since the previous measurable event.
- The 72-hour interval is waived if the preceding measurable storm did not result in a stormwater discharge.
- The precipitation can be measured using a rain gauge, or by checking local weather reports for rainfall data.

If storm event data is not collected on the day the sample is collected, a web site, such as the one in the following link may be used as a reference:

http://www.nws.noaa.gov/climate/index.php?wfo=aly

If the only discharge from an outfall during a quarter is from snowmelt, this discharge may be used to satisfy the requirement.

## 10.2.5 Sample Collection "Window"

Stormwater samples are collected during the first ½ hour to no later than 1 hour of when the discharge from an outfall begins.

## 10.2.6 Sample Collection Procedure

Samples must be collected from flowing stormwater. Do not collect samples from streams, roadside ditches where stormwater or water from other sources, soil, or other contaminants are mixed in with the sample. Hold the sample container directly under the flow of stormwater, until the sample container is filled, or if the container is too big to hold upright under the flowing stormwater, a smaller, clean, metal free container or ladle may be used to transfer stormwater to the container.

Analysis of some benchmark samples requires a small air space to be left between the surface of the sample and the cap of the sample container. Follow lab directions.

Never stand upstream of the sample bottle. Your feet could loosen sediment, and artificially raise the concentration of pollutants in the sample. Don't contaminate the sample with a dirty container cap, soiled hands, etc. Samples are not collected from standing water.

To learn to collect a sample from a shallow discharge, view the video produced by the Minnesota Pollution Control Agency:
http://www.youtube.com/watch?v=AmEJUNp44aU&feature=related

*Note that there is one difference between the instructions in the video and NYS's permit requirement, as follows: The video says the sample must be collected in the first half hour of when stormwater begins to discharge. New York State requires the sample to be collected within ½ hour to 1 hour of when stormwater begins to discharge.*

Storm event data must be collected for each sample collected. Storm event data includes the following information:

- The date the sample was taken.
- The duration of the storm event.
- The time since the last measurable storm event greater than 0.1 inch.
- The estimated rainfall for the storm event in inches.
- The estimated total volume of stormwater discharged in gallons.

A Storm Event Data form is available from the NYSDEC web site:

- http://www.dec.ny.gov/chemical/9009.html

43

# INSERT:

HOW TO DO STORMWATER SAMPLING: A GUIDE FOR INDUSTRIAL
FACILITIES - WASHINGTON STATE DEPARTMENT OF ECOLOGY FOUND
AFTER PAGE

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:20-cv-05071-ENV-VMS Document 1 Filed 10/22/20 Page 136 of 203 PageID #: 136
Case 1:16-cv-05008-NG-ST Document 1-1 Filed 05/04/17 Page 136 of 148 PageID #: 512
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 81 of 148 PageID #: 214

# How To Do Stormwater Sampling
## A guide for industrial facilities



Washington State
Department of Ecology

December 2002 (rev. 1/05)

*Publication #02-10-071*



WASHINGTON STATE
DEPARTMENT OF
ECOLOGY

*The Department of Ecology is an equal opportunity agency and does not discriminate on the basis of race, creed, color, disability, age, religion, national origin, sex, marital status, disabled veteran's status, Vietnam Era veteran's status, or sexual orientation.*

If you have special accommodation needs or require this document in an alternative format, please call *Melinda Wilson* at (360) 407-6401. The TTY number is 7-1-1 or 1-800-833-6388. Email may be sent to *mewi461@ecy.wa.gov*

# Table of Contents

**Introduction**

**Advance Planning for Stormwater Sampling** . . . . . . . . . . . . . page 1
**Deciding What To Sample** . . . . . . . . . . . . . . . . . . . . . . . . . . . page 1
**Selecting a Laboratory to Test Your Sample** . . . . . . . . . . . . . . . . page 1
**Contacting the Lab in Advance** . . . . . . . . . . . . . . . . . . . . . . . page 1
**Deciding How You Will Take The Sample** . . . . . . . . . . . . . . . . page 3
**Collecting Oil and Grease Samples** . . . . . . . . . . . . . . . . . . . . . page 3
**Determining which Discharges to Sample** . . . . . . . . . . . . . . . . page 4
**Selecting Sampling Points** . . . . . . . . . . . . . . . . . . . . . . . . . . . page 5
**Obtaining Supplies for Sampling** . . . . . . . . . . . . . . . . . . . . . . page 6

**Planning Just Prior to Stormwater Sampling** . . . . . . . . . . . . . page 7
**Being Prepared** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 7
**Choosing the Storm Event** . . . . . . . . . . . . . . . . . . . . . . . . . . . page 7

**Conducting Sampling at Your Facility** . . . . . . . . . . . . . . . . . page 9
**Checklist for Sampling** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 9
**How to Fill Sample Bottles** . . . . . . . . . . . . . . . . . . . . . . . . . . page 9
**Keeping Records** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 10
**Determining if the Sampled Storm Event
Met the Recommended Criteria** . . . . . . . . . . . . . . . . . . . . . . . page 11
**When the Sampled Storm Doesn't Meet the Recommended Criteria** . page 12

**Special Sampling Considerations** . . . . . . . . . . . . . . . . . . . . page 13
**Sampling as Stormwater Discharges from a Pipe** . . . . . . . . . . . . page 13
**Sampling from a Manhole** . . . . . . . . . . . . . . . . . . . . . . . . . . page 13
**Sampling from a Drainage Ditch or Swale** . . . . . . . . . . . . . . . . page 14
**Sampling Sheet Flow** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 14
**Sampling from a Stormwater Detention Pond or other BMP** . . . . . page 15
**Ecology Wants to Hear from You** . . . . . . . . . . . . . . . . . . . . . . page 15

**Appendix - Proper and Improper Methods of Sampling** . . . . . . page 16

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 18

# Introduction

*The purpose of this guide is to help those who operate facilities do their own sampling.*

The *Industrial Stormwater General Permit* requires that your facility conduct at least quarterly visual monitoring and sampling of stormwater and report the sampling results to Ecology. These requirements are outlined in the permit under *Section S4. MONITORING REQUIREMENTS*. This guide supports the sampling portion of the general permit but does not substitute for it.

The purpose of this guide is to help those who operate facilities do their own sampling by more fully describing the steps and procedures to be followed. This guidance will lead you to be able to sample in a way that will provide you and Ecology with meaningful results.

Sources of pollutants that may enter surface water, sediments, or ground water can be identified by sampling stormwater discharges. The results of sampling will be helpful when developing your Stormwater Pollution Prevention Plan (SWPPP), determining if your existing plan is adequate, and when implementing or assessing Best Management Practices (BMPs).

Some effort is required up front to prepare for sampling in a way that will meet requirements and provide useful data. What follows is a step-by-step procedure of what you need to do to gather and report data that will represent the quality of stormwater leaving your facility. The steps are organized to guide you through the process from start to finish of stormwater sampling.

*This guidance is an update to "How to do Stormwater Sampling" which was originally developed by Ecology's Environmental Assessment Program in 2002. The update was made in accordance with the modified The Industrial Stormwater General Permit which became effective in January 2005.*



# Advance Planning for Stormwater Sampling

## Deciding What To Sample

Before beginning your sampling, you'll need to determine the specific pollutants (water quality parameters) you are required to sample and test for. Ecology has listed these parameters on your permit cover sheet. Your parameters are based on:

◆ the standard set of parameters for all facilities,

◆ your facility's primary Standard Industrial Code (SIC Code),

◆ whether your facility discharges to an impaired (303 (d) listed) water body, and

◆ any requirements that apply to water cleanup plans (TMDLs).

All facilities must monitor for turbidity, pH, zinc, and oil and grease. Oil and grease are grouped together as a single parameter tested in the lab with a single analysis. Turbidity can be measured directly in the field using a handheld meter, or sampled and analyzed in the lab. pH must be measured in the field using either a calibrated pH meter or pH paper. You can get pH paper from a distributor of scientific/laboratory supplies or through the same laboratory that will be doing your sample analysis. Zinc, oil and grease and other parameters required by the permit (other than turbidity and pH) are measured by sending bottled samples to a laboratory for analysis.

## Selecting a Laboratory to Test Your Sample

Having identified the parameters you will need tested, the next step is to select a laboratory to perform the tests. You are required to select a lab accredited by Ecology. Accreditation assures Ecology that the lab is able to do quality testing using the analytical methods specified under Monitoring Requirements in your permit. A list of labs can be found on Ecology's website: www.ecy.wa.gov/programs/eap/labs/lablist.htm.

## Contacting the Lab in Advance

You should contact the lab well ahead of time. They will be providing you with the sampling bottles you'll need. For some water quality parameters, such as oil and grease, it is not only desirable but necessary to collect the sample directly into a specially-cleaned container, so you will need to have bottles from the lab on hand before you sample. You can also ask your lab to send pH paper along with your sample bottles.

Discuss with the lab the analytical methods they will use, as specified in the sample parameter tables included in S4. D of the general permit. The lab will provide you helpful information and explanations that go beyond the scope of this guide. If you must meet discharge limits listed in S3, Discharge Limitations, you should carefully review them with the lab.

*All facilities must monitor for turbidity, pH, zinc, and oil and grease.*

*Contact the lab well ahead of time.*

## Issues you may want to cover with the lab include:

**The type and size of bottle** that will be supplied for each water quality parameter to be sampled and tested.

**How full** to fill the bottle.

**Any safety concerns** with materials supplied by the lab.

**What you need to know about preserving your samples:** Make a note of the parameters for which bottles will have preservative inside. For some tests, a preservative is necessary. The preservative is a substance that stabilizes certain chemicals at the time of sampling so that a valid test can be done later. It is critical that you use the correct bottles because tests requiring preservative will not be valid without the correct preservative. In some cases, the wrong preservative will interfere with a test. It is important not to lose the preservative that comes in the bottles supplied by the lab.

**The kind of labels** the lab will supply for the bottles and how the labels should be filled out. The labels or tags you use to identify the samples you take must be waterproof, and if you write on them, the writing must be waterproof also.

*Ask questions - your lab can help you.*

**A description of forms** or other paperwork to submit to the lab with the samples and how to fill them out.

**Whether the lab will supply pH paper** as well as sample bottles, tags or labels for the bottles, and blank forms.

**How bottles** and other supplies from the lab will be delivered to you.

**The holding times** for each water quality parameter to be sampled and tested. A holding time is the maximum time allowed between taking the sample and doing the lab analysis. If you exceed holding time, the sample analysis is not acceptable.

**How and when you will deliver samples to the lab.** Plan with the lab how you will get the samples to them in time to begin analysis before the parameter with the shortest holding time reaches that holding time. The fastest way to deliver samples to the lab may be to do so in person, but it may be possible to ship samples (cooled in picnic coolers) and still meet holding times. If you deliver samples in person, you can pick up bottles and supplies for the next quarter at the same time.

The table (left) shows typical sampling information for the three water quality parameters that must be monitored under the Industrial Stormwater General Permit. The information you obtain from your lab may differ somewhat from this:

In many cases, the preservatives listed above come pre-measured in the sampling bottles and there is no need to check pH. Ask your lab about this.

Sampling requirements tend to use scientific words and units of measure. Temperature is measured in degrees Celsius, "C". Thermometers that we typically use in the United States measure temperature in degrees Fahrenheit, "F" and 4° C is about 39° F. But for your purposes, "Cooling to 4° C" means putting the samples on crushed ice or packed with blue ice in

**Typical Sampling Information**

| Parameter | Bottle Type | Minimum Sample Required | Holding Time | Preservation |
|---|---|---|---|---|
| Turbidity | 500 mL wide-mouthed poly | 100 mL | 48 hours | Cool to 4° C |
| Total Zinc | 1liter (L) bottle cleaned according to protocol | 500 mL | 6 months | $HNO_3$ to pH<2 Cool to 4° C |
| Oil and Grease | 1L glass jar | 750 mL (jar ¾ full) | 28 days Jar preserved in lab within 24 hours of arrival to lab. | HCl to pH<2 Cool to 4° C |

**Advance Planning for Stormwater Sampling**

an ice chest so they will be kept just above freezing. Metric units are used to measure weight, volume and distance. Liquid volumes do not use "quarts" and "cups" but use measures such as liters, "L" and milliliters "mL". Chemicals use their own scientific notation. Nitric acid for example is $HNO_3$ Be sure to have the lab explain any words or expressions that you do not understand.

## Deciding How You Will Take The Sample

Section S4.A.1 of the Industrial Stormwater General Permit states that a grab, time-proportionate, or flow proportionate sample may be taken. A grab sample is a single sample "grabbed" by filling up a container, either by hand or with the container attached to a pole. It is the simplest type of sample to collect and it is expected that most Permit holders will choose to collect grab samples. The general permit recommends that grab samples be collected within the first hour after stormwater discharge begins.

As we will discuss in the next section, oil and grease samples *must* be collected as grab samples. Some Permit holders may choose to better represent water quality parameters other than oil and grease by collecting time-proportionate or flow-proportionate samples. These samples consist of a number of subsamples taken at intervals rather than a single grab sample. The general permit recommends that time-proportionate and flow-proportionate samples be started within the first 30 minutes after discharge begins, and be taken over a two-hour period.

A time-proportionate sample is one made up of a number of small samples (subsamples) of equal volume collected at regular time intervals combined into a single large sample. A flow-proportionate sample is one made up of a number of subsamples where each subsample is collected in such a way as to represent a given amount of stormwater discharge. Time-proportionate and flow-proportionate samples provide the advantage of including a number of smaller samples (subsamples) in the sample so that the stormwater discharge is better represented than with a grab sample. Time-proportionate and flow proportionate samples can be collected either by hand or with automated equipment. Collecting them by hand is somewhat difficult and collecting them with automated equipment involves additional expenses. Additionally, flow-proportionate sampling requires some knowledge of how to measure fluid flow. A reference for automatic stormwater sampling is the book *Automatic Stormwater Sampling Made Easy* (Thrush and De Leon, 1993) published by the Water Environment Federation. It can be purchased at *www.wef.org.*

## Collecting Oil and Grease Samples

The general permit requires that oil and grease samples be collected by all permit holders. Because of the particular way oil and grease samples must be collected, this requirement may govern your overall approach to sampling.

For some parameters other than oil and grease, it is possible to sample in difficult situations by filling a container and transferring it to the sample bottle to be sent to the lab. Oil and grease samples, however, must be collected from the stormwater source directly. The sample cannot be transferred from another container because oil and grease tends to stick to the inside surfaces of containers. Since you must sample directly into the oil and grease bottle (grab sample), taking grab samples may be the easiest way to collect additional samples for the other parameters. Take samples by collecting stormwater directly from the discharge into the bottles supplied by the lab, filling each bottle one after another.

*Oil and grease samples must be collected directly into the bottle you send to the lab.*

Because oil and grease samples cannot be transferred between containers, a sample cannot be formed from separate grab samples combined together. If more than one oil and grease sample is desired from a sampling site during a storm event, additional oil and grease grab samples must be collected and analyzed separately.

Because oil and grease samples must be collected directly and not through the tubing of an automatic sampler, those using automatic samplers will still have to grab oil and grease samples by hand.



## Determining which Discharges to Sample

The first step in selecting sampling points is to consider the areas draining your facility. The site map in your SWPPP should show the drainage areas. Areas of particular concern are those where raw materials or finished product are exposed to rainfall and/or runoff, and areas where leaking fluids such as petroleum products and hydraulic fluids have the potential to enter stormwater runoff.

The next step is to determine where the runoff from each drainage area is discharged from your facility. If there are separate drainage areas with separate discharge points, stormwater sampled at one discharge sampling point may not represent the facility's stormwater quality overall.

Section S4.A.5 of the Industrial Stormwater General Permit describes the requirements for selecting sampling points:



*"Sampling must be conducted to capture stormwater with the greatest exposure to significant sources of pollution. Each distinct point of discharge offsite must be sampled and analyzed separately if activities and site conditions that may pollute the stormwater are likely to result in discharges that will significantly vary in the concentration or type of pollutants. Where*

*pollutant types do not vary, the Permittee may sample only the discharge point with the highest concentration of pollutants. However, the SWPPP must include documentation on how these determinations were made and in the description of each point of discharge, including the relative quantity (volume) of discharge and pollutants likely to be found."*

If your facility discharges stormwater collected over areas that are used for similar activities and have similar site conditions, and there is reason to believe pollutant types will be similar in such areas, a single sampling point can be used to represent several discharge points. For example, if a facility has separate discharge points but the industrial activities are similar, you can sample at just one of the discharge points. The site chosen must be the one where there is reason to believe the pollutant concentration is highest (the worst case). For example, select the discharge that drains an area with greater use and/or more equipment activity. Determining where to sample can be approached as a logical deduction, or you may want to take samples at multiple sites and use the results to determine sampling location. Documentation of how sampling sites were chosen is required in the SWPPP, as described above in the general permit.

If your facility has multiple discharge points from areas with different uses or activities, you need to determine if that will result in significant differences in the type of pollutants that may be discharged. For example, if one portion of the site is used to store raw materials and discharges separately from another portion of the site where finished product is stored, it may be necessary to take separate samples. Some initial sampling and analysis may be necessary to make this determination. Ecology expects that most facilities will be able to choose a single sample location for their site.

Making a determination of whether a discharge is likely to have stormwater quality that differs from other discharges and require separate sampling requires a review of the site map in the SWPPP with consideration to sources of pollutants in each drainage area. This should be followed up with an on site assessment of activities, sources and quantities of pollutants in each drainage area. This information will help you document your decision as to whether two or more drainage areas can be represented by a single sample site.

## Selecting Sampling Points

◆ Pipes discharging your facility's stormwater offsite.

◆ Ditches carrying your facility's stormwater offsite.

◆ Manhole access to storm sewer's carrying your facility's stormwater, so you can lower a sample bottle attached to a pole into the manhole. In general, manhole access on your property may be simpler and safer than access off property and more readily verifiable as carrying only your facility's stormwater.

These three types of sampling points are not too difficult to access and the flow within them tends to be fast enough, with enough turbulence, to allow you to collect well mixed, representative samples. In some cases, portions of industrial stormwater runoff leave a site as sheet flow. Specific approaches to sampling of pipes, ditches, manholes, grated storm drains, and sheet flow will be covered in the final section of this guide manual.

Make sure your sampling points will provide for sampling only the stormwater that comes from your facility. If the stormwater in a pipe (storm sewer) contains other discharges, move your sampling point upstream to a point where the flow is from your facility only. Also check to

see that there is no base flow in the storm sewer during dry periods. Report in your SWPPP the presence of any base flow and measure or estimate its flow rate. If it is not possible to sample only flow from your facility, document the reason for this and provide information concerning the source of the flow you are sampling.

If possible, the stormwater your facility samples should not be a mixture of your facility's stormwater with other water. Some examples of situations where a sample would be of a mixture of water sources, situations in which you should **not** sample:

## Examples of mixed water sources situations in which you should not sample:

**A ditch that carries** additional stormwater from properties upstream. In this case, the stormwater from your facility is mixed with other water and you should find a location or locations where your facility's stormwater alone can be sampled.

**A stormwater sewer or pipe** (culvert) discharges to a creek or other receiving water, the pipe being partially submerged where it discharges into the receiving water. In this case, this final discharge point will not be able to be used as a sampling point because the stormwater flow is mixed with the receiving water.

**A manhole** that carries stormwater, not only from your facility but from other stormwater sources as well. If you are grabbing a sample from a manhole but from the point where a storm sewer from your facility ends at a municipal manhole, make sure that the flow in that pipe is entirely from your facility, that the pipe is not submerged or partly submerged and that you are otherwise not prevented from collecting stormwater from your facility only. If you are not sure that a storm sewer carries only flow from your facility, the municipality may

*Base flow here refers to any water in the ditch that is not a direct result of stormwater runoff. Ground water seepage into the ditch, for example, would add base flow.*

*Manhole access can be a good sample point if it can be accessed safely and the stormwater is solely from your facility. Do **not** climb into the manhole. Use a sample bottle attached to a pole to take the sample.*

**Advance Planning for Stormwater Sampling**

*Practice sampling before you do the real thing.*

*Take time to get ready for sampling.*

have storm sewer plans to help you determine this. Contact the municipality beforehand to discuss sampling from the manhole and associated safety issues, particularly for manholes in areas with vehicular traffic.

It is important to sample flow from only your facility if possible because otherwise it cannot be determined what the sample actually represents. If you discharge stormwater to a stormwater conveyance system that includes stormwater from other sources, you need to sample before your stormwater commingles with stormwater from other sources. However, if stormwater runs onto your property in an uncontrolled fashion (for example, sheet flow) from adjacent property, into areas of industrial activity on your site so that it becomes a part of the stormwater discharge from your site, this should be included in your sample of stormwater discharge. If you are concerned about this offsite source, you may want to sample that stormwater where it enters your property. If the results show significant pollution, you may want to provide Ecology with a narrative description of the contributing site and sample results to document the relative contribution of the other property or upstream source.

It is a good idea to observe the sampling point(s) you have chosen during actual stormwater runoff conditions to see how readily stormwater can be sampled there. Keep in mind that changing tides and flow conditions in receiving waters, including flood stages may occur during storm events. This may cause a pipe that is discharging your facility's stormwater to become submerged or partly submerged, preventing you from sampling during some conditions.

## Obtaining Supplies for Sampling

The supplies you will want to have on hand before sampling include:

◆ Sampling bottles from the lab, including a few extra of each type.

◆ When needed, a pole to hold sample bottles and filament strapping tape.

◆ Powder-free disposable nitrile or latex gloves (sold by medical and laboratory suppliers). Do not use powdered gloves as the powder may contain metals that could contaminate metals samples such as zinc.

◆ Foul-weather gear.

◆ One or more picnic coolers (depending on the number of samples to be stored and transported or shipped).

◆ A bound notebook to serve as a field book for keeping records concerning sampling. Notebooks with waterproof pages are available for these field notes at office supply stores. The information to be included in the notes will be described in the "Keeping Records" section of this guide.



**Advance Planning for Stormwater Sampling**

# Planning Just Prior to Stormwater Sampling

Now that the bulk of the planning for sampling is complete, there are a few things to keep in mind before deciding to actually begin sampling.

## Being Prepared

It is important to assemble everything that will be needed for the sampling event ahead of time because opportunities to sample during storm events often come with little advanced notice. Complete the identification tags and Lab Services Required form. Place the tags, lab form, field notebook, permanent ink pen, meter, and pH paper in the cooler with the sample bottles. Have re-sealable plastic bags or other means on hand to keep the pH paper dry. If you are using a turbidity meter or pH meter, be prepared to protect them from the rain. Have foul-weather gear ready and available. It will be necessary to keep sufficient ice on-site or plan to purchase ice that day.



## Choosing the Storm Event

Now you are ready to sample. Successful sampling is first and foremost a matter of being at the right storm event at the right time. What follows is some guidance on how to do that.

The general permit recommends that the storm event to be sampled must meet the following two conditions:

**1.** Be preceded by at least 24 hours of no greater than trace precipitation.

**2.** Have an intensity of at least 0.1 inches of rainfall (depth) of rain in a 24-hour period.

If the above criteria can't be met, the permittee must still collect and submit stormwater sampling results in accordance with the general permit. A permittee is required to sample only once in a sample collection period and use its best efforts to achieve the above recommended sample collection criteria. If a sample is taken and the recommended sample collection criteria are not met, the permittee is not required to conduct additional sampling for that sample collection period.

Success in collecting grab samples requires being ready to go as soon as the decision is made to sample during a particular storm event. It is especially important to be at-the-ready because the permit recommends that grab samples be collected during the first hour of stormwater discharge. Note that the permit recommends that the sample be taken within the first hour after discharge from your facility to a point off site, not from when rainfall begins.

You will increase your chances of meeting the second recommended criterion for rainfall intensity at a minimum of effort if you evaluate weather forecasts before deciding whether or not to sample a particular rain event.

*Sample during a hard (intense) rain event.*

If your facility is located in an area that is covered by a standing snow pack for days at a time during a year of normal precipitation, you may alternatively sample a snowmelt event during the winter or spring quarter. The recommended sampling conditions for a snowmelt event are as follows:

**1.** It is preceded by at least 24 hours of no greater than *trace* precipitation.

**2.** The snowmelt is generated by a rainfall or warm weather melt-producing event on a standing snow pack of at least one inch in depth.

**3.** The sample is collected during the first hour of discharge from your facility that was produced by the melting snow.

Keeping up with the weather forecast and planning so that sampling can be carried out on short notice are the keys to successful sampling.

Local forecasts, including televised satellite and radar images can give an indication of the expected intensity of coming storms. The National Weather Service is an excellent source of information on upcoming storms. It also includes local current radar and satellite images. Their website: *http://www.wrh.noaa.gov/seattle.* A number of commercial websites, such as *http://www.weather.com/* and *Yahoo* also provide weather information and forecasts.

When evaluating a weather forecast, consider indications of expected intensity, for example "90% chance" rather than "50% chance" and "rain" rather than "showers." Over the telephone, National Weather Service personnel can often provide estimates of anticipated rainfall amounts. In addition to intensity, consider the predicted duration of the storm. It will be very helpful to spend time observing rain events at your site with attention to how rain intensity relates to stormwater discharges from your site, before you begin sampling.

Once the decision has been made to attempt to sample a storm event, the personnel who will be sampling should be notified and they should prepare to sample. If it does rain, they should be at the sampling sites before stormwater begins discharging so they can document the time of discharge and be ready to sample.

### Check weather forecasts.



**Planning Just Prior to Stormwater Sampling**

# Conducting Sampling at Your Facility

After you have selected a storm event and it begins raining, the personnel conducting the sampling should prepare their equipment and go to the sampling site(s). They will be collecting grab samples at the sampling site(s), placing the samples in picnic coolers containing ice, and keeping notes in a field book.

Sampling for the first time may require working out some difficulties, but after performing these duties once, future sampling will not be difficult.

## Checklist for Sampling

Because stormwater sampling is not a daily part of the workload of a facility, it is a good idea to keep a checklist of things to have prepared before sampling and to do during sampling. You can make the checklist by jotting down the things you did for the first sampling event to remember for subsequent sampling events. Update this checklist, if necessary, based on the experience you gain with each sampling event.

## How to Fill Sample Bottles

This section and an illustrated appendix at the end of this guide describe how to collect a sample properly. Collecting a grab sample can be as simple as holding a bottle under the stormwater falling from a pipe and filling the bottle properly. Still, the person doing the sampling must use care in applying the principles outlined below so that the sample will be representative of the water being sampled.

## Simple principles of good grab sample collection:

**Wear disposable powder-free gloves** when sampling.

**Grab samples with the stormwater entering directly into bottles** supplied by your lab rather than by transferring the samples from a container that may not be clean. Metal contamination of ordinary containers is common and household detergents often contain phosphorus, a tested parameter for some industries. Again, transferring the sample from another container is not an option for oil and grease samples under any circumstances.

**When holding the sample bottle** your lab has provided, keep your hands away from the opening in order to prevent contaminating the sample.

**Always hold the bottle with its opening facing upstream** (into the flow of water) so that the water enters directly into the bottle and does not first flow over the bottle or your hands.

**Sample where the water has a moderate flow** and, if possible, some turbulence, so that the stormwater discharge will be well-mixed and the sample will be representative. Sampling in still water should be avoided. Include in your field book a note about the sample location and how briskly the water appears to be moving.

**Sample from a central portion of the stormwater flow**, avoiding touching the bottom of channels or pipes so as not to stir up solid particles.

*Have your sampling kit ready to go.*

**Do not rinse or overfill the bottles.**
The bottles supplied by your lab for some parameters (ammonia and phosphorus) will include small amounts of liquid preservative (generally a few drops). Fill the bottle to about ½ inch of the top (not quite full) to ensure that no preservative is lost.

**As soon as the sample is collected,** cap the bottle and label it. It is important that the bottles are labeled correctly so that the lab will be able to identify samples by sample site and ensure proper preservation for each parameter. It is a good idea to place sample bottles in re-closable bags. Place the samples in a picnic cooler partially filled with ice. Plan to maintain ice in the picnic cooler until the samples arrive at the lab. Remember to make certain that the samples will be delivered to the lab soon enough for the lab to meet holding times.

### Oil and grease sampling raises additional concerns:

**Oil and grease floats on water** so sampling it requires special attention. Oil and grease samples must be collected directly into the sample bottles supplied by the lab because oil and grease tends to stick to the sides of containers. Do not rinse the sampling bottles beforehand or pour the sample from another container. Do not fill the bottle completely and do not pour out some of the sample if the bottle is overfilled by mistake. If you do overfill a bottle, use a new bottle instead to collect your sample. Because you only get one try at filling an oil and grease bottle, it is a good idea to have plenty of extra bottles on hand.

**Oil and grease samples should be collected** as the stormwater falls from a pipe or from a running, turbulent stream of flow when possible so the source will be well mixed. When the samples must be collected from a water surface, the person holding the bottle should plunge it below the sur-

face in a sweeping arc and then bring it upwards through the water surface again, so the water surface is broken twice by the mouth of the bottle. Be sure to note in your field book how you collected your samples as this is especially important for the oil and grease sample.

## Keeping Records

Section S5. of the general permit specifies requirements for reporting and recordkeeping. In order to comply with the requirement that lab reports include sampling date and sampling location, you will need to supply this information to the lab when submitting samples. You can do this by using the sample location as the field station identification on your labels or sample tags.

You should purchase a notebook for use in the field. Water resistant "rite in the rain" notebooks serve the purpose well. Information is available at www.riteintherain.com.

Section S5.C. requires that you record the date, exact place, method, and time of sampling or measurement, and the individual who performed the sampling or measurement (the section also specifies some requirements for lab record keeping). Record these in your field book:

◆ Time rainfall began

◆ Sampling location (when there is more than one)

◆ Date of sampling

◆ Time of sampling (and time you completed sampling if different)

◆ How you collected the sample (for example, "from a ditch by hand" or "from a manhole with the bottles on a pole")

◆ name of the sampler(s)

◆ number, types (parameters) of samples collected

*Take notes! Writing down your observations at the time of sampling is importatnt.*

◆ field measurement results (such as pH)

◆ unusual circumstances that may affect the sample results.

Entries in the field book should be made with ink. If you make an error in the field book, cross it out rather than whiting out or erasing. Number the pages of the field book consecutively. To ensure that the bound field book is a complete record, do not rip out pages from it.

It is desirable in addition, though not required by the general permit, to record the following information for each storm event sampled:

◆ number of dry days before the day the sample was collected, or a statement that there was at least one day of no greater than trace precipitation before sampling.

◆ inches of rain during a 24-hour period

◆ time of sampling as well as date

◆ date and time the rainfall began

◆ date and time the discharge began at the sampling site

◆ duration of the storm in hours

◆ inches of rainfall during the storm

The information you record for the first two items above (number of preceding days of no greater than trace precipitation and inches of rain during a 24-hour period) will serve to document that you met those recommended criteria for sampling specified in the general permit.

## Determining if the Sampled Storm Event Met the Recommended Criteria

Section S4.A. recommends that the storm event be preceded by at least 24-hours of no greater than trace precipitation. During times of clear weather, it may be obvious that this criterion has been met. When it is cloudy, you can verify that there has been no precipitation (including overnight) by installing a simple, inexpensive rain gauge at your site.

The same section of the permit also recommends that the storm have a rainfall intensity of at least 0.1 inches of rain in a 24-hour period. This does not mean that the rainfall must last for a full 24 hours, only that from the time it begins raining to the time you stop sampling, the rainfall be of the recommended intensity or greater. To determine this, you should observe and record the time it began raining as well as the time you stopped sampling. What the storm does after you stop sampling is of no concern. In addition to the times rainfall began and sampling ended, your rain gauge will give you all of the information you need to easily calculate the rainfall intensity.

### An example rainfall intensity calculation:

*Rainfall begins at 9:35 AM (you empty the rain gauge beforehand)*

*Stormwater discharge at your sampling site begins at 10:05*

*You complete sampling at 10:30*

*Your rain gauge shows 0.01 inches of rain when you stop sampling*

*Rain intensity*
= 0.01 inches / 55 minutes
= 0.00018 inches/minute
= 0.00018 inches/minute
   x 60 min/hr
   x 24 hrs/24 hrs
= 0.26 inches/ 24 hours

*The criterion for rain intensity is 0.1 inches / 24 hours. 0.26 is greater than 0.1, so the storm event you sampled meets the recommended criterion.*



*A simple, inexpensive rain gauge mounted on a post. A rain gauge such as this one provides accurate readings at the low rainfalls often associated with the period from the beginning of rainfall to the end of sampling. The gauge can be removed and the water that has collected in it dumped out between rains.*

If you do not have a rain gauge, you will have to rely on rainfall data from other sources. The National Oceanographic and Atmospheric Administration (NOAA) posts daily rainfall records on their website: *http://www.wrcc.dri.edu/ state_climate.html.* (Note that there is an underline between "state" and "climate," but no space, in this web address). The data posted is only for the previous day, so you will have to make sure you don't miss the internet posting. A disadvantage of relying on this data is that it is a measure of nearby rainfall but not that from your site. A further disadvantage is that it gives you only daily (24-hour) rainfall data and, while this may indicate a rainfall of less than 0.1 inches in some cases, you may have had sufficient rainfall intensity at your site to meet the recommended criterion of the general permit, had you measured it with a rain gauge.

*Get the best sample you can.*

## When the Sampled Storm Doesn't Meet the Recommended Criteria

There may be times when you start to sample but the rainfall intensity turns out not to meet the recommended criterion of the general permit. Or despite your best efforts, you are unable to collect grab samples during the first hour of a storm event that meets the recommended criterion for preceding dry conditions. When this happens, the general permit states that the permittee must still collect and submit stormwater sampling result, and must include an explanation with the monitoring report identifying what recommended criteria were not met and why.



# Special Sampling Considerations

Safety should be the primary consideration in sampling. Samples should never be collected in a way that compromises the safety of the sampler. In cases where a physical hazard such as a trip hazard or when sampling near deep water bodies, samplers should work in pairs. Do not wade in water where the estimated depth in feet times the velocity in feet per second is equal to or greater than 8, as swift currents can lead to drowning accidents. Be aware of the slip hazard common near the banks of water bodies and decide whether a bank is too steep to negotiate safely. Safety comes down to individual judgment. Never put yourself in a position you consider to be unsafe.

Collecting grab samples of stormwater is basically a simple process but an important one since getting good results depends on proper sampling. Samples can be collected easily in some locations, but not all stormwater discharges are as readily sampled as the flow in a ditch or from a pipe falling into a receiving water. Below are some situations you may encounter and suggested approaches for handling them. Because oil and grease samples must be collected directly into the bottle supplied by the lab we will consider only methods for collecting samples directly by hand or with a bottle attached to a pole. When sampling in these or other situations, keep in mind the steps outlined in the section, *How to Fill Sample Bottles*.

## Sampling as Stormwater Discharges from a Pipe into a Receiving Water

If stormwater is being discharged from your facility through a pipe into a ditch, creek, or other receiving water, it can be readily sampled as it falls from the pipe before it reaches the receiving water if the discharge pipe is safely accessible and not submerged. Hold the bottles with the bottle opening facing upstream (into the flow and be sure not to overfill them. You may need to fasten the collection bottles to a pole to reach the pipe. Attaching a bottle to a pole is described in the section below, *Sampling from a Manhole*.

## Sampling from a Manhole

When sampling from the manhole of a municipal storm sewer, remember to contact the municipality beforehand. Discuss sampling being sure to cover safety concerns. Open a manhole with a hook or pick axe, exercising care not to drop the manhole cover on hands or feet. **You should not, under any circumstances, enter the manhole unless trained to safely enter confined spaces**, but you can sample the flow in a manhole from above ground by taping the sampling bottles, one at a time, to a pole and lowering the pole into the manhole.

Each bottle can be fastened to the pole by holding the bottle against it and wrapping tape tightly around the bottom and the top of the bottle as you hold the bottle firmly to the pole. Filament strapping tape works well for this purpose as it is waterproof and strong. If the flow in the storm sewer is shallow, the bottle may have to be positioned horizontally with the bottle's opening somewhat higher than its bottom. When sampling in a manhole, be

*Don't take risks - know how to sample safely.*



*When sampling from a manhole, use a pole to safely sample from above ground. Avoid touching the sides of the manhole or pipes with the bottle to prevent contamination. Place the opening of the bottle upstream so that the flow enters the bottle directly.*

careful not to scrape the bottle against the sides of the pipe to avoid picking up extras solids in your sample.

Collecting into bottles with oil and grease samples with a pole is done by plunging the bottle on the pole below the water surface and back upwards. This must be done as a single motion and only once. Because you only get one try at getting a good oil and grease grab sample, it may take some practice and extra bottles to collect the amount of sample you need without overfilling the bottle. Collecting samples other than oil and grease into bottles with preservative can be done by quickly plunging the pole into the flow repeating if necessary until the bottle is most but not all of the way full. If you overfill the bottle, remove it, tape a clean bottle to the pole, and try again. Be sure, when collecting samples with a pole, to follow clean principles by keeping the pole downstream of the bottle while sampling.

## Sampling from a Drainage Ditch or Swale

If a drainage ditch carries stormwater flow from your facility offsite, and if it carries no flow other than the flow from your facility, you can sample the water in the ditch simply by placing the bottle where the flow is free, with the bottle opening facing upstream. If you cannot reach a freely flowing portion of the ditch by hand, you may need to attach the bottles, one at a time, to a pole for sampling. Follow the procedure outlined in the section, *How to Fill Sample Bottles*.

If the flow is carried in a small ditch or swale, you can install a barrier device in the channel or deepen a small area so you can gain enough depth of flow to sample directly into the bottles. Make sure to allow for sufficient time after disturbing the bottom so that the solids resulting from muddying the water will not become part of your sample.

## Sampling Sheet Flow

It is not always possible to sample stormwater runoff in locations such as ditches or pipes where the flow is concentrated. Sometimes the permittee has no choice but to select sample locations for which sheet flow is sampled before it becomes concentrated. Approaches to sampling sheet flow are described below and illustrated in the figures that follow.

In some cases, a stormwater discharge from a facility is not concentrated at any point and leaves the property in the form of sheet flow as it runs off a work area or driveway or grassy area. In this case the flow may be too shallow for the collection bottle to be filled with sample. It is often possible to find a way to collect the stormwater runoff in these situations.

One way to concentrate sheet flow is to excavate a small basin in an existing ditch or other location where stormwater runoff flows. Another approach is to install a barrier device or trough, gutter, or ditch to intercept and concentrate stormwater flow. As with other sample sites, the flow should be moving and somewhat turbulent so the samples will be well-mixed. Be sure that any excavation you do does not expose the stormwater to be sampled to newly worked soil surfaces that the runoff may erode, increasing the solids in your samples. You may want to consider lining the trough, gutter, or ditch with plastic. Be sure not to introduce materials (such as metals that include zinc) that may contaminate the samples. Sheet flow on paved areas can be concentrated and collected by constructing small bumps, similar to speed bumps.

Another way to collect samples from sheet flow is to use a special peristaltic hand pump to pump samples from shallow surface flows. This method is of limited use for collecting the samples required by the general

permit as it cannot be used to collect oil and grease samples.

Roger Bannerman of the Wisconsin Department of Natural Resources has developed simple devices to grab samples of sheet flow from paved areas, rooftops, and lawns. Though the devices are intended to be used for simple, automatic sampling, pouring a container of collected sample into other sample bottles, the ways in which they intercept and concentrate flows can be adopted for direct grab sampling.

The following figures illustrate the methods of sampling sheet flow discussed above:



*Deepening an existing ditch can allow samples to be collected directly into bottles in some cases. Be careful not to stir up solids from the sides or bottom of the ditch.*



*Runoff entering a catch basin can sometimes be collected directly into bottles by removing the grate and allowing the runoff to fall into the bottles.*



*Overland flow from vegetated areas can be sampled by constructing a shallow ditch to intercept the runoff and a deepened area to place bottles to catch the runoff.*



*Overland flow on paved areas can be sampled by constructing asphalt or concrete bumps to collect and concentrate the flow. A box positioned below ground surface in the paved area or the edge of an unpaved area can provide a place to collect samples directly into bottles.*

## Sampling from a Stormwater Detention Pond or other BMP

When stormwater from a facility discharges after flowing through a detention pond or other treatment system, sample as the stormwater flows out at the discharge point. Ponds may hold stormwater for a time before discharge begins. Sample within the first hour, preferably 30 minutes from when the pond begins to discharge.

## Ecology Wants to Hear from You

*If you have suggestions on how Ecology can improve this guidance document, have developed innovative sampling techniques, or just want to comment on stormwater sampling, please contact*

*Joyce Smith:*
*Email (preferred):*
*josm461@ecy.wa.gov*
*Telephone:*
*(360) 407-6858*

*Mail:*
*Washington State Dept of Ecology PO Box 47600 Olympia WA 98504-7600*

# Appendix - Proper and Improper Methods of Sampling



**Do not** *touch openings of bottles. Keep bottles clean to prevent contamination.*



**Do not** *allow bottle lids to touch ground. Keep lids clean to prevent contamination.*



**Do not** *sample in stagnant areas with little flow. Do not stir up bottom sediments or allow foreign materials to enter the sample bottle. (Do be careful to grab a clean sample in cases where stormwater runoff is shallow.) If the runoff is so shallow that it is not possible to sample without the sample being contaminated in the process, then find an alternative way to sample.*



**Do** *attach a bottle to a pole for sampling in manholes or when a hand sample would be in stagnant water. A boathook is used in this example and the bottle is attached to it with filament strapping tape.*



*If the water is too shallow to sample with the bottle upright on the pole, try taping it on sideways, but tilted up slightly.*



**Do not** *sample with the bottle opening facing downstream, when using a pole or sampling by hand. Water flowing past your container, pole, or hand and into the container can be contaminated by such contact.*



**Do not** *allow water to overfill the bottle, particularly not for sample bottles with preservative. Oil and grease samples should be collected from water falling into the bottle when possible, or otherwise in a single swoop.*



**Do** *sample with the opening of the bottle facing upstream, into the flow so the water will enter directly into the bottle. This is true when sampling either by hand or with a pole.* **Do** *sample water that is rapidly flowing rather than stagnant.*



**Do** *collect samples without overfilling the bottles.*

# References

Bannerman, R.T.; Owens, D.W.; Dodds, R.B.; Hornewer, N.J., 1993. *Sources of Pollutants in Wisconsin Stormwater*, Wat. Sci. Tech. Vol. 28. No. 3-5, pp 241-259.

Colorado Department of Public Health and Environment; Water Quality Control Division; Colorado Discharge Permit System, 1996. CDPS Stormwater Sampling Guidance Document.

Dodson, Roy D., 1995. *Storm Water Pollution Control: Municipal, Industrial, and Construction NPDES Compliance*, 1999, 1995. Second Edition. McGraw-Hill.

Ecology, 2005. *The Industrial Stormwater General Permit: A National Pollutant Discharge Elimination System and State Waste Discharge General Permit for Stormwater Discharges Associated with Industrial Activities*. State of Washington Department of Ecology, January 14, 2005.

Ecology, 2000, 1999. *Field Operations and Safety Manual: Environmental Assessment Program*, Washington State Department of Ecology, Environmental Assessment Program, Updated August 2000.

New Jersey Department of Environmental Protection Division of Water Quality, 1998. *General Sampling and Reporting Guidance for PAS and ADI Form*.

Thrush, Cindy and De Leon, Dana B., 1993. *Automatic Stormwater Sampling Made Easy*, Water Environment Federation.

United States Environmental Protection Agency, 1992. NPDES Storm Water Sampling Guidance. EPA 833-B-92-001.

Waschbusch, R.J.; Selbig, W.R.; Bannerman, R.T., 2000. *Sources of Phosphorus in Stormwater and Street Dirt from Two Urban Residential Basins in Madison, Wisconsin, 1994-95*. National Conference on Tools for Urban Water Resource Management and Protection Proceedings, February 7-10, 2000, Chicago, IL.

Wisconsin Department of Natural Resources Bureau of Water Management Municipal Wastewater Section – Storm Water Unit, 1994. *Wisconsin's Guidance for Industrial Storm Water Monitoring*.

Torno, Harry C., 1995. *Stormwater NPDES Related Monitoring Needs*, American Society of Civil Engineers.

## 10.3 REPRESENTATIVE OUTFALL WAIVER

The following information is to be considered to assess whether a Representative Outfall Waiver may be claimed:

Two outfalls discharging stormwater from two poorly defined subdrainage areas have been identified at this facility. All areas of the facility are one hundred percent impervious. Similar best management practices are implemented in all areas.

Outfalls 001 discharges stormwater associated with Sector P activities from DA-1. This drainage area is roughly 25,800 square feet (0.56 acres).

Outfall 002 discharges stormwater associated with Sector P activities from DA-2. This drainage area is roughly 12,900 square feet (0.28 acres).

A minor rise, approximately 5,225 square feet (0.12 acres) in area discharges to both drainage areas.

In intense storms, Outfalls 001 and 002 may also discharge stormwater overflowing from a minor depression, roughly 5,660 square feet (0.13 acres) in area.

In addition to being larger in area, the majority of industrial activities, including the majority of truck maintenance, exposed material storage and metal working occurs in Drainage Area-1, which discharges to Outfall 001. Discharges from Outfall 001 represent the worst case scenario has therefore may be considered as a representative outfall.

Representative Outfall Waiver forms are available from the NYSDEC web site: http://www.dec.ny.gov/docs/water_pdf/msgprowc.pdf

## 10.4 QUARTERLY VISUAL EXAMINATIONS RESULT EVALUATION

### 10.4.1 QUARTERLY VISUAL EXAMINATIONS MONITORING

Quarterly Visual Examinations are completed once during each of the following periods at each outfall, unless a valid waiver is claimed:

- o Quarter 1: January 1- March 31
- o Quarter 2: April 1 – June 30
- o Quarter 3: July 1-September 30
- o Quarter 4: October 1- December 31

Samples are collected in a clean, clear container as directed above. The samples are then brought to an area with good light. Observations of:

- Color
- Odor
- Clarity
- Floating Solids
- Settled Solids
- Suspended Solids
- Foam
- Oil Sheen and
- Any other obvious indicators of pollution are documented using the Quarterly Visual Examination form found in the Appendix I.

### 10.4.2 QUARTERLY VISUAL EXAMINATIONS RESULT EVALUATION

If results indicate stormwater is contaminated, the following actions are taken:

- Potential sources of contamination are identified.
- Corrective actions are implemented and recorded in Appendix G of this plan in compliance with required schedules.
- If required, the SWPPP is updated to reflect the changes to BMPs.

Records of storm event data are retained in Appendix B. Storm event data for Quarterly Visual Stormwater Monitoring do not have to be submitted to the Department of Environmental Conservation.

## 10.5 BENCHMARK SAMPLE RESULT EVALUATION

Results are compared with the benchmark cut-off concentrations in the Tables in Section 10.2.1. This information is used to evaluate whether the stormwater controls and best management practices at the facility are adequate and are being implemented effectively.

### 10.5.1 Requirements If Benchmark Cut-off Concentrations Are Exceeded

Results that are higher than benchmark cut-off concentrations indicate stormwater is contaminated at unacceptable levels. If results indicate contamination, the following actions are required:

- A diligent effort to identify potential sources of contamination is made.

- Corrective actions are implemented and recorded in compliance with required schedules. See Section E of the Introduction of this plan.

- Complete a Corrective action form. Blank forms are included in Appendix I. Retain completed forms in Appendix G. If required, the SWPPP is updated to reflect the changes to BMPs. Revisions are recorded in Appendix H.

- Facilities with an exceedance of a benchmark cutoff concentration in a calendar year must collect a stormwater sample at the *outfall* where the exceedance occurred during the first six months of the following calendar year (January 1 to June 30), and complete analysis for the pollutant(s) that exceeded the benchmark cutoff concentration. This sample collection and analysis is in addition to the sample collection required in Part IV.B.1.c (1) for the calendar year. The sample may not be collected during the same storm event as the benchmark sample collected to satisfy Part IV.B.1.c (1).

- If no *qualifying storm event* occurs during the first six months of the calendar year following the year in which the exceedance occurred, the *owner or operator* must complete the additional sample and analysis during the next six months of the year. Retain Chain of Custody forms and lab reports in Appendix C.

## 10.6 ANNUAL DRY WEATHER FLOW INSPECTION AND ANNUAL DRY WEATHER FLOW CERTIFICATION

The MSGP authorized discharges of stormwater. Other discharges, known as non-stormwater discharges or process wastewater discharges, are not authorized under the MSGP and may require other permits. To maintain compliance with the MSGP, all outfalls included in the NOI must be monitored during periods of dry weather to confirm that no discharges, other than eligible stormwater discharges are present.

The Annual Dry Weather Flow Inspection Report must include:

- Outfall locations
- The inspection date and time
- Inspection personnel
- Description of unauthorized discharge, if found
- The source of dry unauthorized discharge, if found
- Actions taken to eliminate the discharge.

A blank Annual Dry Weather Flow Inspection form and an Annual Dry is found in Section I. Completed Dry Weather Flow Inspections forms are signed by the inspector, The Annual Non-Stormwater Certification is also included in Appendix I. To maintain eligibility under the MSGP, the Certification must be signed in accordance with Part V.H. of the MSGP on an annual basis. These forms must be retained in Appendix F.

## 10.7 ANNUAL COMPREHENSIVE SITE COMPLIANCE EVALUATION

An annual comprehensive compliance evaluation must be documented at least once per calendar year. This review includes a critical comparison of actual site conditions and practices with the most current version of the SWPPP and compliance with permit requirements. At minimum, the evaluation includes the following items.

- A summary of the scope of the evaluation
- The date(s) of the inspection
- Major observations relating to the following:
  - Accuracy of map
  - Confirmation of location of drainage areas and associated outfalls
  - Pollutants of concern and risk of exposure to stormwater and run-on
  - Dry weather flow inspection
  - Evidence of erosive flows
  - Compliance with inspection and maintenance requirements
  - Compliance with training requirements
  - Integrity and effectiveness of BMPs implemented
  - Implementation of structural and non-structural best management practices identified in SWPPP
  - Compliance with monitoring and reporting requirements
  - Comparison of results of monitoring and analysis with benchmark cut-off concentrations and narrative standards
  - Identification of sources of contamination, if found
  - Integrity of stormwater diversions
  - Reporting and record – keeping compliance
  - Adequacy of Spill Control and Countermeasure (SPCC) Plan

Blank report forms and completed Annual Comprehensive Site Compliance Reports are included Appendix I. Completed reports are signed in accordance with Part V.H and are retained in Appendix F. for at least five years from the date coverage expires or is otherwise terminated. Corrective actions must be completed and recorded as needed.

THIS PAGE INTENTIONALLY LEFT BLANK

## 10.8 REPORTING REQUIREMENTS

### 10. 8.1 Annual Certification Report

Every year, all facilities covered under the MSGP must submit an Annual Certification Report to the New York State Department of Environmental Conservation Central Office. The Annual Certification Report Form asks questions about the results of monitoring and inspections conducted at a facility during a calendar year (January 1- December 31). The report is due by February 28th following the end of each calendar year. For example, reports of results of monitoring and inspections conducted during calendar year 2016 are due by February 28, 2017.

The Five Star Carting Humboldt Street facility is also required to submit a copy of the Annual Certification Report to the New York City Department of Environmental Protection Municipal Separate Storm Sewer System offices.

The Annual Certification Report asks the facility operator to summarize the facility's compliance with the permit conditions. The form asks whether required monitoring was completed, whether records were kept as required, whether results of monitoring were acceptable, and if not, whether corrective actions were completed and the Stormwater Pollution Prevention Plan was revised to reflect appropriate responses to any deficiency.

A copy of the report form and instructions can be found through the New York State Department of Environmental Conservation web page:

http://www.dec.ny.gov/docs/water_pdf/msgpanncertform.pdf

Send original reports to the DEC. Keep copies in Appendix D.

10. 8.2 Discharge Monitoring Reports

Results of Benchmark Monitoring sample analysis performed during a calendar year must be reported on Discharge Monitoring Reports (DMRs) by February 28th following the end of the calendar year.

Results from each outfall must be reported on preprinted DMRs provided by the Department. The information included in the DMRs is based on the information provided to the Department in the NOI(s) submitted to gain or modify coverage under MSGP.

The facility submits Discharge Monitoring Reports (DMRs) for each outfall discharging stormwater from industrial activity where benchmark monitoring requirements apply. Instructions for completing DMRs are included in this Section.

The DMRs must be submitted to the New York State Department of Environmental Conservation Central Office with Storm Event Data noted as directed in Section 10.2.4 of this plan.

Retain laboratory reports, Chain of Custody forms in Appendix C. Retain copies of reports submitted to the Department of Environmental Conservation in Appendix D of this plan.

The facility is also required to submit a copy of the Discharge Monitoring Report to the New York City Department of Environmental Protection Municipal Separate Storm Sewer System offices.

Original Discharge Monitoring Reports (DMRs) must be submitted to the Department of Environmental Conservation by the due date, even if a representative outfall waiver is claimed. Each DMR submitted for an outfall where a waiver is claimed must note: Representative Outfall Waiver information is included in Section 10.3.

Retain copies in Appendix D.

### 10.8.3  Corrective Action Forms and Non-Compliance Event Forms

If Benchmark Monitoring results exceed the benchmark cut-off concentrations in the MSGP GP-0-12-001, the facility is required to complete another sample collection within the first six months of the calendar year following the year the exceedance(s) occurred. The sample(s) must be analyzed for the particular parameter(s), at the outfall(s) where the exceedance occurred, or if the results were of samples from a representative outfall, then a sample must also be collected at the outfalls for which a waiver was claimed.

For exceedances of benchmark cut-off concentration:

The results of analysis of the corrective action sample(s) collected in the first six months of a year must be reported on DEC- generated Corrective Action forms by July 31 of the year in which the sample was collected.

Submit original forms to the Department of Environmental Conservation. Retain copies in Appendix D.

THIS PAGE INTENTIONALLY LEFT BLANK

DMR INSTRUCTIONS

THIS PAGE INTENTIONALLY LEFT BLANK

**Instructions for Completing a Discharge Monitoring Report in Compliance with the Multi-Sector General Permit (MSGP) for Stormwater Discharges Associated with Industrial Activity (GP-0-06-002)**

### 1. Check the Pre-printed Information on the DMR

The preprinted DMRs have been prepared based upon the information provided in the NOI form that was submitted to the Department of Environmental Conservation.

Check the following preprinted entries:

- Stormwater discharge outfalls
- Benchmarks for each drainage area at the facility
- SPDES ID – Should match the ID in the acknowledgment letter sent by the Department

If you believe that the DMR sent by the Department contains errors, contact the Department immediately so the problem can be addressed before the reporting deadline.

DMRs that are altered by the permittee will not be accepted by the Department and will be returned.

The *DISCHARGE NUMBER* is based on the outfall identifications provided in the NOI. The outfall identification number is followed by a letter. The letter represents the "limit set." The DISCHARGE NUMBERS will be the outfall ID, plus a letter. Example: If there are industrial activities included under two sectors that are being conducted in the drainage area  discharging to outfall 001, DISCHARGE NUMBERS will be 001A and 001B.

### 2. Enter the Sample Values and Units

- Enter data legibly in blue or black ink.
- Data must be reported in the units preprinted on the DMR.

- If the results of your lab analysis are reported in different units than those preprinted on the DMR, you must convert the numeric value(s) to the appropriate unit of measurement before entering on the DMR.
- Enter the sample value results from the lab in the appropriate blank boxes on the DMR.
- Only enter data in blank boxes, do not write in boxes containing asterisks.
- Do not enter units or other extraneous information (descriptive words or symbols such as "Trace", "ND", "<MDL", "Not Applicable", "None", etc) in the *SAMPLE MEASUREMENT value* boxes.
  Enter the units for each parameter in the *UNITS* column of the DMR.

## 3. Enter the Frequency of Analysis

Enter the sampling frequency in the *FREQUENCY OF ANALYSIS* column (located to the right of the sample results and units fields) as "01/YR".

## 4. Enter the Sample Type

Enter the sample type in the *SAMPLE TYPE* column for each parameter. The general permit only requires *GRAB* samples to be collected, so report "GR" on your DMR.

## 5. Enter Comments and/or Explanation

Enter storm event data in the *COMMENTS AND EXPLANATION OF ANY VIOLATIONS* section.

The storm event data must include the following information regarding the storm event(s) that was sampled in the comments section or on an attached sheet:
- Provide the date the sample was taken.
- Provide the duration of the storm event.
- Provide the time since the last measurable storm event greater than 0.1 inch.
- Provide the estimated rainfall for the storm event in inches.
- Provide the estimated total volume of stormwater discharged in gallons.

If you didn't collect the storm event data on the day you sampled, you can try the following web site: http://www.nws.noaa.gov/climate/index.php?wfo=aly

### 6. Name/Title Principal Executive Officer

Provide the name and title of the principal executive officer.

### 7. Signature and Certification

Each page of the DMR must have an original (not a photocopy), legible signature of a person with signatory authority per Part V.H of the MSGP. This person must sign and date the completed form.

**Telephone**

Enter the telephone number of the person signing the DMR.

**Date**

Enter the date of signature.

**Mail the DMR so it is received by the due date of March 31, of the year following the year in which the samples were collected.**

Case 1:20-cv-05071-ENV-SMS   Document 1   Filed 10/22/20   Page 173 of 203 PageID #: 173
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 118 of 148 PageID #: 549
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 118 of 148 PageID #: 251

Case 1:20-cv-05071-ENV-SMS Document 1 Filed 10/22/20 Page 174 of 203 PageID #: 174
Case 1:16-cv-05008-NG-ST Document 17 Filed 05/04/17 Page 119 of 148 PageID #: 550
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 119 of 148 PageID #: 252

# APPENDIX A – QUARTERLY SITE INSPECTION RECORDS

A

Case 1:20-cv-05071-ENV-SMS Document 1 Filed 10/22/20 Page 175 of 203 PageID #: 175
Case 1:16-cv-05008-NG-ST Document 17 Filed 05/04/17 Page 120 of 148 PageID #: 551
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 120 of 148 PageID #: 253

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:20-cv-05071-ENV-SMS   Document 1   Filed 10/22/20   Page 176 of 203 PageID #: 176
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 121 of 148 PageID #: 552
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 121 of 148 PageID #: 254

# APPENDIX B – QUARTERLY VISUAL MONITORING EXAMINATION RECORDS

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX C –

## BENCHMARK MONITORING RECORDS

### STORM EVENT DATA

### CHAIN OF CUSTODY FORMS

### LABORATORY REPORTS

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:20-cv-05071-ENV-SMS Document 17 Filed 10/22/20 Page 180 of 203 PageID #: 180
Case 1:16-cv-05008-NG-ST Document 17 Filed 05/04/17 Page 129 of 148 PageID #: 558
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 125 of 148 PageID #: 258

# APPENDIX D

## STORMWATER MONITORING REPORTS

### DISCHARGE MONITORING REPORTS

### FOLLOW-UP BENCHMARKS CORRECTIVE ACTION FORMS

### NON-COMPLIANCE EVENT REPORT FORMS

### ANNUAL CERTIFICATION REPORTS

Case 1:20-cv-05071-ENV-SMS   Document 17   Filed 10/22/20   Page 181 of 203 PageID #: 191
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 126 of 148 PageID #: 557
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 126 of 148 PageID #: 259

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX E – TRAINING RECORDS

Case 1:20-cv-05071-ENV-SMS   Document 1   Filed 10/22/20   Page 183 of 203 PageID #: 183
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 128 of 148 PageID #: 559
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 128 of 148 PageID #: 261

THIS PAGE INTENTIONALLY LEFT BLANK

## APPENDIX F

# ANNUAL DRY WEATHER FLOW INSPECTION FORM

# ANNUAL DRY WEATHER FLOW CERTIFICATION

# ANNUAL COMPREHENSIVE COMPLIANCE EVALUATION
# REPORTS

F

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX G – RECORDS OF CORRECTIVE ACTIONS

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:20-cv-05071-ENV-SMS Document 1 Filed 10/22/20 Page 188 of 203 PageID #: 198
Case 1:16-cv-05008-NG-ST Document 17 Filed 05/04/17 Page 133 of 148 PageID #: 504
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 133 of 148 PageID #: 266

# APPENDIX H

# STORMWATER POLLUTION PREVENTION PLAN (SWPPP)

# REVISION LOG

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX I – BLANK FORMS

THIS PAGE INTENTIONALLY LEFT BLANK

Forms on line:

Storm event form

http://www.dec.ny.gov/docs/water_pdf/msgpsedf.pdf


Quarterly visual monitoring form

http://www.dec.ny.gov/docs/water_pdf/msgpqvmf.pdf


Annual Certification Report form

http://www.dec.ny.gov/docs/water_pdf/msgpanncertform.pdf


Instructions for completing Annual Certification forms

http://www.dec.ny.gov/chemical/88650.html


Corrective Action form for Benchmark Exceedance

http://www.dec.ny.gov/docs/water_pdf/msgpcaf.pdf


Representative Outfall Waiver Form

http://www.dec.ny.gov/docs/water_pdf/msgprowc.pdf

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX J – NOTICES OF INTENT and MODIFICATION, ACKNOWLEDGMENT LETTER, CORRESPONDENCE

THIS PAGE INTENTIONALLY LEFT BLANK

Case 1:20-cv-05071-ENV-SMS Document 1 Filed 10/22/20 Page 196 of 203 PageID #: 196
Case 1:16-cv-05008-NG-ST Document 17 Filed 05/04/17 Page 141 of 148 PageID #: 572
Case 1:16-cv-05008-NG-ST Document 15-1 Filed 04/12/17 Page 141 of 148 PageID #: 274

# APPENDIX K

# THE MULTI-SECTOR GENERAL PERMIT (MSGP) FOR STORMWATER DISCHARGES ASSOCIATED WITH INDUSTRIAL ACTIVITY (GP-0-12-001)

Case 1:20-cv-05071-ENV-SMS   Document 1   Filed 10/22/20   Page 197 of 203 PageID #: 197
Case 1:16-cv-05008-NG-ST   Document 17   Filed 05/04/17   Page 142 of 148 PageID #: 573
Case 1:16-cv-05008-NG-ST   Document 15-1   Filed 04/12/17   Page 142 of 148 PageID #: 275

THIS PAGE INTENTIONALLY LEFT BLANK

# APPENDIX L - SPILL REPORTING - MSGP

L

THIS PAGE INTENTIONALLY LEFT BLANK

**Areas where spills or leaks may occur**

Spills or leaks may reasonably be expected to occur in all areas of the facility.

**First response**

1. Stop the flow if possible.

2. Immediately take measures to the spill. Contain on-land spills using dry materials. Contain spills that may enter storm drains using booms, temporary booms and drain blocks.

Dry absorbents are available in the steel-span structure.

3. Notify facility manager/owner

NAME: _____

24 hr. PHONE_____

4. In the case of large spills, immediately dial 911.

5. In the case of large spills, contact neighboring facilities that may have emergency response equipment.

6. Store used clean up materials in the non-leaking container at the office.

7. Contact DEC about disposing of clean up materials and soils or gravel contaminated by spilled fluids.

**Spill Reporting**

Any spill of petroleum must be reported in accordance with 6 NYCRR Part 613.8.

It is the owner's responsibility to determine if the spill is reportable and to report the spill, if required.

## New York State Department of Environmental Conservation

Petroleum spills must be reported to the New York State Department of Environmental Conservation (NYSDEC) Spill Hotline at 1-800-457-7362 unless they meet all of the following conditions:

- The spill is known to be less than 5 gallons; and
- The spill is contained and under control; and
- The spill has not and will not reach the State's waterways or any land; and
- The spill is cleaned up within 2 hours of discovery.

If the spill is reportable, it must be reported within 2 hours to the New York State Department of Environmental Conservation Spill Hotline (518) 457-7362

Have the following information available to the DEC:

- Name and telephone number of reporter;
- Name and address of facility;
- Time and type of incident (e.g., spill, tank failure, etc.);
- The location of the release or threat of release;
- Name and quantity of material(s) involved, to the extent known;
- The possible hazards to human health or the environment outside the facility;
- The extent of injuries, that may have occurred
- A description of actions taken or proposed to be taken in response to the release or threat of release.

After providing the above information, you will be assigned a spill number.

Based on the information provided, a NYS DEC Spill Engineer will contact you with further information.


**Follow-up Reporting**

## NYSDEC

If a spill is reported to the NYSDEC, documentation must be provided to the NYSDEC Spill Engineer so that to close the Spill File.

Contact the NYSDEC Spill Engineer to determine what information must be submitted. Information may include:

• Spill Number and facility where spill occurred;

• Date of Spill;

• Type of material and amount spilled;

• Amount of spilled material recovered;

• Location and nature of spill (i.e. tank overfill, leaking tank, etc.);

• Actions taken to contain spilled material, recover material, and remove contaminated media (i.e. soil, groundwater, etc.); and

• Additional actions required.

**USEPA**

If the spill exceeded 1,000 gallons or impacted a navigable waterway, the

Spill must be reported to EPA within 60 days:

The Regional Administrator

U.S. Environmental Protection Agency

290 Broadway

New York, New York 10007-1866

The report to EPA must include:

- Name of the facility;
- Name(s) of the owner or operator of the facility;
- Location of the facility;
- Date and year of initial facility operation;
- Maximum storage or handling capacity of the facility and normal daily throughput;
- Description of the facility, including maps, flow diagrams, and topographical maps;
- A complete copy of the SPCC Plan with any amendments;

- The cause(s) of such spill, including a failure analysis of system or sub-system in which the failure occurred;
- The corrective actions and/or countermeasures taken, including an adequate description of equipment repairs and/or replacements;
- Additional preventive measures taken or contemplated to minimize the possibility of recurrence; and
- Such other information as the Regional Administrator may reasonably require pertinent to the Plan or spill event.